UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LARRY HARRINGTON,

       Plaintiff,

v.                             Case No:  2:15-cv-322-FtM-38MRM

ROUNDPOINT MORTGAGE
SERVICING CORPORATION and
MULTIBANK 2010-1 SFR
VENTURE, LLC,

       Defendants.

_____/

**OPINION AND ORDER**[1]

This matter comes before the Court upon review of Defendants RoundPoint Mortgage Servicing Corporation's ("RoundPoint") and Multbank 2010-1 SFR Venture, LLC's ("Multibank") Motion for Summary Judgment filed on January 9, 2017. (Doc. 111). Plaintiff Larry Harrington ("Harrington") filed his Response in Opposition on January 23, 2017. (Doc. 120). Pursuant to leave granted by the Court, Defendants then filed a Reply (Doc. 125) on February 6, 2017 and Harrington filed a Sur-Reply on February 13, 2017. (Doc. 130). This matter is ripe for review.

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

## BACKGROUND

This case involves allegations that Defendants violated federal and state statutes by attempting to collect a debt through repeated automatically-dialed telephone calls without first obtaining consent to do so from the debtor. In September of 2003, Harrington and his wife, Lori Harrington (collectively, the "Harringtons"), executed an agreement (the "Construction Agreement") with Oyster Bay Homes, Inc. ("Oyster Bay") in anticipation of building a home at 3161 Rustic Lane, North Fort Myers, Florida 33917 (the "Property"). (Doc. 111-5). Notably, the Construction Agreement included Harrington's cell phone number (the "5307 Number").

On November 26, 2003, Harrington and Lori Harrington took out a loan ("Loan") with Riverside Bank of the Gulf Coast ("Riverside Bank") in connection with their purchase of the Property. (Doc. 111-3). In so doing, they executed a promissory note ("Promissory Note") in favor of Riverside Bank that was secured by a mortgage ("Mortgage") on the Property. (Doc. 111-3, 111-4). The Note and Mortgage were then put together in a file for the Loan.

In 2009, Riverside Bank was taken over by the Federal Deposit Insurance Company ("FDIC"), and in the process the FDIC acquired all of Riverside Bank's loans. (Doc. 111 at ¶ 6). Later, Multibank acquired the loan from the FDIC, who, as a result of the transaction, transmitted a file containing the Note and Mortgage (the "Loan File") to RoundPoint, Multibank's debt service company. (Doc. 111-2 at ¶ 8). The file that RoundPoint received also contained the Construction Agreement.[2] (Doc. 111-2 at ¶ 8).

---

[2] Harrington states that he never provided the Construction Agreement to Riverside Bank prior to its acquisition by the FDIC, and the record does not indicate exactly how it arrived in the Loan File. (Doc. 120-2 at ¶ 4).

The Harringtons subsequently defaulted on their obligations vis-à-vis the Note by failing to make a payment that was due on September 1, 2010. (Doc. 111-2 at ¶ 9). RoundPoint, acting as Multibank's loan servicer, tried to contact the Harringtons telephonically to discuss their obligations. (Doc. 111-2 at ¶¶ 10, 14). But, RoundPoint alleges that from September 2010 until November 29, 2010 it was unable to do so because the telephone numbers it had for the Harringtons were disconnected. (Doc. 111-2 at 21).

That purportedly changed on November 29, 2010, when Defendants allege that Harrington called to check on the status of the loan and, in so doing, provided RoundPoint with the 5307 Number.[3] (Doc. 111-2 at ¶ 20). While RoundPoint does not have a transcript of this call, an entry on an internal activity database for that day reads "BRRW CALLED RQST STATS OF ACCT." (Doc. 111-6 at 3). The next day, the 5307 Number was entered into RoundPoint's contact database for the Harringtons. (Doc. 111-6 at 3).

From November 29, 2010 until June 2, 2011, Defendants allege that only one call was placed to the 5307 number.[4] (Doc. 111-2 at ¶ 22). Nevertheless, on June 2, 2011, Defendants received a telephone call from someone purporting to be Lori Harrington, who wished to inquire about hazard insurance on the Property. (Doc. 111-9 at ¶ 3). Prior to engaging in substantive conversation, the RoundPoint representative asked a series of questions that were employed as a security mechanism to verify the caller's identity. The caller then responded to these questions by providing the Loan number, the last four digits of both Harrington's and Lori Harrington's social security number, and the Property

---

[3] Harrington disputes this allegation, claiming that he never provided RoundPoint with the 5307 Number. (Doc. 120-2 at ¶ 8).

[4] Notably, this call is outside the applicable statute of limitations.

address.  (Docs. 111-9 at ¶ 3-6; 111-10 at 2:19-3:18; 120-25 at 41:24-42:8).  Importantly, the caller was also asked for a phone number that she could be reached at, and in response she supplied the 5307 Number as the "main number."  (Doc. 111-10 at 3:19-4:1).  Harrington has since claimed that the caller was not actually Lori Harrington, but Harrington's daughter, Jamie Harrington, who called at Lori Harrington's direction and with her consent.  (Doc. 120-6 at ¶ 9, 120-3).  In any event, RoundPoint began attempting to contact the Harringtons via the 5307 Number on that day and continued to do so in the days, months, and years that followed.  (Docs. 111-2 at ¶ 27; 111-7 29-58).

