UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| LARRY HARRINGTON,<br>　　　　　　　　　　Plaintiff,<br>-vs-<br>ROUNDPOINT MORTGAGE SERVICING CORPORATION, and MULTIBANK 2010-1 SFR VENTURE, LLC,<br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO. 2:15-cv-322-FtM-28MRM

**TRIAL BRIEF BY DEFENDANTS ROUNDPOINT MORTGAGE SERVICING CORPORATION, AND MULTIBANK 2010-1 SFR VENTURE, LLC**

Defendants, Multibank 2010-1 SFR Venture, LLC ("Multibank") and RoundPoint Mortgage Servicing Corporation ("RoundPoint") (collectively "Defendants"), pursuant to the Court's Order Granting Agreed Motion for Extension of Pretrial Deadlines (ECF No. 41) submit this Trial Brief addressing Plaintiff's claims, Defendants' affirmative defenses, and the legal standards governing the issues to be tried in this matter. In support, Defendants state as follows:

## I. INTRODUCTION

Multibank owned Plaintiff's mortgage loan before it was foreclosed. RoundPoint is a loan servicer for Multibank. This is a lawsuit initiated by Plaintiff against Defendants seeking to recover damages under the Telephone Consumer Protection Act (the "TCPA") and under the Florida Consumer Collection Practices Act (the "FCCPA") for calls allegedly made by RoundPoint to Plaintiff after his mortgage loan went into default. Under the TCPA, Plaintiff alleges that RoundPoint, acting on behalf of Multibank, called his cell phone (the "5307 Number") without his consent using an automatic dialing telephone system. *See generally*, Second Am. Compl. (ECF No. 81) ("Compl."). Under the FCCPA, Plaintiff claims that

RoundPoint, acting on behalf of Multibank, called him in such a manner as to become harassing. *See id.*

## II. FACTUAL BACKGROUND

In September of 2003, Plaintiff and his wife, Lori Harrington ("Mrs. Harrington" and together with Plaintiff, the "Harringtons") took out a mortgage loan ("Loan") with Riverside Bank of the Gulf Coast ("Riverside Bank") in connection with their purchase of property and construction of a home.  In addition to the note, mortgage, and other loan origination documents, the Harringtons also executed a construction agreement (the "Construction Agreement").  These documents were maintained by Riverside Bank in the ordinary course of its business for use in servicing the Loan.  It is customary practice for a loan originator to gather and maintain these types of documents for use in servicing a loan.

In 2009, Riverside Bank was taken over by the Federal Deposit Insurance Company ("FDIC"), and in the process the FDIC acquired all of Riverside Bank's loans and the origination files for each loan. Later, Multibank acquired the Loan from the FDIC and with it, the loan origination file, which included the Construction Agreement. When the origination file was transmitted, all of its pages were imaged by RoundPoint where they have been maintained in the ordinary course of RoundPoint's business.  (Deposition Transcript of David Hughes[1] at 133:4-25; 134:1-6).  Indeed, the only way that RoundPoint could have acquired the Construction Agreement was by transmission of the origination file; initially, from Riverside Bank to the FDIC and then, from the FDIC to RoundPoint.

On November 29, 2010, Plaintiff called RoundPoint regarding the Loan and, in so doing, provided RoundPoint with the 5307 Number. (ECF No. 111-2 at ¶ 20).  The next day, the 5307 Number was entered into RoundPoint's contact database for the Harringtons. (ECF No. 111-6 at

---

[1] Abbreviated herein as "Hughes Tr."

3).  From November 29, 2010 until June 2, 2011, only one call was placed to the 5307 Number. (ECF No. 111-2 at ¶ 22).  On June 2, 2011, RoundPoint received a telephone call from Mrs. Harrington, who inquired about hazard insurance on the Harringtons' property. (ECF No. 111-9 at ¶ 3). The RoundPoint representative asked a series of questions that were employed as a security mechanism to verify the caller's identity. The caller then responded to these questions by providing the Loan number, the last four digits of both Plaintiff's and Mrs. Harrington's social security number, and the property address. (ECF Nos. 111-9 at ¶ 3-6; 111-10 at 2:19-3:18).  Importantly, the caller was also asked for a phone number at which she could be reached, and in response, she supplied the 5307 Number as the "main number." (ECF No. 111-10 at 3:19-4:1).[2]  RoundPoint had no way of knowing that the caller was neither the subscriber for the 5307 Number or the customary user.  Plaintiff is aware that this June 2, 2011 call was made, and never informed RoundPoint that the caller did not have the authority to convey his personal information and specifically, the 5307 Number, to RoundPoint.  In fact, Plaintiff testified that Mrs. Harrington **did** have the authority to convey his personal information in order to speak with their joint creditors. (Plaintiff's Deposition Transcript[3] at 40:13-21; 43:23-25; 48:2-7; 48:16-25; Plaintiff's Response to Defendants' Request for Admissions, Defs.' Tr. Ex.[4] 37.)

Following the June 2, 2011 call, RoundPoint called the 5307 Number numerous times. However, Plaintiff testified in deposition that he only answered one of these calls, and on that occasion he hung up without speaking. (ECF No. 129-2 at 46:8-11, 49:18-24). Plaintiff did not listen to the call, and he does not know if the call was made by a human or was automated.  (*See* Plaintiff Tr. at 49:1-5).  Plaintiff never requested that RoundPoint stop contacting him at the

---

[2] Plaintiff claims that the caller was not actually Mrs. Harrington, but the Harrington's daughter, Jamie Harrington, who called at Mrs. Harrington's direction and with her consent. (ECF Nos. 120-6 at ¶ 9; 120-3.)

[3] Plaintiff's deposition transcript shall hereinafter be referred to as "Plaintiff's Tr. at 'x'."

[4] Defendants' trial exhibits shall hereinafter be referred to as "Defs.' Tr. Ex. 'x'."

5307 Number. (ECF No. 111 at ¶¶ 26, 28).   On May 5, 2014, RoundPoint received a facsimile

from an attorney stating that he represented Plaintiff and directed future communications to his

office. (ECF No. 111-2 at ¶ 29, 111-6 at 31).   RoundPoint ceased calling the 5307 number on

that date. (ECF No. 111-2 at ¶ 29).

### III. MEMORANDUM OF LAW

**A.      Legal Standard to Establish a TCPA Claim.**

The TCPA prohibits "any call (other than a call made for emergency purposes or made

with the prior express consent of the called party) using any automatic telephone dialing system[5]

or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular

telephone." 47 U.S.C. § 227(b)(1)(A)(iii).   Plaintiff bears the burden of establishing that all calls

were made to the 5307 Number, without his prior express consent and with an ATDS.  *See Smith*

*v. Microsoft Corp.*, 297 F.R.D. 464, 471 (S.D. Cal. 2014) (*citing Meyer v. Portfolio Recovery*

*Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)); *Gaza v. LTD Fin. Services, L.P.*, Case

No. 8:14-cv-1012-T-30JSS, 2015 WL 5009741, at *4 (M.D. Fla. Aug. 24, 2015).

**B.      Plaintiff Cannot Establish a TCPA Violation Occurred.**

**1.   Plaintiff Cannot Establish That an ATDS Was Used For All Calls.**

An ATDS is defined in the  TCPA as "equipment which has the capacity— (A) to store

or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers."  47 U.S.C. §227(a)(1).  It is Plaintiff's burden to show that an ATDS

was used.  *Gaza,* 2015 WL 5009741, at *4.

Interpreting the ATDS provision, the Federal Communications Commission ("FCC") has

held that "the basic functions of an autodialer are to dial numbers **_without human intervention_**

and to dial thousands of numbers in a short period of time." *In the Matter of Rules & Regulations*

---

[5] An "automatic telephone dialing system" is abbreviated as "ATDS" herein.

*Implementing the Tel. Consumer Prot. Act of 1991 Am. Ass'n of Healthcare Admin. Mgmt. et. al.*, 30 F.C.C. Rcd. 7961 (2015)  (emphasis added).  Therefore, in order for RoundPoint to have violated the TCPA in this case, Plaintiff must prove that the telephone systems at issue were (a) an ATDS and that (b) calls were made without human intervention.  *See id; see also Legg v. Voice Media Grp., Inc.,* 20 F.Supp.3d 1370, 1376 (S.D. Fla. 2014) (denying summary judgment in favor of plaintiff where plaintiff had not shown that messages were transmitted without human intervention).