On June 28, 2011, Harrington called RoundPoint to request information regarding his account.  (Doc. 111-11 at 2:6-10).  After asking a series of security questions that did not include requesting a telephone number where he could be reached, RoundPoint informed him that his mortgage was in foreclosure because the account had been behind since September 2010.  (Doc. 111-11 at 4:2-3).  The representative then stated that the account had been stopped and that RoundPoint was intent on conducting foreclosure proceedings if it did not receive payment.  (Doc. 111-11 at 5:10-15).  The representative then stated that "[RoundPoint] will not be taking any payments," but offered to send a loan modification package to work out a solution.  (Doc. 5 at 18-23).  Harrington was then directed to an attorney that had been contracted to handle the loan and told that he could receive more information about the account by following up there.  (Doc. 111-11 at 7:9-12).

Notably, the 5307 Number was part of a group of phones on a family plan paid for by Harrington.  (Doc. 129-2 at 14:19-21, 17:25).  Within the two years prior to the filing of this lawsuit, RoundPoint attempted to contact the Harringtons at the 5307 Number 264

times.  (Docs. 111-2 at ¶ 16; 120-11 at 12; 120-17 at 1-2).  Harrington testified in deposition that he only answered one of these calls, and on that occasion he hung up without speaking.  (Doc.129-2 at 46:8-11, 49:18-24).  He never requested that RoundPoint stop contacting him at that number.  (Doc. 111 at ¶¶ 26, 28).

On March 2, 2012, Multibank filed a foreclosure action in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County.  *Multibank 2010-11 SFR Venture, LLC v. Harrington et al.*, 12-CA-051326 (Fla. 20th Cir. Ct. filed March 2, 2012).  On May 5, 2014, RoundPoint received a facsimile from an attorney stating that he represented Harrington and directing all future communications to his office.  (Doc. 111-2 at ¶ 29, 111-6 at 31).  RoundPoint then ceased calling the 5307 number.  (Doc. 111-2 at ¶ 29).

On May 28, 2015, Harrington filed this action.[5]  (Doc. 1).  In the complaint, and through two subsequent amendments, Harrington claims that RoundPoint, acting on behalf of Multibank, wrongfully utilized an automatically-dialed telephone to call him repeatedly without his prior express consent, and in such a manner as to become harassing.  As a result, he alleges that the calls violated the Telephone Consumer Practices Act ("TCPA") and the Florida Consumer Collection Practices Act ("FCCPA").  Now, Defendants move for summary judgment on those claims.

## LEGAL STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a

---

[5] Interestingly, this was only one (1) day before final judgment was entered in the state-based foreclosure action against Harrington.  *See Multibank 2010-11 SFR Venture, LLC*, 12-CA-051325 (Fla. 20th Cir. Ct. May 29, 2015).

matter of law.  Fed. R. Civ. P. 56(a).  An issue is genuine if there is sufficient evidence such that a reasonable jury could return a verdict for either party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Similarly, an issue is material if it may affect the outcome of the suit under governing law.  *Id.*  The moving party bears the burden of showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In deciding whether the moving party has met this initial burden, the court must review the record and all reasonable inferences drawn from the record in the light most favorable to the non-moving party.  *Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1313 (11th Cir. 1999).  Once the court determines that the moving party has met its burden, the burden shifts to the non-moving party, who must present specific facts showing that there is a genuine issue for trial that precludes summary judgment.  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissible at trial."  *Demyan v. Sun Life Assurance Co. of Canada*, 148 F. Supp. 2d 1316, 1320 (S.D. Fla. 2001) (citing *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991)).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).  Failure to show sufficient evidence of any essential element is fatal to the claim, and the court should grant the summary judgment.  *Celotex*, 477 U.S. at 322-323. Conversely, if reasonable minds could find a genuine issue of material fact then summary

judgment should be denied.  *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992).

## DISCUSSION

While Defendants concede that they made all of the calls in question, they argue that they are entitled to summary judgment because the Harringtons consented to the calls by providing RoundPoint with the 5307 Number, and because the calls were not harassing.  Moreover, the Defendants argue that if no liability can be assessed against RoundPoint, the maker of all of the calls, none can carry over to Multibank.  In contrast, Harrington argues that summary judgment is inappropriate because he never consented to the provision of the 5307 Number, and because a determination of whether the calls were harassing is necessarily one left for a trier of fact.  Upon review, the Court finds genuine issues of material fact that preclude entry of summary judgment on both Counts.