The FCC left it for the courts to define the parameters of "human intervention" required to remove a phone system from the definition of ATDS.  *See id.*  Elaborating on the FCC's pronouncement, Florida courts have decided that the crucial issue is whether human intervention is required at the point at which the call is made.  *Pozo v. Stellar Recovery Collection Agency, Inc.,* 8:15-cv-929-T-AEP, 2016 WL 7851415, at *3 (M.D. Fla. Sept. 2, 2016) (". . . dialing systems which require agents to use an electronic 'point and click' function to initiate calls are not autodialers because human intervention is required to initiate the calls."); *Legg,* 20 F.Supp.3d at 1376.  Further, both the Middle and Southern Districts of Florida have found calling systems that require the calling agent to click a button to make calls required sufficient human intervention to remove the calling systems from the definition of ATDS.  *Pozo*, 2016 WL 7851415, at *4; *Strauss v. CBE Group, Inc.*, 173 F.Supp.3d 1302, 1310 (S.D. Fla. 2016), *reconsideration denied*, 2016 WL 4402270 (S.D. Fla. June 8, 2016).  To be clear, these calling systems require some action by the agent in connection with a call and therefore, the courts found that human intervention was required exempting the phone system from the definition of ATDS.  *Id.*

RoundPoint used two different telephone systems during the relevant time period.  From May 28, 2011 through March 19, 2013, RoundPoint used the Cisco phone system.  (Hughes Tr. 12:1-3).  Beginning March 19, 2013, through May 5, 2014 (when the disputed calls ceased), RoundPoint used the Cameo phone system.  (*See* Hughes Tr. 34, 3:7; RoundPoint's Comment History for Loan, Defs.' Tr. Ex. 12). During use of both telephone systems, some call representatives manually dialed calls.   (Hughes Tr. at 11:7-22; 12:1-3.)    That is, the representative picked up the phone and physically pushed the buttons to dial telephone numbers using the telephone key pad. (Hughes Tr. 11:7-22; 12:1-3).

It is not subject to reasonable dispute that RoundPoint's representatives who made calls by manually pressing buttons made calls using human intervention.  *Pozo*, 2016 WL 7851415, at *3 ("Dialing systems which require an agent to manually initiate calls do not qualify as autodialers under the TCPA"); *Wilcox v. Green Tree Servicing, LLC*, Case No. 8:14-cv-1681-T-24TGW, 2015 WL 2092671, at *5 (M.D. Fla. May 5, 2015); *Carlisle v. Green Tree Servicing*, LLC, Case No. 1:15-CV-2332-TWT, 2016 WL 4011238, at *1 (N.D. Ga. July 27, 2016) (granting summary judgment in favor of the defendant when the evidence showed that all calls were manually dialed); *Martin v. Allied Interstate, LLC*, Case No. 15-61140-Civ-Scola, 2016 WL 3619684, at *9 (S.D. Fla. June 17, 2016) (granting summary judgment in favor of defendant when testimony indicated that all calls were manually dialed); *Dennis v. Reg'l Adjustment Bureau, Inc.*, Case No. 09–61494–CIV, 2010 WL 3359369, at *3 (S.D. Fla. July 7, 2010) (granting summary judgment in favor of the defendant when call notes indicated that all calls were manually dialed).  As such, these calls did not violate the TCPA because they were not placed using an ATDS.

Other RoundPoint representatives, made calls to Plaintiff using "preview" mode.  That is, the telephony system (paired with computer hardware) presented information on a particular loan; the representative then reviewed the loan information presented and made their own personal decision about whether to place a call. (Hughes Tr. at 56:2-18).   If the RoundPoint representative decided to make a call, they pressed a button.  (Hughes Tr. at  57:22-25; 58:1-11; 59:5-9).  The representative waited while the phone rang.  (*Id.*)  The agent did not make any simultaneous calls.  (*Id.*)  The agent chose whether and when to end the call.  (Hughes Tr. at 59:12-19).  Thus, these calls made by call center employees in preview mode were not made using an ATDS because they involved human intervention in reviewing the loan prior to placing the call, affirmatively deciding whether to place a call, pressing a button to initiate the call and choosing whether and when to end the call. *See Pozo*, 2016 WL 7851415, at *4; *Strauss*, 173 F.Supp.3d at 1311 (click-to-dial preview mode required sufficient human intervention to remove equipment from definition of ATDS).

Under the TCPA, Plaintiff must prove that each call at issue was made using an ATDS and without human intervention.  Plaintiff cannot do this because he never listened to the phone calls, and because his expert, Randall Snyder ("Mr. Snyder") never investigated how individual calls were actually made or whether RoundPoint had the necessary telephone software licenses to generate calls using an ATDS.  Mr. Snyder merely reviewed the Cameo and Cisco manuals, assumed RoundPoint had all of the functionality and licenses available, assumed that RoundPoint representatives never manually dialed calls, and assumed that RoundPoint representatives only used an ATDS.  *See, e.g.,* Randall Snyder Depo. Tr. at 105:3-6; 105:15-22; 106:11-16; 106:19-25; 107:1-6).  These unsupported conclusions do not meet Plaintiff's burden

to establish that each call at issue was made using an ATDS without human intervention.[6]  *See Legg*, 20 F.Supp.3d at 1376 (denying summary judgment in favor of plaintiff where plaintiff had not proven link between evidence of ATDS and calls at issue in case); *Smith*, 2013 WL 6497073 at *5.

**C.      Defenses to Liability Under the TCPA.**

**1.      Plaintiff Consented to Calls on Three Occasions.**

Calls in which the called party provides consent are excepted from the TCPA.  *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251 (11th Cir. 2014).  The called party is "the person who pays the bills or needs the line in order to receive other calls."  *Id.*

If provided directly, consent may be evidenced by provision of a phone number in connection with the transaction which resulted in the debt by the called party.  *See Osorio*, 746 F.3d at 1251.  This includes provision of a number as part of a loan application.  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 564 (2008) ("We conclude that the provision of a cell phone number to a creditor, e.g., ***as part of*** a credit application, reasonably evidences prior express consent . . .") (emphasis added).

Once provided by the called party or his agent, consent may be transferred by the initial recipient to a third party for all purposes related to the initial transaction provided the called party does not instruct otherwise.  *Johnson v. Credit Protection Ass'n, L.P.*, Case No. 11-80604-CIV, 2012 WL 5875605 *4 (S.D. Fla. Nov. 20, 2012) (cellular number given to cable provider on work order initiating cable services constitutes consent for debt collection calls); *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 340 (6th Cir. 2016) (consent found where cell phone

---

[6] This issue of Mr. Snyder's unsupported legal conclusions was briefed by Defendants in their pending Motion to Exclude the Expert Witness Testimony of Randall Snyder.  (*See* ECF Nos. 127, 128.)

number provided to hospital, hospital provided to anesthesiologists, then anesthesiologists provided number to its debt collector).

The called party may provide consent directly, or he can imbue his agent with consent. An agent of the called party can provide consent where he has either actual or apparent authority to do so. *See Osorio,* 746 F.3d at 1251. A person has actual authority to provide a cell phone number where provision of the number is "incidental" or "is reasonably necessary" to accomplish a goal for which they have explicit authority. *See Bd. of Trustees of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Glob. Markets, Inc.,* 622 F.3d 1335, 1342–43 (11th Cir. 2010). A person has apparent authority to provide a number where the called party manifests to the third party that the agent has such authority, the third party relies upon the authority, and changes its position in reliance thereon. (ECF No. 140 at 19 (*quoting Mobil Oil Corp. v. Bransford,* 648 So. 2d 119, 121 (Fla. 1995)). Notably, actual and apparent authority can exist even where the called party denies such authority exists. *Ja Dan, Inc. v. L-J, Inc.,* 898 F. Supp. 894, 900 (S.D. Fla. 1995).

Here, it has been established that Plaintiff is the called party. (ECF No. 140 at 17). Therefore, there are four issues for determination by the Court at trial. First, whether Plaintiff provided consent in the Construction Agreement. Second, whether Plaintiff provided the 5307 Number during a conversation with RoundPoint that occurred on November 29, 2010. If the Court finds consent from either of these instances, the Court does not need to go any further. If not, third, the Court should decide whether Mrs. Harrington had either actual or apparent authority to provide the 5307 Number to RoundPoint during the June 2, 2011 call.[7] If not,

---

[7] Although the party who called RoundPoint on June 2, 2011 was actually Jamie Harrington and not Mrs. Harrington, the Court has already found that Jamie Harrington had actual authority from Mrs. Harrington to call RoundPoint on June 2, 2011 to obtain insurance information and to provide the information necessary to achieve this purpose. (ECF No. 140 at 14, 16; *see also* Mrs. Harrington Tr. at 9:21-10:2.)

fourth, the Court should decide whether RoundPoint had a good faith basis to believe Plaintiff had consented to calls to the 5307 Number as a result of any or all of the above-enumerated circumstances.

> ### a.   Plaintiff Provided Consent to Call the 5307 Number by Providing the Number in the Construction Agreement.

The Construction Agreement constitutes evidence of consent because (1) Plaintiff failed to limit the purpose for which the 5307 Number could be used on the face of the Construction Agreement, and (2) the 5307 Number was available to Riverside Bank, and subsequently the FDIC and RoundPoint, because the Construction Agreement was part of a larger financial transaction in which Plaintiff initially provided the 5307 Number to his builder, Oyster Bay Homes.