### A.  Count I – Consent in the Context of the TCPA

Count one of the Second Amended Complaint alleges that Defendants violated the TCPA by placing numerous automatically-dialed calls to the 5307 Number without Harrington's prior express consent.  The TCPA prohibits "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone." 47 U.S.C. § 227(b)(1)(A)(iii). Notably, though, the statute contains a carve-out for calls "made with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A); *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1304–05 (11th Cir.2015).

Ability to avail oneself of the statutory carve-out hinges on the precise meaning of two phrases: the "called party" and "prior express consent."  The Eleventh Circuit has found that the "called party" denotes a phone's current subscriber, meaning the individual that pays the bills or needs the line in order to receive other calls.  *See Osorio v. State Farm Bank*, F.S.B., 746 F.3d 1242, 1251-52 (11th Cir. 2014); *see also In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 8000–01 (2015) (the Federal Communications Commission ("FCC") defines the "called party" as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan.").

Separately, through its rulemaking authority, the FCC has clarified that in the context of prior express consent, "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."   *Murphy*, 797 F.3d at 1305–06 (quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8769 (1992) (internal quotation marks omitted).

The FCC has also provided additional guidance as time has passed.  In 2008, the FCC issued a declaratory ruling regarding autodialed and prerecorded calls to wireless numbers by creditors in the context of pre-existing debt.  There, the FCC stated that "the provision of a cell phone number to a creditor - as part of a credit application, for example - reasonably evidences prior express consent . . . to be contacted at that number regarding the debt."   *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 564 (2008).  It further specified  "that

prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed[.]" *Id.* at 565. Importantly, the FCC established that creditors shoulder the responsibility for "demonstrating that the consumer provided prior express consent." *Id.*

1. Provision of the 5307 Number in the Loan Application

Against this backdrop, Defendants fist claim that they are entitled to summary judgment because Harrington provided the 5307 number in the Construction Agreement, and because he knew that the Construction Agreement would be provided to Riverside Bank in connection with the Loan. Harrington, however, paints a different picture. He argues that he never provided the Construction Agreement to Riverside Bank, or consented to it being placed in the Loan File. Instead, he contends that the Construction Agreement was an insular transaction with Oyster Bay.

"[T]he TCPA does not prohibit a caller from obtaining consent through an intermediary. *In re GroupMe, Inc./Skype Commc'ns S.A.R.L. Petition*, 29 FCC Rcd. 3442, 3447 (2014); *see also In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. at 564. In this regard, a third-party debt collector can lawfully make autodialed or pre-recorded calls regarding a debt incurred "to a wireless number that the consumer had provided to the creditor, which the creditor had then passed along to the debt collector." *Id.* at 3446. Nevertheless, "the intermediary may only convey consent that has actually been provided by the consumer; the intermediary cannot provide consent on behalf of the consumer." *Id.* at 3447.

Defendants cite a line of cases, most notably *Mais v. Gulf Coast Collection Bureau, Inc.,* 768 F.3d 1110, 1113 (11th Cir.2014)*,* and *Johnson v. Credit Prot. Ass'n, L.P.*, No. 11-80604-CIV, 2012 WL 5875605 (S.D. Fla. Nov. 20, 2012), that they contend shows that prior express consent can be provided by an intermediary. But, while those cases indicate two ways in which prior express consent can be transmitted through an intermediary, neither provides firm ground for summary judgment.

First, in *Mais*, the plaintiff experienced an emergency requiring him to seek medical assistance. *Mais*, 768 F.3d at 1113. Upon arriving at the hospital, his wife filled out admissions documents that required the provision of her husband's cell phone number and an express acknowledgment that the hospital would use the information for the purposes of payment, including to third-party providers by whom he would be treated. *Id.* at 1113-114. The plaintiff was then admitted to the hospital, where he received specialized services from a third-party hospital-based provider. *Id.* at 1114. In so doing, the plaintiff incurred a debt to the provider, who then referred the debt to its billing company. *Id.* The billing company then retrieved the plaintiff's telephone number from the hospital and billed the plaintiff. *Id.* When the plaintiff did not pay or dispute the debt, the billing company forwarded his account to a debt collection company. *Id.* After the billing company called the plaintiff's cell phone a number of times, the plaintiff filed a TCPA action. *Id.* On an appeal, the Eleventh Circuit found that the hospital's admittance forms explicitly contemplated the possibility that the plaintiff's information would be provided by the hospital to a third-party provider by whom he had been treated. *Id.* at 1124. Thus, they held that the man, through his wife, had provided prior express consent to be contacted through use of that information. *Id.*

Upon review, *Mais* is distinguishable from this case. First, the provision of contact information in *Mais* was explicitly mentioned in the admittance forms signed by the plaintiff's wife, whereas here, the Construction Agreement contains no such clause. *See id.* at 1113-1114. Second, the plaintiff in *Mais* did not contest his wife's provision of information, and the case did not hinge on that issue. And, most importantly, Harrington claims that he did not provide the Construction Agreement to Riverside Bank, and that he never consented for Oyster Bay to provide the Construction Agreement to any relevant party. Consequently, *Mais* is of no moment here.