While it is true that Plaintiff provided the 5307 Number to his builder and not his lender, this is a distinction without a difference.  Plaintiff did not provide instructions limiting the use of the 5307 Number, and the Construction Agreement was a necessary part of a larger financial transaction - the purchase and construction of his house.  *Johnson v. Credit Prot. Ass'n, L.P.*, Case No. 11-80604-CIV, 2012 WL 5875605, at *3 (S.D. Fla. Nov. 20, 2012).  The FCC has said that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."  *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 F.C.C. Rcd. 8752, ¶ 9 (Oct. 16, 1992); *see also Johnson*, 2012 WL 5875605, at *3;  *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 340 (6th Cir. 2016).

In *Johnson*, the plaintiff provided his cell phone number to his cable provider on a work order in connection with the installation of his cable services.  *Johnson*, 2012 WL 5875605 *3.

He claims he gave his number to the cable provider only for purposes of cable installation and did not authorize use of the number for any other purpose. *Id.* Later, when an unrelated third-party debt collection company called him to collect the cable debt, he sued under the TCPA arguing he did not provide consent. *Id.* The court held that the consent provided to the cable company on the work order was effective as consent to collection calls by the third party. *Id.* at *4. The court reasoned that since the plaintiff failed to provide any evidence that he provided instructions limiting the use of the number to solely installation services, the simple fact that he provided the number in connection with the account on a work order was sufficient to evidence his consent to calls for any purpose related to the account by any party. *See id*; *see also Cavero v. Franklin Collection Svc., Inc*., Case No. 11–22630–CIV, 2012 WL 279448, at * 3–4 (S.D. Fla. Jan. 31, 2012) (finding no issue of fact as to consent when the plaintiff gave his cellular telephone number to his telephone and internet provider and debt collector later called).

In *Baisden*, the court came to a similar conclusion based on slightly different reasoning. *Baisden*, 813 F.3d at 340. In *Baisden*, the plaintiff provided his number to the hospital, which provided it to an anesthesiologist, who in turn provided it to his/her collection company. *Id.* The Court analyzed the various rulings by the FCC on provision of consent through an intermediary and the Eleventh Circuit's *Mais* decision and concluded that

> [C]onsumers may give 'prior express consent' under the FCC's interpretations of the TCPA when they provide a cell phone number ***to one entity as part of a commercial transaction, which then provides the number to another related entity from which the consumer incurs a debt*** that is part and parcel of the reason they gave the number in the first place.
>
> *Baisden.*, 813 F.3d at 346 (emphasis added).

Specifically, the *Baisden* court ruled that where the phone number was provided to one party as part of a larger transaction, other parties involved in the transaction had consent to use

the number.  *See id*.  Therefore, the court held that by providing the number to the hospital, plaintiff in effect made the number available for all purposes related to the transaction: "The FCC's rulings in this area make no distinction between directly providing one's cell phone number to a creditor and taking steps to ***make that number available*** through other methods like consenting to disclose that number to other entities for certain purposes."  *Id*. (emphasis in original).

Here, under either a *Johnson* or *Baisden* analysis, Plaintiff provided consent in the Construction Agreement.  While Plaintiff was securing funding for purchase of his property and construction of his home from his lender, Plaintiff provided the 5307 Number on his Construction Agreement.  Just like in *Johnson*, there is no evidence he ever limited use of the 5307 Number solely to use by his builder.  Because Plaintiff never provided "instructions to the contrary" indicating that his lender could not use the 5307 Number provided to his builder, Plaintiff's provision of the 5307 Number in the Construction Agreement is sufficient evidence of consent.

Further, the Loan at issue and the Construction Agreement were part of a larger financial transaction, as demonstrated by the fact that the Construction Agreement outlined the funds to be paid to Oyster Bay Homes by Plaintiff's lender, Riverside Bank.  In return for provision of these funds, Riverside Bank obtained a mortgage secured by the property on which Oyster Bay Homes was constructing Plaintiff's home.  Just like in *Baisden*, Plaintiff provided the 5307 Number in the Construction Agreement, which was undisputedly a part of the same commercial transaction as the Loan, which paid for the house built by Oyster Bay Homes, and for which the house served as collateral.  Stated differently, construction of Plaintiff's house was "part and parcel" of the reason the debt was incurred in the first place, and therefore, Plaintiff consented to provision

of the 5307 Number to his lender as a part of the larger financial transaction.  As such, Plaintiff provided consent by providing his number on the Construction Agreement.

> **b.     Plaintiff Provided Consent to Call the 5307 Number by Providing It on November 29, 2010.**

Then, on November 29, 2010, after the Loan had been sold to RoundPoint, Plaintiff provided the 5307 Number directly to RoundPoint as a phone number at which he could be reached. (Hughes Tr. at 21:2-21).  During the November 29, 2010 call, RoundPoint followed its established procedures by documenting the call in its system, noting the caller, and by requesting Plaintiff's contact information for the Loan.  Plaintiff provided a 6864 number as the main telephone number for the Loan. *See* RoundPoint's Passport and DataWarehouse Reports, Defs.' Tr Ex. 18 at RDPT-004521; RoundPoint's Comment History for Loan, Defs.' Tr. Ex. 12.  He also provided the 5307 Number, which was added as an additional contact number for Plaintiff and the Loan.  Despite Plaintiff's anticipated self-serving testimony on this issue, the only independently verifiable contemporaneous evidence reflects that Plaintiff called on November 29, 2010 and provided the 5307 Number as the number at which he could be reached after the loan was fully boarded.  *Id.*

> **c.     Plaintiff Provided Consent to Call the 5307 Number on June 2, 2011 Through His Agents.**

It has been established that Mrs. Harrington provided the Harrington's daughter, Jamie Harrington, with actual authority to call RoundPoint on June 2, 2011 and to provide the information necessary to achieve her purpose.  (ECF No. 140 at 16).  The issue remaining for determination at trial is whether Mrs. Harrington had actual or apparent authority to provide consent on behalf of Plaintiff for calls to the 5307 Number.

### i.      Mrs. Harrington Had Actual Authority.

In Florida, actual agency may occur where it is either expressly or impliedly granted. (ECF No. 140 at 18, *citing Taco Bell of Cal. v. Zappone*, 324 So. 2d 121, 123 (Fla. 2d DCA 1975)).   "[A]ctual agency in Florida does not require the principal to specify the singular acts for which his or her authority exists as long as the acts are incidental to or reasonably necessary to accomplish what is authorized." (ECF No. 140 at 16, *citing Board of Trustees of the City of Delray Beach Police and Firefighters Retirement System v. Citigroup Global Markets, Inc.*, 622 F.3d 1335, 1342–43 (11th Cir. 2010)).   "[A]ctual agency can even exist even where both the principal and the agent deny the relationship."  (ECF No. 140 at 18, *citing Cleveland Compania Maritima, S.A. Panama v. Logothetis*, 378 So. 2d 1336, 1338 (Fla. 2d DCA 1980)).   In this regard, "[t]he existence of an agency may be shown by any substantial evidence, either direct or circumstantial and the fact of an agency is a jury question."  (ECF No. 140 at 18, *citing McCabe v. Howard*, 281 So. 2d 362, 363 (Fla. 2d DCA 1973)).

Here, there is no dispute that Mrs. Harrington had the actual authority to speak with her and Plaintiff's joint creditors.  (Plaintiff Tr. at 40:13-21; 43:23-25; 48:2-7; 48:16-25; Plaintiff's Responses to First Request for Admissions, Defs.' Tr. Ex. 37 at 4:¶ 17.   Plaintiff and Mrs. Harrington were married and co-borrowers on the Loan.   Mrs. Harrington also had actual authority to provide Plaintiff's personal information to joint creditors in order to discuss their joint financial obligations.  *Id*.   Thus, Mrs. Harrington clearly had actual authority to act on behalf of Plaintiff in connection with the Loan and to provide the information necessary to achieve this purpose.  Plaintiff's self-serving attempt to carve out his cellular number as the sole piece of personal information that his wife did not have actual authority to provide to joint creditors is suspect at best.  Plaintiff's attempt to distinguish Mrs. Harrington's actual authority

to provide his cellular number should therefore be disregarded at trial in the face of superior evidence of Mrs. Harrington's actual authority to convey the 5307 Number to RoundPoint.

Second, Plaintiff authorized Mrs. Harrington to speak with their joint creditors and to use his personal information in connection with that task. This is exactly what happened here. Plaintiff conveniently claims that Mrs. Harrington did not have authority to convey *one* piece of personal information that gives rise to his claim for damages - the 5307 Number. It defies logic that Plaintiff allowed Mrs. Harrington to release his social security number, but not his cell phone number.