*Johnson* is equally inapposite. There, the plaintiff provided his cellular telephone number to Comcast so that it could install cable services. *Johnson*, 2012 WL 5875605 at *1. Later, the plaintiff incurred an outstanding balance to Comcast that was never paid. *Id.* As a result, Comcast provided his information to a debt collection service, who contacted the plaintiff. *Id.* The plaintiff then brought a TCPA suit, arguing that he never provided Comcast with prior express consent and that any information he gave them was for installation purposes only. *Id.* at *4. Nevertheless, the court there found that nothing on the record indicated such a limitation and held that his provision of contact information during installation had amounted to prior express consent to the debt collection calls. *Id.*

The facts of *Johnson* clash with this case because the only intermediary involved there was Comcast. It was thus a linear transaction for Comcast to provide the plaintiff's information to a debt collector. Conversely, the Construction Agreement here somehow made its way from one creditor, Oyster Bay, to another potentially unrelated creditor, the FDIC, before being forwarded to a debt collector, RoundPoint. Unless altered by contract, the central idea of the FCC's guidance on the issue centers on the principle that a creditor

must be in some way connected to, or in privity with, a third-party in order for the conveyance of information to be proper. *See* 23 F.C.C. Rcd. at 564 ("[c]alls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call[,]"). The facts in *Johnson*, then, fit snugly within the penumbra of FCC guidance while the facts in this case do not. *See Johnson*, 2012 WL 5875605 at *4.

This issue is not without parallel in the Eleventh Circuit, though. In *Moise v. Credit Control Servs., Inc.*, 950 F. Supp. 2d 1251 (S.D. Fla. 2011), a plaintiff went to his doctor for treatment and provided the doctor with his cell phone number. *Id.* at 1252. As part of the treatment, the plaintiff was referred to an independent medical laboratory for testing. *Id.* When the plaintiff did not pay his bills to the laboratory, the debt was referred to a collection company that attempted to contact the plaintiff on his cellular phone. *Id.* As a result of those calls, the plaintiff filed suit against the defendant alleging violations of the TCPA. *Id.* at 1253. Saliently, the court held that "if [p]laintiff gave his cell phone number directly to [the laboratory], that would constitute consent. However, if the number was given only to [p]laintiff's treating physician, then [p]laintiff did not give prior express consent to [the laboratory] or its third party collector." *Id.* With that, the court held that "[t]o whom Plaintiff gave his number remains an issue for trial." *Id.*

The Court is inclined to echo *Moise*. A review of the record reveals that there are genuine issues of material fact as to whether prior express consent was granted through possession of the Construction Agreement. First, Harrington denies that he provided the Construction Agreement to Riverside Bank or to the Defendants, or that Oyster Bay had permission to provide it on his behalf. (120-2 at ¶¶ 4, 5). Second, neither the Note nor the Mortgage reference the Construction Agreement, and that the Construction

Agreement does not contain a waiver relating to its transmittal to other parties. (Doc. 111-5). And, while Defendants have stated that Riverside Bank provided the Construction Agreement to the FDIC in the Loan File, they do not detail how the Construction Agreement ended up in the Loan File in the first place. Defendants, therefore, have not carried their burden of demonstrating Harrington's prior express consent. Hence, summary judgment on this basis would be improper. The relation of the Construction Agreement to the Loan and how the documents proceeded to the Defendants is properly reserved for a decision by the trier of fact.

2. Provision of the 5307 Number on November 29, 2010

Defendants next argue that they are entitled to summary judgment on Count one because Harrington provided prior express consent to be contacted when he called RoundPoint on November 29, 2010 and provided the 5307 Number. In support, Defendants show a portion of RoundPoint's loan history software that shows the addition of the 5307 Number to their electronic database the day after the call. (Doc. 111-6 at 3). Defendants attempt to bolster this evidence by stating that RoundPoint's regular business procedure is to require call center representatives to request at least two (2) phone numbers during incoming calls.[6] (Doc. 111-2 at ¶ 19). Harrington, however, denies he provided the 5307 Number at any point in the November 29, 2010 call. (120-2 at ¶¶ 4, 5). He argues that Defendants' record states merely that "BRRW CALLED RQST STATS OF ACCT" and failed to indicate the identity of the caller or the substantive contents of the call. (Doc. 111-6 at 3).

---

[6] This statement is called into question by the fact that the RoundPoint representative on the June 28, 2011 call did not request even a single form of contact information from Harrington. (Doc. 111-11).

As Harrington points out, no audio or transcribed record exists of the call. Consequently, there is no hard evidence to show that Harrington provided the 5307 Number during the conversation. Where, as here, the Court is presented with differing accounts of an event, the non-movant's story must be read in the light most favorable. When doing so, Harrington's denial that he provided the 5307 Number to RoundPoint creates a genuine issue of material fact that precludes summary judgment.