### ii.   Mrs. Harrington Had Apparent Authority.

Even if Mrs. Harrington did not have actual authority to convey the 5307 Number to RoundPoint, she had apparent authority to do so. Apparent authority exists "only if each of three elements are present: (a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation." (ECF No. 140 at 19, *quoting Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995)).

Further, "[a] principal can create the appearance of an agent's authority by 'knowingly permit[ting] [an] agent to act in a certain manner as if he were authorized.'" *Ja Dan, Inc. v. L-J, Inc.,* 898 F. Supp. 894, 900 (S.D. Fla. 1995). In other words, a principal's manifestations can be conveyed indirectly through an agent so long as the principal also makes direct manifestations. *Id.* ("[Principal's] actions, in combination with those of [it's agent], gave the reasonable appearance that [agents] had the authority to contract [on principal's] behalf"). Again, this is true even where the alleged principal and agent both deny the existence of any agency

relationship. *Id*. at 900.  The existence of an agency may be shown by any substantial evidence, either direct or circumstantial. *Id.*

Here, the circumstantial evidence reflects that Mrs. Harrington had authority and that RoundPoint reasonably relied upon that authority.   First, Mr. Harrington, the principal, represented that Mrs. Harrington was authorized to discuss the Loan and to update personal information on the Loan by agreeing to be jointly obligated.  More specifically, under the terms of the contract, both of them were obligated to make payments on the loan, and notice to either of was sufficient as notice to both of them.  (Mortgage, Defs.' Tr. Ex. 2 at 11:¶¶ 13,15.)  Mrs. Harrington had independent authority to provide a contact number for the Loan and RoundPoint had no way of knowing that she was not the subscriber or ordinary user of the 5307 telephone number.  Plaintiff provided Mrs. Harrington with the necessary information to make the June 2, 2011 call.  (Plaintiff Tr. at 40:16-18).   Plaintiff had, in fact, provided the 5307 Number in connection with the Loan on two prior occasions.   RoundPoint reasonably relied upon the information provided to it during the June 2, 2011 call because Mrs. Harrington provided detailed personal information to RoundPoint to establish her identity, including social security numbers for both the Plaintiff and Mrs. Harrington.  (Recording of June 2, 2011 Call, Defs.' Tr. Ex. 29; Transcript of June 2, 2011 Call, Defs.' Tr. Ex. 31 at 3:1-11.)  RoundPoint had no reason to believe that Mrs. Harrington was neither the subscriber or the customary user of the 5307 Number, or further, that she allegedly had no authority to provide the 5307 Number despite being authorized on the Loan and providing Plaintiff's social security number.   Finally, RoundPoint changed the position of the 5307 Number from the second position to the primary phone number position in reliance on Mrs. Harrington's representation that it was the "main"

number for the Loan. Thus, Mrs. Harrington had apparent authority to provide RoundPoint with the 5307 Number on behalf of Plaintiff and to hold otherwise would lead to inequitable results.

> ### d. Even If Defendants Did Not Have Consent From Plaintiff, Defendants Believed in Good Faith They Had Consent.

Even if Plaintiff did not consent to receive calls to the 5307 Number, RoundPoint believed in good faith that it had consent, thereby barring Plaintiff's claims. *See Chyba v. First Fin. Asset Mgmt., Inc*., Case No. 12-cv-1721-BEN (WVG), 2014 WL 1744136, at *11 (S.D. Cal. Apr. 30, 2014), *aff'd*, 2016 WL 7407274 (9th Cir. Dec. 22, 2016); *Danehy v. Time Warner Cable Enterprises*, Case No. 5:14-CV-133-FL, 2015 WL 5534094, at *7 (E.D.N.C. Aug. 6, 2015), *report and recommendation adopted sub nom. Danehy v. Time Warner Cable Enter. LLC,* 5:14-CV-133-FL, 2015 WL 5534285 (E.D.N.C. Sept. 18, 2015).

In *Chyba*, the court ruled that the defendant had consent to call the number at issue because it reasonably relied upon the phone number provided to the defendant by a third party. *Chyba*, 2014 WL 1744136, at *12. The defendant acquired the plaintiff's cellular telephone number from a form provided by a third party. *Id*. at 11. However, the plaintiff claimed she did not give her number to the third party on the form. *Id*. In rebuttal, the defendant argued that even if the plaintiff never provided her number to the third party, the defendant nevertheless relied in good faith on the provision of the number to it by the third party. *Id*. The court held that even if the plaintiff never provided consent to anyone, the defendant was not liable because it reasonably believed in good faith it had consent based upon the information provided to it. *Id*. at 12. The court also noted that there was little the defendant could have done to verify consent other than to call the number at issue. *Id*. at 11.

Similarly, in *Danehy*, the court held the defendant relied in good faith upon the consent to call the plaintiff provided to it by a third party and that it would be "unjust" to impose liability

where it had relied in good faith on the information. *Danehy*, 2015 WL 5534094, at *7. Notably, both the *Chyba* and *Danehy* courts applied the good faith defense despite the fact that there was either no consent (*Chyba*) or consent provided by someone other than the called party (*Danehy*). *See Chyba*, 2014 WL 1744136 at *12 ("Even if Plaintiff is correct in stating that she never gave Defendant or [the third party] consent to call, and there was no *actual* prior consent from Plaintiff, Defendant is not liable for acting in good faith upon the information provided to it."); *Danehy*, 2015 WL 5534094 at *6 ("Even assuming that the prior express consent of [the customer] did not operate as consent by plaintiff, it is undisputed that defendant believed in good faith [that it had] consent [and] that the calls were being made for a service [the customer] request[ed]").

Likewise, here, RoundPoint reasonably believed it had consent to call the 5307 Number. First, the 5307 Number appears in the Construction Agreement and in the servicing notes on November 29, 2010. Second Mrs. Harrington—a borrower on the Loan and, therefore, "first party"—provided the 5307 Number as the "main" number for the Loan after providing salient personal identifying information to verify her identity and authority to act with regard to the Loan. RoundPoint had every reason to trust the caller and rely upon the information provided by her in connection with servicing the Loan. In fact, RoundPoint had no way of knowing that Mrs. Harrington was not the subscriber or ordinary user of the 5307 Number, or that she was not authorized to provide the 5307 Number since she had other sensitive personal information. RoundPoint's only reasonable option was to take Mrs. Harrington at her word. To hold otherwise would lead to absurd and unjust results. In other words, "[i]t would be incongruous with the larger statutory and regulatory scheme [of the FDCPA] to interpret [the] TCPA to

require that a debt collector be liable for acting where it had a good-faith basis for doing so." *Chyba*, 2014 WL 1744136, at *11.

**D.      Damages Under the TCPA.**

**1.      The TCPA Statutory Damages, as Applied, Violate the Due Process Clause of the Fifth Amendment.**

A statutory penalty violates due process when it "is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, Iron Mt. & S. Ry. Co. v. Williams*, 251 U.S. 63, 73 (1919).  The Supreme Court has said that excessive punitive damages can "enter the zone of arbitrariness" that violates due process, and that "[s]ingle-digit multipliers" for punitive damages "are more likely to comport with due process . . ." *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003) (finding a ratio of 145 punitive damages to 1 compensatory damages too high) (*citing Gore*, 517 U.S. at 582).  In fact, "few awards, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Under this reasoning, awarding statutory damages here will violate due process if the actual harm suffered by Plaintiff is not at least $50 per call.[8]

Several courts have either reduced TCPA awards on this basis, or suggested it may be appropriate after a finding of liability.  *Tex. v. Am. Blastfax, Inc*., 164 F.Supp.2d 892, 900 (W.D. Tex. 2001) (declining to award $500 per TCPA violation because it would be "inequitable and unreasonable" and instead, awarding 7 cents per violation because that was the actual cost); *Md. v. Universal Elections, Inc.*, 862 F.Supp.2d 457, 466 (D. Md. 2012), *aff'd*, 729 F.3d 370 (4th Cir. 2013) (discussing constitutionality of $10 Million TCPA award and reducing award to $1 Million) (*citing Tx. v. Am. Blastfax, Inc*., 164 F.Supp.2d at 900);  *Centerline Equip. Corp. v.*

---

[8] This equals a ratio of punitive damages to actual harm of 10:1 and is calculated by taking an award of $500 in statutory damages (per call) and dividing it by 10.