3. Provision of the 5307 Number on June 2, 2011

Defendants next argue that summary judgment on Count one is proper because prior express consent was provided when an individual purporting to be Lori Harrington, called RoundPoint on June 2, 2011 and provided the 5307 Number. In response, Harrington argues that two factual disputes preclude the entry of summary judgment. First, Harrington argues that there is a factual dispute regarding whether Lori Harrington actually contacted RoundPoint on June 2, 2011 because the party on the telephone was actually Jamie Harrington. Second, Harrington argues that summary judgment would be improper because he did not authorize Lori Harrington or Jamie Harrington to provide RoundPoint with the 5307 Number.

As an initial matter, the Court finds that there is no genuine issue of material fact as to the identity of the caller on June 2, 2011. Harrington claims, and Defendants do not meaningfully rebut, that the caller was Jamie Harrington. In fact, Lori Harrington has presented both a signed declaration and deposition testimony stating that she was fighting a serious illness at the time of the call, and that she expressly told Jamie Harrington to call RoundPoint to check on insurance matters related to the Property. (Docs. 120-6 at ¶ 9; 120-24 at 9:21-10:19). This story is corroborated by Jamie

Harrington, who claims that she acted according to her mother's wishes, and purported to actually be Lori Harrington on the call. (Docs. 120-7 at ¶ 3; 120-25 at 35:3-25, 37:9-19). In order to execute her ruse, Jamie Harrington answered a number of security questions that were meant to discern the identity of the caller. (Doc. 111-10 at 2:22-3:18). Among those questions was a request for contact information. This prompted her to supply the 5307 Number. (Doc. 111-10 at 3:19-4:1).

Defendants argue that Jamie Harrington was given actual authority to call RoundPoint by Lori Harrington, who they contend had both actual and apparent authority to provide the 5307 Number in connection with the Loan. Questions of agency are normally reserved for a trier of fact, but Florida courts have found that a decision on the matter may be entered as a matter of law where the evidence is so unequivocal "that reasonable persons could reach but one conclusion." *Fernandez v. Florida Nat. Coll., Inc.*, 925 So. 2d 1096, 1100 (Fla. Dist. Ct. App. 2006); *see also Gillet v. Watchtower Bible & Tract Soc'y of Pennsylvania, Inc.*, 913 So.2d 618, 619 (Fla. 3d DCA 2005). "The essential elements of an actual agency relationship are: (1) acknowledgment by the principal that the agent will act for him or her, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Robbins v. Hess,* 659 So.2d 424, 427 (Fla. 1st DCA 1995) (citing *Goldschmidt v. Holman,* 571 So.2d 422, 424 n. 5 (Fla.1990)) . At least as it pertains to Jamie Harrington, this is exactly what happened: Lori Harrington asked and acknowledged that she would call RoundPoint, she accepted the request for action by calling RoundPoint, and Lori Harrington specifically directed Jamie Harrington to request insurance information once on the call.

Notably, actual agency in Florida does not require the principal to specify the singular acts for which his or her authority exists as long as the acts are incidental to or reasonably necessary to accomplish what is authorized. *See Board of Trustees of the City of Delray Beach Police and Firefighters Retirement System v. Citigroup Global Markets, Inc.*, 622 F.3d 1335, 1342–43 (11th Cir.2010) (finding that the principal's express authorization for its agent to execute the contract implied "the authority to do acts that are incidental to it, usually accompany it, or are reasonably necessary to accomplish it.") (citing 2 Fla. Jur.2d Agency & Employment § 47 (2005)). In this regard, Lori Harrington gave Jamie Harrington authority to call RoundPoint to request insurance information. It follows that to fulfill that request, Jamie Harrington could reasonably expect to be required to answer security questions that were incidental to the call. She did just that when she provided RoundPoint information meant to verify her identity as Lori Harrington, including the last four (4) digits of Harrington's and Lori Harrington's social security numbers, the address of the Property, and the 5307 Number.

That said, a question remains as to whether Lori Harrington, and therefore Jamie Harrington, had authority to convey the 5307 Number. As mentioned above, authority to convey a telephone number for debt collection calls can only come from the "called party." 47 U.S.C. § 227(b)(1)(A)(iii). In this regard, though Harrington has testified under oath that "we had four phones, but anybody was allowed to use them[,]" no other members Harrington's family has claimed to be a customary user of the 5307 Number. (Doc. 129-2 at 15:11-14). Moreover, Harrington has presented both deposition testimony and a sworn statement showing that he is the owner of the 5307 Number. (Docs. 120-2 at ¶ 22; 129-2 at 28:18). Finally, Harrington testified that he uses the 5307 Number as the primary

contact for Aced Interiors Drywall, a company that he owns and operates. (Doc. 129-2 at 35:25-36:22-25).  With these facts in mind, it is clear that Harrington was the called party within the meaning of the law. As such, he alone possessed the authority to consent to calls on that number.  True enough, he could authorize others to do so, but to the extent that they would, any person – including Lori Harrington, and thereby Jamie Harrington – would be acting as his agent.