*Banner Pers. Serv., Inc.*, 545 F.Supp.2d 768, 778 (N.D. Ill. 2008) (if statutory damages are in fact so excessive as to be improper, the appropriate remedy would be a reduction of the aggregate damage award"); *Pasco v. Protus IP Sols., Inc.*, 826 F.Supp.2d 825, 835 (D. Md. 2011) (same).  In fact, Plaintiff here could not articulate any actual harm, other than his view that the calls were "harassing."  (Plaintiff Tr. at 70:6-72:1-20).  He acknowledges that he only answered one call, immediately hung up, and that remaining calls may have lasted 10 seconds. (*Id*. at 70:6-72:1-20).  In fact, RoundPoint's procedures indicate that representatives were to allow a phone to ring no more than 6 times.  (Hughes Tr. at 59:15-25).  It takes approximately 25 second for a phone to ring 6 times.  Thus, any actual damages in this case will be valued in *seconds, assuming there can be recovery for unanswered calls*.  Stated differently, the value of Plaintiff's time will have to be worth at least $50 per 25 seconds in order to substantiate an award of $500 per call.  To be clear, this would mean Plaintiff's time was worth $120 a minute, $7,200 an hour, $57,600 per 8-hour workday, $288,000 per 5-day work week and $14,400,000 per 50-week work year.  Accordingly, if the Court were to find Defendants liable, it should reduce any damages awarded in this case to no more than 10 to 1 to comply with due process under the Fifth Amendment.

## 2. The TCPA Allows Calls Made to Collect a Debt Owed to, or Guaranteed to the U.S. Government.

There is no liability under the TCPA for 30 calls per month made to collect a debt owed to the U.S. Government.  47 U.S.C. § 227 (b)(1)(A)(iii); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. 9074 at ¶ 32 (2016) (the "2016 Ruling and Order").  This provision was added to the statute in December 2015.  *See* 2016 Ruling and Order at ¶ 1.  It does not matter whether the caller has consent.  *See id.* at ¶ 11.

This provision should be retroactively applied because Congress did not specify whether it should apply retroactively, and because applying this provision to past conduct would not increase Defendants' liability or impose new additional duties. *Silver v. Pa. Higher Educ. Assistance Agency*, Case No. 14-cv-0652-PJH, 2016 WL 1258629, at *2 (N.D. Cal. Mar. 31, 2016) *appeal pending* (*citing Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994)).

In *Silver*, the court addressed whether this provision should have retroactive effect using the two-step test articulated by the Supreme Court in *Landgraf*. *Id*. at 2.[9]  First, the court found that Congress was silent on whether the provision should have retroactive effect. *Id*. at 3.  Next, the court analyzed whether applying the provision would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id*. (*quoting Landgraf*, 511 U.S. at 280).  Notably, the court found that "plaintiff's 'expectation of success in its litigation is not the kind of settled expectation protected by *Landgraf's* presumption against retroactivity.'" *Silver*, 2016 WL 1258629, at *3 (*quoting Sw. Ctr. for Biological Diversity v. U.S. Dept. of Agric.*, 314 F.3d 1060 (9th Cir. 2002)).  Instead, the court held that the prohibition against liability for calls to collect a U.S. Government debt applied retroactively because the amendment actually *decreases* liability for past conduct, by creating a clear exception for telephone calls "made solely to collect a debt owed to or guaranteed by the United States," rather than "impos[ing] new duties with respect to transactions already completed." *Silver*, 2016 WL 1258629, at *3 (*quoting Landgraf*, 511 U.S. at 280 and 47 U.S.C. § 227).

The debt here is owed to the U.S. Government because the Loan is owned by a holding company in which the FDIC has a one-half ownership stake. *See* Amended and Restated

---

[9] *Silver* appears to be the only case which has addressed the issue of retroactive effect of this U.S. Government debt provision.

Operating Agreement, Defs.' Tr. Ex. 10.[10]  By virtue of the FDIC's partial ownership of the entity that holds Plaintiff's loan, Plaintiff's debt is owed to the U.S. government.  *See  R.S.B. Ventures, Inc. v. F.D.I.C.,* 514 Fed. Appx. 853, 856 (11th Cir. 2013) (U.S. remained real party in interest in litigation although FDIC substituted company it formed as receiver for bank). Notably, the FCC made no distinction in the 2016 Ruling and Order between various capacities in which the government might own any particular loan.  *See generally*, 2016 Ruling and Order.

In fact, the FCC stated only that "the debt must be *currently owed to* or guaranteed *by the federal government* at the time the call is made."  *Id.* at ¶ 20 (emphasis in original and supplied). This is clearly the case here.  Further, the Operating Agreement between the FDIC and RoundPoint specifies that the FDIC receives revenue from collection of the loans by virtue of its Membership interest.  (*See* Defs.' Tr. Ex. 10 at Sect. 6.2, *et seq.*)  By virtue of the FDIC's ownership of the entity that holds Plaintiff's loan, the Plaintiff's debt is owed to the U.S. government.  *See  R.S.B. Ventures, Inc.*, 514 Fed. Appx. at 856.  Therefore, in the event the Court finds Defendants liable for the calls at issue in this case, the total number of calls at issue should be reduced accordingly.

### 3.  Multibank Cannot be Held Vicariously Liable for Any Alleged Violations of the TCPA.

It is Plaintiff's burden to establish that Multibank is liable for RoundPoint's alleged violation of the TCPA.  *Strauss*, 173 F.Supp.3d at 1310, *reconsideration denied*, 15-62026-CIV, 2016 WL 4402270 (S.D. Fla. June 8, 2016).  The FCC has addressed when such liability is appropriate.  *In the Matter of the Joint Petition Filed by Dish Network, LLC, et. al., for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C. Rcd.

---

[10] The Amended and Restated Operating Agreement ("Operating Agreement") outlines that the FDIC is a member of Multibank, that the FDIC is an "Initial Member" of Multibank, and that the FDIC, along with a private owner, own all interests in Multibank.  *See* Operating Agreement at 1-2.

6574, 6582 (2013) (the "2013 Ruling and Order").  Specifically, the FCC provided illustrative examples where vicarious liability might be appropriate. These examples included (1) granting the agent access to information and systems that normally would be within the principal's exclusive control, including customer information; (2) allowing the agent to enter consumer information into the principal's sales or customer systems; (3) giving the agent authority to use the principal's trade name, trademark, or service mark; (4) approving, writing, or reviewing a script for the caller to use; or (5) knowing of TCPA violations and failing to stop such violations. *Id.* at 6593-94.  It is not enough to merely show that the calls were made "for the benefit" of the party sought to be held accountable.  *Id.* at 6592.  As articulated by the FCC,

> A number of parties argue that statutory 'on behalf of' liability extends beyond agency principles to subject the seller to vicarious liability for violations of both section 227(c) and section 227(b) so long as the call is made simply to aid or benefit the seller — even if agency principles would not impose vicarious liability on the seller for the call.  We reject these contentions for purposes of this declaratory ruling proceeding . . . vicarious liability for violations of section 227(b) is available only under federal common law agency principles.

*Id.*

Although the FCC was specifically addressing telemarketing calls in the 2013 Ruling and Order, it was discussing Section 227(b) (the provision at issue in this case) generally.  Further, this standard has been adopted by courts in the Eleventh Circuit in matters involving non-telemarketing calls like those at issue in this case.  *Strauss,* 173 F.Supp.3d at 1309.

In *Strauss*, the court rejected the plaintiff's theory of vicarious liability because the testimony and Master Subscription Agreement at issue did not evidence "'substantial control' or apparent authority by the FCC's standards."  *Strauss*, 173 F.Supp.3d at 1310.   The *Strauss* court found that there was no evidence that the calling party had unfettered access to the principal's systems, authorized the debt collector to use its name or marks, or knew that the debt collector

was violating the TCPA and failed to stop it, which were the benchmarks set forth by the FCC for evaluating apparent authority sufficient to find vicarious liability. *Id.* As a result, the court found that the plaintiff had failed to meet his burden, and declined to impose vicarious liability. *Id.*

Similarly, here, the only "evidence" of vicarious liability is a servicing agreement between RoundPoint Ventures I, LLC and RoundPoint Mortgage Servicing Corporation, and a power of attorney conferring authority upon RoundPoint Ventures I, LLC by Multibank 2010-1 SFR Venture, LLC. (*See* Defs.' Tr. Ex. 6.) Notably, RoundPoint Ventures I, LLC, is not in privity with either RoundPoint or Multibank, nor is it a party to this case. Further, the testimony of RoundPoint's corporate representative only establishes that RoundPoint was servicing the Loan and making calls "for the benefit" of Multibank. (Hughes Tr. at 161:6-25; 162:1-25; 163: 1-8). This is not enough. *See* 2013 Ruling and Order at 6592. There is no evidence that RoundPoint had access to Multibank's electronic systems, allowed RoundPoint to enter information into its computer systems, approved, reviewed or wrote any of RoundPoint's call scripts, or in any way controlled the content or timing of the calls at issue or that it knew of TCPA violations and failed to stop them. As such, Plaintiff has failed to meet his burden and there can be no vicarious liability for Multibank. *See Strauss*, 173 F.Supp.3d at 1310.