Thus, although Jamie Harrington was acting with actual authority on behalf of Lori Harrington, the relevant question is whether Lori Harrington possessed the authority to provide RoundPoint with the 5307 Number in the first place.  Defendants argue that she had both actual and apparent authority.  The underpinnings of Defendants' actual authority argument centers on the fact that Lori Harrington was married to Harrington, and that she entered into the Loan as a co-signer, and therefore, a co-principal.  They argue that these factors show that both individuals had equal and actual authority to act in connection with the loan.

Harrington attempts to rebut a finding of agency by averring that neither Lori Harrington nor Jamie Harrington had actual authority to supply RoundPoint with the 5307 Number.  (Doc. 120-2 at ¶ 12).  Additionally, both Lori Harrington and Jamie Harrington have provided signed declarations and deposition testimony explicitly stating that Jamie Harrington did not receive permission to provide the 5307 Number.  (Docs. 120-6 at ¶ 9; 120-24 at 15:5-7; 120-7 at ¶¶ 3-4; 120-25 at 60:24-61:1).  That being said, in deposition Harrington testified that he had provided Lori Harrington with his personal information so that she could speak with joint creditors, and denied any memory of telling her that she

could not use that information. (Doc. 129-2 at 40:16-21). Elsewhere, he presented somewhat contradictory testimony on the issue of permission, stating:

> Q.   Did she have permission to give your personal -- use your personal information to get information from creditors?
>
> A.   No, I don't believe so.
>
> Q.   Your wife didn't have authority to use your personal financial information?
>
> A.   For what purpose?
>
> Q.   To talk to your joint creditors.
>
> A.   She generally didn't.
>
> Q.   She generally didn't talk to them?
>
> A.   Correct.
>
> Q.   But if she needed to, did she have authority to use your personal financial information?
>
> A.   Yes.

(Doc. 129-2 at 48:12-25).

In Florida, actual agency may occur where it is either expressly or implied granted. *Taco Bell of Cal. v. Zappone*, 324 So. 2d 121, 123 (Fla. 2d DCA 1975). Moreover, actual agency can even exist even where both the principal and the agent deny the relationship. *See Cleveland Compania Maritima, S.A. Panama v. Logothetis*, 378 So. 2d 1336, 1338 (Fla. 2d DCA 1980). In this regard, "[t]he existence of an agency may be shown by any substantial evidence, either direct or circumstantial and the fact of an agency is a jury question." *McCabe v. Howard*, 281 So. 2d 362, 363 (Fla. 2d DCA 1973). Consequently, though Harrington states that he did not expressly authorize Lori Harrington to provide

the 5307 Number to RoundPoint, this does not end the inquiry. To the contrary, the existence of an actual agency is called into question by Harrington's conflicting statements that Lori Harrington either possessed or did not possess authority to use his personal information when dealing with creditors, the existence of their marital relationship and that they were cosigners on the Loan. As a result of these circumstances, a genuine issue of material fact exists as to whether Jamie Harrington, through Lori Harrington, had implied actual authority to provide RoundPoint with the 5307 Number.

Defendants next contend that even if summary judgment cannot be entered on the basis that actual authority existed to convey the 5307 Number, it is appropriate because Jamie Harrington, through Lori Harrington, possessed apparent authority to do so. Unlike actual authority, the doctrine of apparent authority "rests on appearances created by the principal and not by agents who often ingeniously create an appearance of authority by their own acts." *Taco Bell of Cal.*, 324 So. 2d at 124.

Apparent authority exists "only if each of three elements are present: (a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation." *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995). Like actual authority, apparent authority can arise from express or implied consent. *Thomkin Corp. v. Miller*, 156 Fla. 388, 24 So.2d 48, 49 (1945). That said, an agent's actions, on their own, are insufficient to establish authority to act on the principal's behalf. *See Owen Indus., Inc. v. Taylor*, 354 So.2d 1259, 1262 (Fla. 2d DCA 1978); *Taco Bell of Cal.*, 324 So.2d at 124; *Smith*, 498 So.2d at 449. Moreover, even where authority is granted, the scope of the agency is limited to that which the principal has authorized the agent to do. *See Poe &*

*Assocs., Inc. v. Estate of Vogler*, 559 So.2d 1235, 1236 (Fla. 3d DCA 1990); *see also Taco Bell of Cal.*, 324 So. 2d at 124.

Using these elements, Defendants contend that the Harringtons' marital relationship and their status as co-signers on the Loan constitutes a representation upon which RoundPoint can rely that Lori Harrington (or those posing as her with her consent) had authority to convey the 5307 Number. But like the Court found in the context of actual authority, the existence and scope of any apparent authority is properly left for the trier of fact. Notably, the focal point of this inquiry is not the authority possessed by Jamie Harrington, but instead whether RoundPoint could reasonably rely on the Harrington's relationship and related dealings to infer that Lori Harrington – in actuality, Jamie Harrington – had the authority to convey the 5307 Number.