### 4. RoundPoint's Conduct Was Not Willful.

The TCPA statute provides for the imposition of treble damages if the court finds that calls were made willfully or knowingly in violation of the TCPA statute. 47 U.S.C. §227(b)(3). The Eleventh Circuit has held that the alleged violator must not only know that the calls were made, but must also know that the calls violated the applicable subsection of the statute. *Lary v. Trinity Physician Fin. & Ins. Services*, 780 F.3d 1101, 1107 (11th Cir. 2015) ("The requirement

of 'willful[ ] or knowing[ ]' conduct requires the violator to know he was performing the conduct that violates the statute." (*quoting* 47 U.S.C. §227(b)(3)).  Here, this means that RoundPoint must have known they were (1) calling a cell phone, (2) using an ATDS, and (3) calling without consent.  *See* 42 U.S.C. § 227(b)(1)(A)(iii);  *Lary*, 780 F.3d at 1107 ("For example, to violate section 227(b)(1)(A)(i), a defendant must know that he is using an "automatic telephone dialing system" to place a "call," and that the call is directed toward an "emergency" line.")  Here, RoundPoint did not know the 5307 Number was a cell phone based on the information in its computer system.  (Hughes Tr. at 17-24).  Further, as already indicated, RoundPoint had a good faith belief that it received consent to call the 5307 Number on multiple occasions.  (Hughes Tr. at 32:10-33:8).  It also had a good faith basis to believe the Cisco telephone system was not an ATDS and that it was making calls with human intervention.  (*Id*. at 36:25-37:23).  As such, Plaintiff cannot establish the calls at issue were made willfully or knowingly.

**E.      Legal Standard to Establish an FCCPA Claim.**

Florida Statute § 559.72(7) prohibits "willfully communicat[ing] with the debtor or any member of her or his family with such frequency as can reasonably be expected to harass the debtor or her or his family, or willfully engag[ing] in other conduct which can reasonably be expected to abuse or harass the debtor or any member of her or his family."  Fla. Stat. § 559.72(7).

Notably, the statute's use of the word "willful" means that the calls must be made consciously, and thus, the statute concerns both "the purpose as well as the frequency of the creditor's calls."  *Story v. J. M. Fields, Inc.*, 343 So. 2d 675, 677 (Fla. 1st DCA 1977).  In other words, Plaintiff must prove two things.  First, that Defendants "willfully" engaged in conduct that could reasonably be expected to abuse or harass him; and second, that the conduct was

harassing.  *See Bacelli v. MFP, Inc*., 729 F.Supp.2d 1328, 1337 (M.D. Fla. 2010) ("Plaintiff asserts that Section 559.72(7) requires neither knowledge nor intent.  However, Plaintiff neither explains how to square this construction with the statutory language requiring 'willful' conduct nor cites any authority supporting her contention."); *see also Brandt v. I.C. Sys., Inc*., Case No. 8:09-CV-126-T-26MAP, 2010 WL 582051, at *2 (M.D. Fla. Feb. 19, 2010) ("It is clear the FCCPA [§ 559.72] requires an allegation of knowledge or intent by the debt collector in order to state a cause of action.").  Therefore, there are two issues for determination by the Court at trial.  First, whether RoundPoint's intent in placing the calls at issue was to harass Plaintiff.  If the Court finds this was not the case, it need not conduct any further analysis.  *See Bacelli*, 729 F.Supp.2d at 1337; *Brandt*, 2010 WL 582051, at *2.  Second, the Court must determine whether the volume of calls coupled with other conduct made the calls harassing.  (*See* ECF No. 140 at 24, *citing Story*, 343 So. 2d at 677.)

**F.      Plaintiff Is Unable to Establish His FCCPA Claim.**

**1.      RoundPoint Was Not Calling to Harass Plaintiff.**

The first part of the *Story* analysis is whether the purpose for the calls was to harass the plaintiff.  *Story*, 343 So. 2d at 677.  "A thing is willfully done when it proceeds from a conscious motion of the will, intending the result which actually comes to pass. It must be designed or intentional, and may be malicious, though not necessarily so."  *Id*.  For example, intentional harassment occurs when the debtor tells the creditor to stop calling and the creditor continues to call repeatedly anyway.  *Id*.; *see also Tucker v. CBE Grp., Inc.*, 710 F.Supp.2d 1301, 1305–06 (M.D. Fla. 2010) (granting summary judgment for collector where plaintiff never told defendant to stop calling); *Lardner v. Diversified Consultants Inc*., 17 F.Supp.3d 1215, 1225 (S.D. Fla. 2014) ("Summary judgment is denied [in favor of defendants] where the call recipient shows

evidence of a high call volume coupled with the debt collector ignoring requests to cease communications, or where the calls occur at odd hours, disrupting sleeping patterns and causing emotional stress.") (collecting cases).

That is not what happened here. In fact, Plaintiff never asked RoundPoint to stop calling. (Plaintiff Tr. at 51:6-7). Rather, the evidence establishes that RoundPoint's intention was to enter into an agreement for repayment so that the Harringtons could keep their home. (Hughes Tr. at 105:25-107:14). The evidence also establishes that RoundPoint was required to make certain calls, and that calls were made for other ancillary purposes. (Hughes Tr. at 158:20-159:16). RoundPoint only left one message per day. (Hughes Tr. at 60:12-14). Finally and most significantly, RoundPoint's representative discussed that its "objective is to try to get our customer on the phone and help them resolve their delinquency" ideally through a modification of the loan. (Hughes Tr. at 78:25; 79:1.)[11] In fact, RoundPoint's development of procedures dictating the number of calls per day is undertaken to "[try] to find the balance between effective outreach and getting the customer to engage with us." (Hughes Tr. at 81:21-25.) Further, a significant disparity between the number of telephone calls placed by the defendant and the number of actual successful conversations with the plaintiff "suggests a difficulty of reaching plaintiff, rather than an intent to harass." *Saltzman v. I.C. Sys., Inc.*, Case No. 09-10096, 2009 WL 3190359, at *7 (E.D. Mich. Sept. 30, 2009).

Far from harassment, these policies evidence an intent by RoundPoint to help Plaintiff keep his home. The undisputed evidence reflects that Plaintiff never answered his phone, and so RoundPoint continued to try to call. (Plaintiff Tr. at 46:4-11; 49:1-23.) Nor did Plaintiff ever tell RoundPoint to stop calling until May 5, 2014 when his attorney sent RoundPoint a fax. (*See*

---

[11] Notably, a resolution of the delinquency would not require Plaintiff to pay the outstanding balance immediately. Instead, the arrears are typically spread out over the remaining term of the modified loan.

Plaintiff Tr. at 51:6-7.)  Upon receiving this directive, RoundPoint immediately stopped calling. (RoundPoint's Comment History for Loan, Defs.' Tr. Ex. 12.)  It is clear, therefore, that Plaintiff cannot meet his burden for proving that these calls were made with an intent to harass, and cannot establish his claim for a violation of the FCCPA.

### 2.   The Frequency of the Calls Was Not Harassing.

The second part of the FCCPA analysis is whether the volume of calls coupled with other nefarious circumstances made the calls harassing.  *See* ECF No. 140 at 23, *citing Story*, 343 So. 2d at 677.  For example, nefarious conduct includes calls that continue after being asked to cease.  *Tucker,* 710 F.Supp.2d at 1305 (M.D. Fla. 2010); *see also Lardner,* 17 F.Supp.3d at 1225 (S.D. Fla. 2014).  It also includes threats, yelling and offensive language.  *Saltzman*, 2009 WL 3190359, at *7; *Mimbs v. J.A. Cambece Law Office, P.C.,* Case No. 12-62200-DIMITROULEAS/SNOW, 2013 WL 11982289, at *5 (S.D. Fla. July 31, 2013); *Mammen v. Bronson & Migliaccio, LLP*, 715 F.Supp.2d 1210, 1218 (M.D. Fla. 2009).  However, it does not include cases where a few calls a day were made unaccompanied by other offensive conduct. *See Tucker*, 710 F.Supp.2d at 1305; *Lardner*, 17 F.Supp.3d at 1225.

As found by the Court, the inquiry into Plaintiff's claim that the frequency of calls was harassing under "Florida Statute § 559.72(7), depends on a fact-intensive inquiry including the frequency of the calls, the legitimacy of the creditor's claim, the plausibility of the debtor's excuse, and the sensitivity or abrasiveness of the personalities of the callers."  ECF No. 140 at 24, *citing Story*, 343 So. 2d at 677.  In other words, the content of the calls is relevant to determine whether the number of calls is harassing.  *See Weaver v. Wells Fargo Bank N.A.,* 8:15-CV-1247-T-23TGW, 2015 WL 4730572, at *2 (M.D. Fla. Aug. 10, 2015) ("*Story* explains that the purpose of a creditor's calls can affect the number of calls required for the creditor's calls to

constitute abuse or harassment."). Further, calls are only harassing "when they continue after all such information [about the debt and default] has been communicated and reasonable efforts at persuasion and negotiation have failed." *Story*, 343 So. 2d at 677.