This issue has previously been confronted in *Osorio*, where a roommate of credit card debtor sued a creditor, alleging that it had violated the TCPA by using autodialed debt collection calls made by creditor's agent to roommate's wireless number. *Osorio, 746 F.3d at 1247-48*. The Court there found that although the roommate and the debtor shared an adult child, lived in the same residence, and shared a cell-phone plan, because they had never given each other authority to consent to calls from third parties, a genuine issue of material fact existed if she had implied apparent authority to convey the roommate's cell phone number. *Id.* at 1253-54.

Like *Osorio*, this case involves an individual that was not the called party, but who still provided contact information to a creditor. *See id.* at 1247. Moreover, as in *Osorio*, the called party has testified that he never gave anyone authority to consent to phone calls from third parties. *See id.* at 1253-54. Even so, Defendants attempt to distinguish

this case by arguing that the Harringtons are married whereas *Osorio* involved individuals who were not. Defendants also argue that, unlike in *Osorio*, both Harrington and Lori Harrington were co-signers on the Note and Mortgage, and thus joint obligors. These are distinctions without a difference. First, *Osorio* specifically contemplated the existence of an intra-family relationship and equated it with that of cohabitation, stating "[p]arents and cohabitants everywhere would be shocked to learn that every adult in their household is legally entitled to consent to having autodialing debt collectors call any of their cell phones." *Id.* at 1254. The court continued by noting that "[t]his is not to say that in some cases one adult might authorize another adult to do so, but we cannot say that all cohabitants possess such authority as a matter of law." *Id.* at 1254. In so holding, the Eleventh Circuit clearly indicated that an individual cannot simply gain the ability to grant prior express consent on behalf of another adult by virtue of a relationship, but rather that such a finding was fact-specific.

Second, to the extent that Defendants argue this case is different than *Osorio* because both Harrington and Lori Harrington are co-signers on the Note and Mortgage, they miss the entire basis upon which *Osorio* was decided. *Osorio* did not turn on the creditor's relationship to the parties, but rather on a party's ability to consent to calls to a number for which she was not the called party. Here, like in *Osorio*, there is a question issue of material fact as to whether Lori Harrington had the apparent authority to consent to a creditor's calls to a number for which she was not the called party. *That* is the relevant focus. Though Lori Harrington's status as a co-signor is relevant to discerning the existence of actual or apparent authority, it is not dispositive. Consequently, summary judgment is precluded by a genuine issue of material fact as to agency.

4.  Ratification

Defendants argue that even if the Court does not find that Jamie Harrington, through Lori Harrington, had actual or apparent authority to convey the 5307 Number, that Harrington ratified the consent by failing to tell RoundPoint either to stop calling, or that Jamie Harrington and/or Lori Harrington were not authorized to act for him on the June 2, 2011 phone call.

Florida courts have defined ratification as "the express or implied adoption by a person of an act or contract entered into in his behalf by another without authority."  *Port Largo Club, Inc. v. Warren*, 476 So. 2d 1330, 1333 (Fla. 3d DCA 1985).  It "requires an affirmative showing of an intention on the part of the principal to ratify the act in question." *Carolina-Georgia Carpet & Textiles, Inc. v. Pelloni*, 370 So. 2d 450, 452 (Fla. 4th DCA 1979); *see also G & M Restaurants Corp. v. Tropical Music Serv., Inc.*, 161 So. 2d 556, 557 (Fla. 2d DCA 1964) ("it is ordinarily required that for a ratification of an unauthorized act or transaction of an agent to be valid and binding, the principal shall have full knowledge, at the time of the ratification, of all material facts and circumstances relating to the unauthorized act or transaction.").  "Moreover, the required intention must be manifested in some way." *G & M Restaurants Corp.*, 161 So. 2d at 558.

In deposition, Harrington testified that he talked with Lori Harrington about Jamie Harrington's phone call after it was made. (Doc. 129-2 at 42:3-22).  That being said, Harrington did not testify that he had any knowledge of the substantive content of the call other than the fact that it concerned insurance. (Doc. 129-2 at 42:20-21).  This plainly creates a genuine question of material fact, because absent knowledge of the substantive content of the call, he could not know of the provision of the 5307 Number.  And absent

knowledge or the provision of the 5307 Number, it was not possible for Harrington to exhibit an intent to ratify the act.

## B. Count II – Harassment Under the FCCPA

Next, Defendants argue that they are entitled to summary judgment on Count two, which alleges that they violated Florida Statute § 559.72(7) by harassing Harrington through numerous automatically-dialed telephone calls. They argue that summary judgment is warranted because Harrington never answered RoundPoint's phone calls, the frequency and amount of calls to Harrington was not harassing, and that the calls were not made for the purpose of harassment.

Florida Statute § 559.72(7) prohibits "willfully communicat[ing] with the debtor or any member of her or his family with such frequency as can reasonably be expected to harass the debtor or her or his family, or willfully engag[ing] in other conduct which can reasonably be expected to abuse or harass the debtor or any member of her or his family." Fla. Stat. § 559.72(7). Notably, the statute's use of the word "willful" means that the calls must be done consciously, and thus that the statute concerns both "the purpose as well as the frequency of the creditor's calls." *Story v. J. M. Fields, Inc.*, 343 So. 2d 675, 677 (Fla. 1st DCA 1977).