As a preliminary matter, no one disputes that the loan was valid or that the Harringtons were behind in their payments. (Plaintiff Tr. at 71:17-23; Recording of June 28, 2011 Call, Defs.' Tr. Ex. 30; Transcript of June 28, 2011 Call, Defs.' Tr. Ex. 32 at 5:1-9.) The remaining analysis is quite simple since Plaintiff only spoke with RoundPoint once. (Larry Tr. at 49:1-23; 50:19-20). Therefore, it cannot be argued that RoundPoint's callers were "abrasive." *See Saltzman* 2009 WL 3190359, at *7 (granting summary judgment in favor of defendant under FDCPA claim where plaintiff presented no evidence that frequency, pattern or content of calls was harassing). Far from "abrasive," during that one conversation, the RoundPoint representative offered to send loan modification paperwork. (*See* Recording of June 28, 2011 Call, Defs.' Tr. Ex. 30; Transcript of June 28, 2011 Call, Defs.' Tr. Ex. 32.) Although Plaintiff makes much of the issue that calls were made after the foreclosure suit was filed, this fact does not negate that RoundPoint still had the desire, and indeed, the *obligation* to contact him about loss mitigation. (Hughes Tr. at 82:3-7; 83:1-6).

Further, there is no evidence that RoundPoint ever left threatening messages, yelled, used profane language, or threatened arrest. *Saltzman*, 2009 WL 3190359, at *7; *Mimbs*, 2013 WL 11982289, at *5; *Mammen*, 715 F.Supp.2d at 1218.

Additionally, multiple calls per day does not translate into *per se* harassment. *Tucker*, 710 F.Supp.2d at 1305 (granting summary judgment in favor of defendant where it "made no more than seven calls in a single day, and did not call back the same day after leaving a

message."); *see also Lardner*, 17 F.Supp.3d at 1225 (citing cases in which summary judgment was granted for defendant where volume indicates multiple calls per day were made).

Instead, "[a] debt collector does not necessarily engage in harassment by placing one or two unanswered calls a day in an unsuccessful effort to reach the debtor, if this effort is unaccompanied by any oppressive conduct such as threatening messages." *See Saltzman*, 2009 WL 3190359, at *7 (*quoting See Udell v. Kansas Counselors, Inc.,* 313 F.Supp.2d 1135, 1143–44 (D. Kan. 2004)). In fact, the evidence establishes that on most days, Roundpoint either did not call the Plaintiff at all or called 1-2 times. (*See* RoundPoint's Comment History for Loan, Defs.' Tr. Ex. 12.)

Significantly, Plaintiff testified that the only reason he believed the calls were harassing was because of their frequency. (Plaintiff Tr. at 70:6-72:11). After unequivocally testifying that the call frequency was the only harassing characteristic of the calls and in response to Defendants' Motion for Summary Judgment, Plaintiff makes much of the fact that RoundPoint called after the foreclosure had been filed, and that the representative on the June 28, 2011 call stated she could not accept payments. (ECF No. 120 at 8.) He cites this as evidence that all negotiations had failed and calls thereafter were harassing. *Id.* However, Plaintiff's assumptions are misplaced. RoundPoint's established procedures dictate they may not accept payments during a foreclosure without full resolution of the outstanding amount, typically through a loan modification. (Hughes Tr. at 104:6-105:10 (noting that partial payments cannot be accepted since the purpose for calls during foreclosure is "get [the] loan current again ideally through a modification and have [the borrower] on a path with a monthly payment he can afford" prior to the imminent foreclosure sale).) These policies evidence that all negotiations had not failed and

in fact, evidence an intent by RoundPoint to help Plaintiff keep his home—a far cry from harassment.

Plaintiff cannot meet his burden to show that the content or pattern of the calls were harassing, or that all reasonable efforts at negotiation and persuasion had failed.  As such, he cannot prove liability under the FCCPA.

### 3.      RoundPoint Was Not Collecting a Debt.

The FCCPA only applies to conduct that allegedly occurred in connection with collection of a debt.  *See* Fla. Stat. § 559.72 (proscribing enumerated conduct "in collecting consumer debts."); *see also Trent v. Mortg. Elec. Registration Sys., Inc.*, 618 F.Supp.2d 1356, 1360 (M.D. Fla. 2007), *aff'd*, 288 Fed. Appx. 571 (11th Cir. 2008) ("The FDCPA is intended to curtail objectionable acts occurring in the process of collecting funds from a debtor.").  As such, the Court will need to determine at trial whether RoundPoint's purpose in making the calls was to collect a debt.  This is an affirmative element of Plaintiff's claim.  *See* Fla. Stat. § 559.72.  Thus, it is Plaintiff's burden to show that RoundPoint was collecting a debt.  *Mammen,* 715 F.Supp.2d at 1216 ("The plaintiff must prove that: the plaintiff has been the object of collection activity arising from consumer debt . . .")      Significantly, it is the substance of the information actually communicated to the debtor which dictates whether it is debt collection.  *See Read v. MFP, Inc.*, 85 So. 3d 1151, 1154 (Fla. 2d DCA 2012) (dismissing FCCPA complaint because innocuous phone messages left for debtor by debt collector did not communicate any impermissible right to collect); *see also Parker v. Midland Credit Mgmt., Inc.*, 874 F.Supp.2d 1353, 1358 (M.D. Fla. 2012) (dismissing complaint because substance of the communication did not seek to collect a debt).  Notably, just because calls were made during a foreclosure does not mean they were made to collect a debt.  *See Trent,* 618 F.Supp.2d at 1360 (collecting cases) (foreclosure action is not

debt collection because payment of funds is not the primary objective of a foreclosure; instead, the primary focus is foreclosing the lien.)

Here, Plaintiff has not submitted any evidence that the calls by RoundPoint communicated any debt collection efforts. Plaintiff testified in deposition that he only answered one of these calls, and on that occasion he hung up without speaking. (Plaintiff Tr. at 46:8-11, 49:18-24.) Thus there was no attempt to collect a debt because there was no information communicated by RoundPoint to Plaintiff. *See Read*, 85 So. 3d at 1154; *see also Parker*, 874 F.Supp.2d at 1358. Even if the purpose for the calls is a relevant inquiry, the undisputed evidence reflects that RoundPoint was calling to engage Plaintiff in loss mitigation. (Hughes Tr. at 103:18-107:14). RoundPoint's procedures, which are standard in the industry, prevent them from collecting payments until the overall delinquency is cured, usually through a modification of the loan. *See id*. This is because the foreclosure cannot be dismissed until the loan is in performing status.

RoundPoint's use of the standard "Mini-Miranda"[12] warning when making or receiving calls is not proof that the calls were for collection purposes. (*See* Hughes Tr. at Ex. 10.) Similarly, reference to "collection" in RoundPoint's call records does not reflect the purpose for the calls. (*See* RoundPoint's Comment History for Loan, Defs.' Tr. Ex. 12.) The FDCPA itself requires loan servicers to include the mini-Miranda warning on communications. *Garfield v. Ocwen Loan Servicing, LLC*, 811 F.3d 86, 89 (2d Cir. 2016) (loan servicer violated FDCPA by failing to include mini-Miranda warning in calls and written communications with borrower); *Read*, 85 So. 3d at 1154 (noting that mini-Miranda is required in phone calls under FDCPA).

---

[12] The "Mini-Miranda" warning states that "Federal law requires we inform you that RoundPoint Mortgage Servicing Corporation is a debt collector attempting to collect a debt …" *See* Hughes Tr. at Ex. 10.

RoundPoint's testimony is clear that the purpose for using the mini-Miranda warning during calls is to achieve compliance with the FDCPA and it is given *even when the loan is current*. (*See* Hughes Tr. at 112:19-120:20.)  Further, the words "collection" are automatically populated in the notes when a call center representative takes or places a call again, *even where the loan is current* and that it is not indicative of the purpose for the call.  (*See id.* at 107:15-109:25.)

In evaluating whether a communication is "debt collection," courts look to the actual substance of the communication rather than legally required disclosures that say the words "debt collection."  *See e.g., Parker v. Midland Credit Mgmt., Inc*., 874 F.Supp.2d 1353, 1358 (M.D. Fla. 2012) (dismissing complaint because although letter included mini-Miranda, the substance of the letter did not seek to collect); *see also Dunavant v. Sirote & Permutt, P.C*., 603 Fed. Appx. 737, 739 (11th Cir. 2015).  Here, the undisputable evidence reflects that RoundPoint was calling to attempt to help its customer bring his loan current by modifying the loan.  (Hughes Tr. at 103:18-107:14).  Plaintiff has no evidence to the contrary.  (Plaintiff Tr. at 49:1-5).

## G.    Defenses to Liability Under the FCCPA.

### 1.    RoundPoint Did Not Act Intentionally and it Has Procedures in Place to Prevent Any Violation.

Even if the Court finds that RoundPoint violated the FCCPA, the statute sets forth the following affirmative defense.