The FCCPA states that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and federal courts relating to the Federal Fair Debt Collection Practices Act ("FDCPA"). Fla. Stat. § 559.77(5). In this vein, Courts in the Middle District of Florida have applied those standards when interpreting Florida Statute 559.72(7). *See Leahy-Fernandez v. Bayview Loan Servicing, LLC*, 159 F. Supp. 3d 1294, 1304 (M.D. Fla. 2016). Notably, Section 15 U.S.C. § 1692d(5) prohibits "causing

a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."

Liability pursuant to Florida Statute § 559.72(7) depends on a fact-intensive inquiry including the frequency of the calls, the legitimacy of the creditor's claim, the plausibility of the debtor's excuse, and the sensitivity or abrasiveness of the personalities of the callers. *See Story*, 343 So. 2d at 677. In some circumstances courts have given a wide birth to conduct under Section 559.72(7), finding that "unless some latitude is given the creditor to invade . . . the debtor's right of privacy . . . we may well end up with the result that the creditor will find it preferable to proceed immediately with legal action" rather than attempt to negotiate with the debtor. *Id.* (quoting *Household Finance Corp. v. Bridge*, 252 Md. 531, 543 (1969). Thus, proof of numerous calls does not automatically constitute a jury issue on liability if all must agree the creditor called only to inform or remind the debtor of the debt, to determine his reasons for nonpayment, to negotiate differences or to persuade the debtor to pay without litigation." *Id.* Even so, where reasonable efforts at persuasion or negotiation have failed, the trier of fact may consider that such communications are harassing in frequency. *See id.* In this regard, calls "should be viewed from the perspective of a consumer whose circumstances makes him relatively more susceptible to harassment, oppression, or abuse." *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1179 (11th Cir. 1985).

According to the record, RoundPoint placed at least 264 calls to Harrington and left (74) voicemails during the two (2) years immediately preceding the suit. (Docs. 111-2 at ¶ 16, 120-17). All of the telephone calls were placed between the hours of 8:00 a.m. and 9:00 p.m. (Doc. 111-2 at ¶ 13). This amounted to an average of 11 calls per month.

(Doc. 111-2 at ¶ 16). Courts in the Middle District have entered summary judgment in cases where defendants made a similar number of calls to a plaintiff. *See Waite v. Fin. Recovery Servs., Inc.*, No. 8:09-CV-02336, 2010 WL 5209350, at *1, *5-*6 (M.D. Fla. Dec. 16, 2010) (entering summary judgment in favor of a defendant who made 132 calls over a nine month period); *see also Tucker v. CBE Grp., Inc.*, 710 F. Supp. 2d 1301, 1303 (M.D. Fla. 2010) (entering summary judgment where defendant made 57 calls over a month, and up to seven calls in a single day). That said, these courts have indicated that summary judgment was proper because the volume of the calls was not accompanied by other egregious conduct, such as calling immediately after hanging up, calling multiple times in a single day, calling places of employment, calling family or friends, calling at odd hours, or calling after being asked to stop. *Waite,* 2010 WL 5209350 at *3.

This case is distinguishable from those where summary judgment has been entered because of the alleged existence of additional conduct by RoundPoint. First, Harrington provides evidence that RoundPoint often called the 5307 Number multiple times on a single day. (Doc. 120-19). Second, both Lori Harrington and Jamie Harrington have issued declarations stating that they received calls from RoundPoint on their personal cell phones regarding the debt. (Docs. 120-6 at ¶¶10-11, 120-7 at ¶ 5). Third, evidence shows that RoundPoint placed telephone calls to the 5307 Number even though the debt at issue was in active litigation and Harrington was represented by counsel. (Doc. 120-5). Finally, though RoundPoint offered to work out a loan modification package with Harrington when he called on June 28, 2011, the RoundPoint representative stated that it would no longer be taking payments and directed Harrington to an attorney who could help explain the situation. (Doc. 111-11 at 5:18-23). While it is true that the

collection of debt and negotiation of same are not mutually exclusive principles, it is foreseeable that RoundPoint's conduct could be considered to be harassing by Harrington, who continued to receive calls after being referred to RoundPoint's attorney, and indeed after the litigation process had started in the underlying foreclosure case. Considering the volume, frequency, calling habits, and the information on the record, the Court finds that there is a genuine issue of material fact as to whether RoundPoint's calls to Harrington were made with an intent to abuse or harass.

Accordingly, it is now

**ORDERED:**

Defendants RoundPoint Mortgage Servicing Corporation's, and Multibank 2010-1 SFR Venture, LLC's Motion for Summary Judgment (Doc. 111) is **DENIED**.

**DONE** and **ORDERED** in Fort Myers, Florida this 10th day of April, 2017.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record