> A person shall not be held liable in any action brought under this section if the person shows by a preponderance of the evidence that the violation **was not intentional** and resulted from a bona fide error, notwithstanding the **maintenance of procedures reasonably adapted to avoid any such error**.

Fla. Stat. 559.72(7) (emphasis supplied).

Plaintiff does not allege that calls were harassing for any reason other than the fact that there were a lot of them.  (Plaintiff Tr. at 70:6-72:11.)  Thus, the relevant inquiry here is whether RoundPoint called Plaintiff multiple times per day in violation of the FCCPA intentionally and whether RoundPoint had procedures designed to prevent this type of claim.

As established in Sections F.1. and F.3. above, RoundPoint's purpose was to remedy the default so that the Harringtons could keep their home.  (Hughes Tr. at 78:25; 79:1.)  Thus, RoundPoint did not act intentionally.  Further, it is RoundPoint's policy to call its customers no more than three times a day.  (Hughes Tr. at 78:7-25; 79:1-4.)  This this policy was based upon what is effective to engage the customer and to help them resolve the delinquency on their account.  *Id.*  The evidence at trial will show that RoundPoint's representatives were educated on this policy and in fact, regularly received training on RoundPoint's policies.  (Hughes Tr. at 83:3-85:8-10; 152: 7-153:2; RoundPoint's Policy for Portfolio Management, Call Center, as amended, Defs.' Tr. Exs. 22, 23, 24, and 25.)

Thus, there was no malicious intent and RoundPoint had procedures designed to make sure that no more than 3 calls per day were made.

## H.      Defenses Common to TCPA and FCCPA Claims.

### 1.      Plaintiff Does Not Have Article III Standing.

Standing consists of three elements.  *Spokeo, Inc. v. Robins,* 578 U.S. ---, 136 S.Ct. 1540, 1547 (2016), *as revised* (May 24, 2016).  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  *Id.*  The Plaintiff bears the burden of establishing these elements.  *Id.* at 1548.  Since each alleged violation under the TCPA is a separate claim, Plaintiff must establish standing for each call and he must establish that the use of an ATDS

actually caused his alleged injuries.  *Romero v. Dep't Stores Nat'l Bank*, 199 F.Supp.3d 1256, 1261 (S.D. Cal. 2016).  He cannot rely upon calls in the aggregate.  *Id.*  In *Romero*, the plaintiff contended the defendants violated the TCPA over 290 times, once for every time the defendants allegedly called her cell phone using an ATDS after the plaintiff had revoked her consent to call. *Id.* at 1261.  The plaintiff alleged she suffered harm from "additional" injuries in fact sufficient for standing including "invasion of privacy," "trespass to chattels," and "lost time, aggravation, and distress."  *Id.*

Initially, the *Romero* court noted that "[e]ach alleged violation is a separate claim, meaning that [the] plaintiff must establish standing for each violation, which in turn means that [the] plaintiff must establish an injury in fact caused by each individual call . . . and not by calls in the aggregate."  *Id.*  (*citing DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)).  The court held that the plaintiff failed to connect her injuries for "lost time, aggravation, and distress," with any (or each) specific TCPA violation and therefore, could not establish standing.  *Id.* at  1263.  More specifically, the court found all calls that the plaintiff did not hear ring were mere "procedural" violations of the statute.  *Id.*  Therefore, such alleged violations were insufficient to confer standing.  *Id.*  For calls that the plaintiff heard but did not answer, the court held that "[n]o reasonable juror could find that one unanswered telephone call could cause lost time, aggravation, distress, or any injury sufficient to establish standing."  *Id.*  This is because "viewing each call in isolation, whether the phone rings as a result of a call from a family member, a call from an employer, a manually dialed call from a creditor, or an ATDS dialed call from a creditor, any 'lost time, aggravation, and distress,' are the same."  *Id.* at 1263.  Finally, as to the two calls answered by the plaintiff, the court found that she failed to connect her alleged harm to the calls and as a result, these calls did not establish

standing. *Id*. Finally, the court reasoned that "although these calls . . . may have been stressful, aggravating, and occupied [p]laintiff's time, that injury is completely unrelated to [d]efendants' use of an ATDS to dial her number. Plaintiff would have been no better off had [d]efendants dialed her telephone number manually." *Id.*

Plaintiff alleges in his Second Amended Complaint that he was harmed in various ways. (ECF No. 81.)  However, at his deposition, Plaintiff could only articulate his view that the calls were "harassing."  In fact, Plaintiff could not articulate ***any*** injury, other than his view that the calls were "harassing."  (Plaintiff Tr. at 70:6-72:20.)  He also acknowledges that he only answered one call.  (Plaintiff Tr. at 49:1-5.)  Plaintiff has failed to articulate, much less offer any proof on how any of these individual calls caused the injury he alleges to have suffered in the Second Amended Complaint.  In fact, Plaintiff testified that he, like most people, had unlimited minutes with his cell phone plans (with the possible exception of one plan which he had for three months).  (Plaintiff Tr. at 29:21-31:14.)  He also testified that he had call-waiting and that each attempted call took no more than 30 seconds to a minute.  (Plaintiff Tr. at 72:9-20.)  When pressed, he acknowledged that each call could have taken less than 10 seconds.  *Id*.  Plaintiff recalls remarkably little detail about the calls despite his claims they caused him harm.  (Plaintiff Tr. at 49:1-50-24; 70:6-13.)  In sum, Plaintiff has provided no evidence supporting his assertion that the calls allegedly made in violation of the TCPA (either individually or in the aggregate) caused him harm.  Since Plaintiff cannot articulate any harm, he does not have Article III standing to sue Defendants.  *Spokeo,* 136 S. Ct. at 1547; *Romero*, 199 F.Supp.3d at 1261.

Once the TCPA claim is dismissed, the FCCPA claim must be dismissed as well.  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims

should be dismissed as well.")  As a result, Plaintiff's claims must be dismissed in their entirety for lack of subject matter jurisdiction.

> **2.    Any Damages Awarded Against Multibank Under the TCPA Must Be Set Off Against the Deficiency Judgment.**

Under Florida and federal law, a party is entitled to set off so long as a judgment has been entered against "the same parties in the same capacity."  *Mass. Cas. Ins. Co. v. Forman*, 600 F.2d 481, 483 (5th Cir. 1979) (allowing set off under Florida and federal law of insurance company's judgment for benefits paid to insured against insured's judgment for attorney's fees against insurer); *see also N. Star Capital Acquisitions, LLC v. Krig*, 611 F.Supp.2d 1324, 1337 (M.D. Fla. 2009) (noting that defendant may be entitled to set-off statutory FCCPA damages against debt owed by plaintiffs); *Lundsted v. JRV Holdings*, LLC, Case No. 14-CV-13981, 2016 WL 1665154, at *2 (E.D. Mich. Apr. 27, 2016) (allowing set off of statutory penalty).

In *Forman*, the party entitled to fees argued that the relevant statute awarded fees and allowing set off would undermine the purpose of the relevant statute.  *Forman*, 600 F.2d at 483. He also argued that the fees were owed to his attorney and therefore, the judgments weren't owed to the "same parties in the same capacity."  *Id*.  The court rejected these arguments because it found set-off would both serve judicial efficiency and discourage needless litigation.  *See id*. at 484-85.  Similarly, here, Multibank has an order granting entitlement to deficiency judgment against Plaintiff and his wife, jointly and severally.  (*See* Defs.' Tr. Ex. 35.)  Thus, if Plaintiff obtains a judgment against Multibank here, the parties will have mutual judgments.  As such, set off of any TCPA and FCCPA judgments is appropriate.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff cannot establish liability against either Defendant under the TCPA, and he cannot establish liability against RoundPoint under the FCCPA.

Dated: June 16, 2017.
By: */s/ Eve A. Cann*
Eve A. Cann
Florida Bar Number: 40808
*ecann@bakerdonelson.com*
*mymarks@bakerdonelson.com*
Angelica M. Fiorentino
Florida Bar Number: 85886
*afiorentino@bakerdonelson.com*
*rgustafson@bakerdonelson.com*

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
SunTrust Center
200 South Orange Ave.
PO Box 1549
Orlando, FL  32802-1549
Telephone:  (407) 422-6600
Facsimile:  (407) 841-0325
*Counsel for Multibank and RoundPoint*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 16, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to:

Chris R. Miltenberger, Esquire
Law Office of Chris R. Miltenberger, PLLC
1340 N. White Chapel, Suite 100
Southlake, TX  76092-4322
*chris@crmlawpractice.com*

Brandon J. Hill, Esquire
Wenzel Fenton Cabassa, P.A.
1110 North Florida Avenue, Suite 300
Tampa, FL  33602
*bhill@wfclaw.com*

*/s/ Eve A. Cann*
Eve A. Cann

38