## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**LARRY HARRINGTON,**

          Plaintiff

                                 2:15-cv-322-JA-MRM

vs.

**ROUNDPOINT MORTGAGE**         JURY DEMANDED
**SERVICING CORPORATION and**
**MULTIBANK 2010-1 SFR VENTURE,**
**LLC**

          Defendants

_____/

### PLAINTIFF LARRY HARRINGTON'S TRIAL BRIEF


By:   */s/ Chris R. Miltenberger*
           Chris R. Miltenberger
           Texas Bar Number:
           14171200

**The Law Office of Chris R.**
**Miltenberger, PLLC**

1340 N. White Chapel, Suite 100
Southlake, Texas 76092-4322
817-416-5060 (office)
817-416-5062 (fax)
chris@crmlawpractice.com

*Trial Counsel*
*Admitted Pro Hac Vice*

**Wenzel Fenton Cabassa, PA.**

Brandon J. Hill
Florida Bar Number: 37061
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct No.: 813-337-7992
Main No.: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com

**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically through the Court's CM/ECF system in compliance with the Local Rules on June 16, 2017.  As such, this document was served on all counsel of record who are deemed to have consented to electronic service.

By:      /s/ Chris R. Miltenberger
            Chris R. Miltenberger

COMES NOW Plaintiff Larry Harrington ("**Plaintiff**" or "**Harrington**"), and presents to this Court, RoundPoint Mortgage Servicing Corporation ("**RoundPoint**") and Multibank 2010-1 SFR Venture, LLC ("**Multibank**") (RoundPoint and Multibank collectively, "**Defendants**") his Trial Brief:[1]

## I.   STATEMENT OF FACTS

1.    This case involves allegations that Defendants (1) violated the Telephone Consumer Protection Act's ("**TCPA**"), Pub. L. No. 102-243, 105 Stat. 2394, codified as amended at 47 U.S.C. § 227, by calling Mr. Harrington's cell phone with equipment that qualifies as an "automated telephone dialing system" without first obtaining consent to do so from Mr. Harrington; and (ii) violated the Florida Consumer Collection Practices Act ("**FCCPA**") by willfully communicating with Plaintiff or any member of his family with such frequency as can reasonably be expected to harass Plaintiff or by willfully engaging in other conduct which can reasonably be expected to abuse or harass Plaintiff in the process of attempting to collect on a consumer debt.

2.    In September of 2003, Plaintiff and his wife, Lori Harrington (collectively, the "**Harringtons**"), executed an agreement (the "**Construction Agreement**") with Oyster Bay Homes, Inc. ("**Oyster Bay**") in anticipation of building a home at 3161 Rustic Lane, North Fort Myers, Florida 33917 (the "**Property**").   (Doc. 140 at p. 2; Doc. 111-5).   The Construction Agreement set forth the funds the Harringtons were to pay their builder. (Doc. 120-2 at ¶ 7).   The Construction Agreement did *not* set forth the funds that the Harringtons were to receive from the

---

[1] By submitting this pre-trial brief Plaintiff does not waive his request for a jury trial and his objection to the Court's striking of his jury demand.

lender for the construction of their home on the Property. (*Id.*).  The Construction Agreement included Plaintiff's cell phone number (the "**5307 Number**").  (Doc. 111-5 at p. 1).

3.      On or about November 26, 2003, Harrington and Lori Harrington took out a loan ("**Loan**") with Riverside Bank of the Gulf Coast ("**Riverside Bank**") in connection with their purchase of the Property. (Doc. 140 at p. 2; Doc. 111-3). In so doing, they executed a promissory note ("**Promissory Note**") in favor of Riverside Bank that was secured by a mortgage ("**Mortgage**") on the Property. (Doc. 140 at p. 2; Doc. 111-3; 111-4). The Note and Mortgage were then put together in a file for the Loan. (Doc. 140 at p. 2).

4.      Neither Plaintiff nor Lori Harrington provided the Construction Agreement to Riverside Bank at any time.   (Doc. 120-2 at ¶ 4; Doc. 120-6 at ¶ 3).   Neither Plaintiff nor Lori Harrington know how Riverside Bank came to be in possession of the Construction Agreement. (Doc. 120-2 at ¶ 4; Doc. 120-6 at ¶ 3). Neither Plaintiff nor Lori Harrington authorized Oyster Bay to provide the Construction Agreement to Riverside Bank.  (Doc. 120-2 at ¶ 5; Doc. 120-6 at ¶ 4). Neither Plaintiff nor Lori Harrington knew that Riverside Bank was in possession of the Construction Agreement until it was produced by RoundPoint in this litigation.   (Doc. 120-2 at ¶ 6; Doc. 120-6 at ¶ 5).

5.      Neither the Promissory Note nor the Mortgage reference the Construction Agreement (Doc. 111-3; Doc. 111-4), and the Construction Agreement does not contain a waiver relating to or allowing its transmittal to other parties (Doc. 111-5). (Doc. 140 at pp. 12-13).

6.      In 2009, Riverside Bank was taken over by the Federal Deposit Insurance Company ("**FDIC**"), and in the process the FDIC acquired all of Riverside Bank's loans. (Doc. 140 at p. 2; Doc. 111 at ¶ 6). Later, Multibank allegedly acquired the Loan from the FDIC, who, as a result of

the transaction, allegedly transmitted a file containing the Promissory Note and Mortgage (the "**Loan File**") to MultiBank who in turn allegedly transmitted the file to RoundPoint, Multibank's debt service company. (Doc. 140 at p. 2; Doc. 111-2 at ¶ 8).

7.      The Harringtons subsequently allegedly defaulted on their obligations vis-à-vis the Promissory Note. (Doc. 140 at p. 3; Doc. 111-2 at ¶ 9).

8.      On numerous occasions the FDIC attempted to contact Plaintiff by telephone and by letter about the Loan and was aware that it was not able to contact him by telephone.

9.      RoundPoint also attempted to contact Plaintiff by telephone but was unsuccessful in doing so as the telephone number it was dialing was not a working number. (Doc. 111-6 at pp. 1-2).  Yet, RoundPoint repeatedly called the non-working number.

10.     Thus, on November 1, 2010 Plaintiff's account with RoundPoint was listed by RoundPoint in its account servicing system as a "SKIP" account.  (Doc. 120-5 at p. 2, entry dated 11/1/2010).

11.     The telephone number ending in 5307 ("the 5307 Number") is Plaintiff's individual cellphone and he was and is the sole person listed on the account as the subscriber and the person responsible for payment on the account.  (Doc. 120-2 at ¶ 22).   The 5307 Number was part of a group of cell phones on a family plan paid for by Plaintiff. (Doc. 129-2 at 14:19-21, 17:25). Plaintiff used the 5307 Number as the primary contact for Aced Interiors Drywall, a company Plaintiff owns and operates (Doc. 129-2 at 35:12-25; 40:21-25).

12.     While Defendants allege that, on November 29, 2010, Plaintiff called to check on the status of the loan and, in so doing, provided RoundPoint with the 5307 Number (Doc. 111-2 at

¶ 20), Plaintiff disputes this allegation, and testifies that he did not provide his 5307 Number (or any cell number) to RoundPoint on November 29, 2010 or any other date. (Doc. 120-2 at ¶ 8).

13.    Although all phone calls with agents and account holders are recorded (Doc. 120-22 at 87:25-89:4), and, indeed, RoundPoint has a transcript of other Harrington calls RoundPoint does not have a transcript of the alleged November 29, 2010 phone call during which RoundPoint claims Mr. Harrington gave RoundPoint his 5307 Number. (Doc. 140 at p. 3).   Defendants have provided only an entry on an internal activity tracking system for that day that reads "BRRW CALLED RQST STATS OF ACCT." (Doc. 111-6 at p. 3). Such an entry in no manner indicates that Plaintiff gave Defendant *any* number at which he could be reached.   As stated previously, Plaintiff denies that he provided his cell number to RoundPoint. (Doc. 120-2 at ¶ 8).   Additionally, the records do not state that "Larry Harrington" called.   The documents only states that "BRRW" called.   There is no evidence that BRRW means Larry Harrington. Additionally, Defendants contend that because RoundPoint's internal database was updated with the 5307 Number, Plaintiff must have provided the 5307 Number in a telephone call with RoundPoint's call center agent. Defendants assumptions are not sufficient to satisfy their burden of proof on the issue of consent.

14.    Jamie Harrington (Plaintiff's daughter) contacted RoundPoint on June 2, 2011 at the request of her mother, Lori Harrington, because Lori Harrington was ill with breast cancer. (Doc. 120-6 at ¶ 9; Doc. 120-7 at ¶ 3).   Lori Harrington asked Jamie Harrington to place the call in order to determine certain information about the insurance on the Harringtons' home. (*Id.*; *see also* Doc. 111-10 at 2:6-2:11, 4:4-5:8).   According to the transcript of the call produced by Defendants,

Jamie Harrington gave RoundPoint the 5307 Number as the "the number she could be reached at." (Doc. 111-10 at 3:19-21).

15.     Plaintiff did not authorize Jamie Harrington to provide his cell number to RoundPoint or to any anyone. (Doc. 120-2 at ¶ 12; Doc. 120-7 at ¶ 4).   Lori Harrington did not give Jamie Harrington Plaintiff's cell phone number (the 5307 Number), nor did she instruct Jamie Harrington to provide that cell number to RoundPoint or to any anyone. (Doc. 120-6 at ¶ 9; Doc. 120-7 at ¶ 3).

16.     However, RoundPoint began attempting to contact Plaintiff via the 5307 Number on that day and continued to do so in the days, months, and years that followed. (Doc. 140 at p. 4). Each time RoundPoint attempted to contact Plaintiff, it was for the purpose of collecting a debt. (*See* Doc. 120-5 at pp. 1-35, entries dated 6/22/10 to 5/5/14; Doc. 120-22 at 147:10-148:6; Doc. 120-243(Mini Miranda warning to be given with each call)). The Mini-Miranda warning that RoundPoint was giving with each call states "Federal law requires we inform you that RoundPoint Mortgage Servicing Corporation is a debt collector attempting to collect a debt and any information obtained will be used for that purpose." (Doc. 120-22 at 147:10-148:6; Doc 120-23). RoundPoint is licensed in the State of Florida as a "consumer collection agency." The only debts RoundPoint attempts to collect are mortgages as RoundPoint is a mortgage servicing company.

17.     On June 28, 2011, Plaintiff called RoundPoint to request information regarding his account and to dispute the amount RoundPoint claimed he owed.  (Doc. 140 at p. 4; Doc. 120-2 at ¶ 9; Doc. 111-11 at 2:6-10, 3:14-18, 4:19-23). After asking him a series of security questions that **did not include requesting a telephone number where he could be reached,** RoundPoint informed him that his mortgage was in foreclosure because the account had been behind since September

2010. (Doc. 140 at p. 4 (emphasis added); Doc. 111-11 at 4:2-8). Plaintiff was told on that date that the account was "active in foreclosure and [RoundPoint] [has] stopped in the account." (Doc. 111-11 at 5:10-5:12). Plaintiff was also told by RoundPoint that "**they will not be taking any payments.**" (*Id.* at 5:22-5:23). RoundPoint would not give Plaintiff details about the account. (*See id.* at 7:3-7:14). Plaintiff was then told to contact RoundPoint's attorney for information about the account. (*Id.* at 6:25-7:7). (*See also* Doc. 120-2 at ¶ 9). Due to the fact that RoundPoint stated that the property was in foreclosure, that it would not be taking any more payments, and that it would not give Plaintiff any details about the account, all reasonable efforts at persuasion and negotiations on the debt had failed at that point.

18.     On March 2, 2012, Multibank filed a foreclosure action against Plaintiff in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County. *See*, Multibank 2010-11 SFR Venture, LLC v. Harrington et al., 12-CA-051326 (Fla. 20th Cir. Ct. filed March 2, 2012). (Doc. 120-5 at p. 17, entry dated 3/8/12; Doc. 140 at p. 5). As of at least that date, if not on June 28, 2011, all reasonable efforts at persuasion and negotiations on the debt had failed. Plaintiff hired an attorney to defend himself and Lori Harrington in the foreclosure. (Doc. 120-2 at ¶ 14).

19.     At least as of May 30, 2012, RoundPoint was aware that Plaintiff was represented by counsel (the Hagen Law Firm). (Doc. 120-2 at ¶ 14; *see also* Doc. 120-5 at p. 19 entries dated 5/30/12). The Hagen Law Firm withdrew as Plaintiff's counsel on May 7, 2013. (Doc. 120-2 at ¶ 11; Doc. 120-3). RoundPoint's records reflect that between the date RoundPoint learned Plaintiff was represented by counsel and the date the Hagen Firm withdrew, RoundPoint called Plaintiff at least 141 times (*see* Doc. 120-13) and left at least 67 messages even though he was represented by counsel (*see* Doc. 120-18). With regard to the present lawsuit the calls were made outside the

statute of limitations under the FCCPA; otherwise the calls would be a violation of section 559.72(18) of the FCCPA.  Fla. Stat. § 559.72(18).

20.     After being unrepresented for a period of time in his foreclosure proceeding Plaintiff hired new counsel. On May 5, 2014, RoundPoint received a facsimile from Plaintiff's new counsel stating that he represented Harrington and directing all future communications to his office. (Doc. 140 at p. 5; Doc. 111-2 at ¶29; Doc. 111-6 at p. 31, entries dated 5/5/14).  Only at that point in time, when RoundPoint learned that Plaintiff was again represented by an attorney, did RoundPoint cease calling the 5307 Number. (Doc. 140 at p. 5; Doc. 111-2 at ¶ 29).

21.     RoundPoint's records reflect that after MultiBank/RoundPoint filed for foreclosure, RoundPoint made at least 453 calls to Plaintiff (*see* Doc. 120-10), including at least 263 calls that were made within the statute of limitations of the FCCPA (*see* Doc. 120-12). Additionally, RoundPoint's records reflect that RoundPoint left at least 172 messages for Plaintiff after foreclosure (*see* Doc. 120-15), including at least 74 messages that were left within the statute of limitations of the FCCPA (*see* Doc. 120-17).

22.     Plaintiff disputes that the call logs and other records of RoundPoint accurately reflect the number of calls RoundPoint made to the 5307 Number and cell phones of family members that are part of Plaintiff's family plan for which he pays.  Plaintiff estimates that approximately 1752 calls were made during the four years in question (using the formula of (365 days x 4 years) x 1.2 calls per day).  Plaintiff did not keep a log of the calls and is estimating from memory. Accordingly, the actual number of calls placed by RoundPoint to Plaintiff is more than the 652 calls RoundPoint's records reflect and to which it admits to placing.  (*See* Doc. 120-2 at ¶¶ 16-21).

23.     With regard to the FCCPA claim of harassment the volume of calls is astonishing and alone makes this case outside the ordinary:

- Between June of 2010 and May of 2014, RoundPoint called Plaintiff and his family at least 652 times. (Doc. 120-9).

- Between June of 2010 and May of 2014, RoundPoint left at least 317 messages for Plaintiff or his family.  (Doc. 120-14).

- On the one occasion when Plaintiff spoke to a representative of RoundPoint on June 28, 2011, RoundPoint told him they would not accept payments, would not provide any information to Plaintiff, said his property was in foreclosure, and told him to contact RoundPoint's attorney. (*See* Doc. 111-11).  After doing so RoundPoint called Plaintiff at least another 527 times. (Doc. 120-11) and left at least another 237 messages (Doc. 120-16).

- Within the statute of limitations period for the FCCPA, RoundPoint called Plaintiff at least 263 times, after foreclosure had begun. (Doc. 120-12).

- Within the statute of limitations period for the FCCPA, RoundPoint left at least 74 messages for Plaintiff, after foreclosure had begun. (Doc. 120-17).

24.     Aside from the sheer volume of calls, the manner in which the calls were placed shows a violation of the FCCPA. During the statute of limitations period alone, on five occasions RoundPoint called Plaintiff four times in a single day, on 24 occasions RoundPoint called Plaintiff three times in a single day, and on 40 occasions RoundPoint called Plaintiff twice in a single day. (Doc. 120-19).  On two days RoundPoint left multiple messages.  (*Id.*)  On 14 days RoundPoint called back after leaving a message on that same day. (Doc. 120-20).  On at least 29 occasions RoundPoint called back within 2 hours after a first call.  Once RoundPoint called back 3 minutes later, once 5 minutes later, once 8 minutes later, once 13 minutes later, once 20 minutes later and once 30 minutes later, all within the statute of limitations. (Doc. 120-19).

25.     Plaintiff was upset by the harassing nature of RoundPoint's conduct and under the FCCPA is entitled to statutory, actual and punitive damages.

## II.   Legal Argument: Liability

**A.   Count I:  Plaintiff's TCPA Claim:  Defendants are liable for the calls they placed to Plaintiff and his family under the TCPA.**

Defendants concede that they made all of the calls listed in the call detail records RoundPoint produced.  (Doc. 140 at p. 7).  However, they argue that they are not liable under the TCPA for a number of reasons.  Each of those reasons is discussed below. First, they argue that, with regard to a portion of the calls, they are not liable because the calling device utilized for such calls (*i.e.* the Cisco dialing system) was not an automated telephone dialing system ("**ATDS**") under the TCPA.  Second, they argue that Plaintiff (or Plaintiff's agent on behalf of Plaintiff) consented to all the calls at issue by providing RoundPoint with the 5307 Number.  (*See* Doc. 111 at pp. 9-18).  Plaintiff will prove the elements of his case under Count I of his Second Amended Complaint (*see* Doc. 81 ¶¶ 52-58), including proof that RoundPoint made the calls at issue and in at least 351 instances with an ATDS, there was no legal consent under the TCPA to the calls to the 5307 Number, and that because there is liability of RoundPoint, there is necessarily liability of Multibank.

### 1.   Article III Standing

The Court should find that Plaintiff has standing under the doctrine of *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (May 16, 2016).  Plaintiff has pled multiple concrete and particularized injuries of the exact nature the TCPA was designed to protect.[2]

Last month Judge Steele quickly disposed of a defendant's argument that TCPA plaintiffs do not have Article III standing and that the plaintiff must show he/she answered the call to have standing.  Judge Steele wrote:

---

[2] Plaintiff will not belabor this point as the law is well-settled in the Eleventh Circuit and this district.

> Congress has prohibited the making of certain prohibited calls, and plaintiff has a right under the TCPA to be free of such prohibited calls. The Court finds that receipt of such calls made in violation of the statute is an injury that Congress has elevated to the status of a legally cognizable injury through the TCPA.

*Tillman v. Ally Fin. Inc.*, No. 2:16-CV-313-FTM-99CM, 2017 WL 1957014, at *6 (M.D.

Fla. May 11, 2017).

Judge Steele also ruled that a plaintiff did not have to answer the calls in order to

have Article III standing.  He stated:

> Ally argues that plaintiff must have been aware of the call when it occurred to be harmed, citing *Romero v. Dep't Stores Nat'l Bank*, 199 F. Supp. 3d 1256 (S.D. Cal. 2016). The Court disagrees. Although hearing the phone ring and being interrupted might be more of an intrusion, noticing that a voicemail was left or that numerous calls were missed can be intrusive as well.

*Id.* at 7.

Just three days ago Magistrate Judge Mirando also confirmed that a TCPA plaintiff

has Article III standing. *Williamceau v. Dyck-Oneal, Inc.*, No. 2:16-CV-855-FTM-29CM,

2017 WL 2544872, at *3 (M.D. Fla. June 13, 2017).  *See also*, *Mohamed v. Off Lease Only,*

*Inc.*, No. 15-23352-CIV, 2017 WL 1080342, at *2 (S.D. Fla. Mar. 22, 2017); *Rogers v. Capital*

*One Bank (USA), N.A.*, 2016 WL 3162592, *2 (N.D. Ga. 2016).

## 2.  Statutory Basis for TCPA Claims Regarding Calls Placed to Cellular Telephones

Count I of the Second Amended Complaint alleges that Defendants violated the TCPA by

placing numerous automatically-dialed calls to the 5307 Number without Plaintiff's prior express

consent. (Doc.  81 at ¶¶ 52-58).   The TCPA prohibits "any call (other than a call made for

emergency purposes or made with the *prior express consent of the called party*) using any automatic

telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned

to a . . . cellular telephone." 47 U.S.C. § 227(b)(1)(A)(iii)(emphasis added).  Thus, Plaintiff will prove that RoundPoint made calls using an automatic telephone dialing system ("**ATDS**") to Plaintiff's cell phone (the 5307 Number) without his prior express consent.  *Id.*

It should be noted that the ability of Defendants to avail themselves of the statutory carve-out regarding express consent hinges on the precise meaning of two phrases: the "called party" and "prior express consent."  The Eleventh Circuit has found that the "called party" is a phone's current subscriber, meaning the individual that pays the bills or needs the line in order to receive other calls. *See Osorio v. State Farm Bank, F.S.B.,* 746 F.3d 1242, 1251-52 (11th Cir. 2014); *see also In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 30 F.C.C. Rcd. 7961, 8000–01 (2015) (the Federal Communications Commission ("**FCC**") defines the "called party" as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan.").  Plaintiff is the "called party."

Pursuant to its rulemaking authority, the FCC has clarified that, in the context of prior express consent, "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *Murphy v. DCI Biologicals Orlando, LLC,* 797 F.3d 1302, 1305–06 (11th Cir. 2015)(quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8769 (1992) (internal quotation marks omitted)).

The FCC has provided additional guidance on this issue. In 2008, the FCC issued a declaratory ruling regarding autodialed and prerecorded calls to wireless numbers by creditors in the context of pre-existing debt. There, the FCC stated that "the provision of a cell phone number

to a creditor - as part of a credit application, for example - reasonably evidences prior express consent . . . to be contacted at that number regarding the debt." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 564 (2008). It further clarified "that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed[.]" *Id.* at 565. Significantly, the FCC ruled that creditors have the responsibility for "demonstrating that the consumer provided prior express consent." *Id.*

### 3. Plaintiff is the Called Party under the TCPA.

Plaintiff is the called party under the definition of the TCPA.  Therefore, Plaintiff is the individual that had to give his prior express consent in order for the Defendants not to be liable under the TCPA for the calls in question.

Plaintiff is the called party because he is the 5307 Number phone's current subscriber, and the individual that paid (and pays) the bills and needed (and needs) the line in order to receive other calls. *See Osorio,* 746 F.3d at 1251-52; *see also* 30 F.C.C. Rcd. 7961, 8000–01 (2015) (the FCC defines the "called party" as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan."). The 5307 Number is Plaintiff's individual cellphone and he was and is the sole person listed on the account as the subscriber and the person responsible for payment on the account.  (Doc. 120-2 at ¶ 22).   The 5307 Number was part of a group of phones on a family plan paid for by Plaintiff. (Doc. 129-2 at 14:19-21, 17:25).   Plaintiff used the 5307 Number as the primary contact for Aced Interiors Drywall, a company Plaintiff owns and operates. (Doc. 129-2 at 35:12-25; 40:21-25).   Thus, Plaintiff alone possessed the authority to consent to

calls on the 5307 Number.  (Doc. 140 at p. 17).  Although Plaintiff could, under the law, authorize others to do so, they would have to do so as his agent.  (*Id.*).  As set forth below, Plaintiff will prove that he did not give his consent, and no other person or entity had the apparent or actual authority to do so.[3]

### 4.  The Calls at Issue Were Placed by RoundPoint Using an ATDS in All Instances.

RoundPoint used two different systems to make the calls at issue in this trial, the Cisco dialing system and the Cameo dialing system.  Defendants have admitted that the Cameo dialing system is an ATDS.  (Doc. 135-1 at p. 6).

The issue regarding whether the Cisco dialing system is an ATDS will be addressed by Plaintiff's expert, Randall Snyder.  His testimony was previously explained in Plaintiff's Response in Opposition to Defendants' Motion to Exclude Expert Witness Testimony of Randall Snyder.  (Doc. 135) (the "**ATDS Response**").  Defendant has not designated any technical experts.

Mr. Snyder will testify that with regard to the Cisco system and Cameo system RoundPoint used dialing equipment that "has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list or database of numbers, and to dial such numbers without human intervention."  (Doc. 128-1, ¶¶ 35-36).  Those technical capacities make the dialing systems an ATDS under the FCC rulings as discussed below and to which this Court is bound by the Hobbs Act.

---

[3] Additionally, Plaintiff is the "called party" for the other cell phones used by his family members but that are a part of his family plan for which Plaintiff paid.  (Doc. 129-2 at 14:19-21, 17:25). Plaintiff will provide testimony that these additional cell numbers were called by RoundPoint, even though their records do not so reflect.  (Doc. 120-2 at ¶¶ 16-21; *supra* ¶ 22).

The controlling issue is whether a given dialing system has the "capacity" to function as an autodialer, not how a telemarketer/debt collector uses the system. *In the Matter of Rules & Regs. Implementing the TCPA*, 18 F.C.C.Rcd. 14014, ¶ 132 (July 3, 2003) ("**2003 Order**"); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (a dialing system "need only have the capacity" to function as an autodialer).

### a.   The TCPA and Autodialers

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).   The FCC has instructed that the term "autodialer" must be broadly construed in order to ensure that new technology is not used to work around the law's consumer protections.   *In the Matter of Rules & Regs. Implementing the TCPA*, 30 F.C.C.Rcd. 7961, ¶ 15 (July 18, 2015) ("**2015 Order**") ("We agree that Congress intended a broad definition of an autodialer").   Hence, the term "autodialer" is not limited to dialing systems that have the capacity to generate numbers, but also includes systems that have "the capacity to dial numbers *without human intervention*."   2003 Order at ¶ 132.

It is well-settled that "predictive dialers" qualify as "autodialers" under the TCPA. Predictive dialers are dialing systems that "store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiency for call centers."   2003 Order at ¶¶ 131-33; *see also, e.g.*, *Harnish v. Frankly Co.*, 5:14-CV-02321-EJD, 2015 WL 1064442, at *2 (N.D. Cal. March 11, 2015) ("The FCC has found that equipment having 'the capacity to dial numbers without human intervention,' including predictive dialers, falls under the definition of an ATDS").

Both the FCC and the courts have ruled that the controlling issue is whether a given dialing system has the "capacity" to function as an autodialer, not how a telemarketer uses the system. 2003 Order at ¶¶ 133-34; *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (a dialing system "need only have the capacity" to function as an autodialer). In other words, even if a telemarketer/debt collector uses a system to make manual calls, the system qualifies as an autodialer if the system is capable of making calls in an automated fashion. In 2015, the FCC further ruled that "the capacity of an autodialer is not limited to its current configuration but also includes its *potential functionalities*." 2015 Order at ¶ 16 (emphasis added). The FCC also explained that dialing equipment qualifies as an autodialer under the TCPA if it can be "paired with predictive dialing software." *Id.* at ¶ 14. Under the Hobbs Act, this Court is bound by the FCC Rulings. *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119-20 (11th Cir. 2014).[4]

## b. RoundPoint's Cisco Dialing System and Cameo Dialing System

Mr. Snyder's testimony is that each of the Cisco dialing system and the Cameo dialing system is "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list or database of numbers, and to dial such numbers without human intervention." (Doc. 128-1 at ¶¶ 35-36). He further testifies that

---

[4] In *Mais* the Eleventh Circuit specifically ruled that FCC rulings have the force of law and could not be disregarded by a district court. The Eleventh Circuit stated:

> The 2008 FCC Ruling thus has the force of law and is an order reviewable under the Hobbs Act in the courts of appeals. See *Leyse v. Clear Channel Broad., Inc.*, 545 Fed.Appx. 444, 455 (6th Cir.2013) (unpublished) ("[T]here is little question that Congress intended FCC rules of the type at issue here to have force of law."). In short, we hold that the district court was without jurisdiction to consider the wisdom and efficacy of the 2008 FCC Ruling.

*Id.* at 1121.

both systems have the capacity to make calls using the "predictive" dialing methods. (Doc. 128-1 at ¶¶ 25-26). RoundPoint does not dispute that the dialing systems have this capacity. With regard to the Cameo dialing system RoundPoint admits in its interrogatory answers that it is an ATDS. (Doc. 135-1 at p. 6, interrogatory response 1(g)). With regard to the Cisco dialing system, the manual produced by RoundPoint addresses its preview dialing capabilities and its predictive dialing capabilities both of which qualify as an ATDS. (Doc. 128-1 at pp. 64-74). Consistent with this evidence RoundPoint corporate representative David Hughes testified that both preview dialing and predictive dialing meet the definition of an ATDS. (Doc. 120-22 at 36:8-24). Further, he admitted and agreed that both the Cisco dialing system and the Cameo dialing system had the capacity to store and automatically dial telephone numbers. (Doc. 120-22 at 93: 8-14). Finally, the declaration of Cisco Systems, in response to RoundPoint's deposition on written questions, confirms the Cisco dialing system's capacity to automatically and predictively dial. (Doc. 135-2 at ¶¶ 3-6).

### i.    Capacity v. Functionality

It is anticipated that Defendants will refer to the Cisco dialing system's then present "functionality" as opposed to "capacity." It is anticipated that Defendants will argue that the Cisco dialing system can only be an ATDS if RoundPoint had purchased the license to use the Cisco system in the predictive dialing mode. Whether they did or not is immaterial.[5] The Cisco dialing system had the "capacity" to function as a predictive dialer regardless of how it was then

---

[5] Even if it is material, RoundPoint is prohibited from testifying about the licenses it acquired for the Cisco dialing system. In his deposition as a RoundPoint's corporate representative, Mr. Hughes was asked whether RoundPoint had a license for the predictive dialing feature as that topic was listed on his topics of questioning. Hughes answered that he did not know and that the company had no knowledge of the licenses acquired. (Doc. 120-22 at 45:12-23). Thus, RoundPoint is estopped from presenting testimony regarding the licenses it had purchased for the Cisco dialing system.

licensed and configured. That is a central holding of the FCC's 2015 Order.  In the 2015 Order the

FCC stated:

> We agree with commenters who argue that the TCPA's use of "capacity" does not exempt equipment that lacks the "present ability" to dial randomly or sequentially. We agree that Congress intended a broad definition of autodialer, and that the Commission has already twice addressed the issue in 2003 and 2008, stating that autodialers need only have the "capacity" to dial random and sequential numbers, rather than the "present ability" to do so. Hence, any equipment that has the requisite "capacity" is an autodialer and is therefore subject to the TCPA.

2015 Order at ¶ 15.

> The FCC further explained that:

> In the 2003 TCPA Order, the Commission held that predictive dialers met the definition of an autodialer because that "hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." By finding that, even when the equipment presently lacked the necessary software, it nevertheless had the requisite capacity to be an autodialer, the Commission implicitly rejected any "present use" or "current capacity" test. In other words, the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities.

2015 Order at ¶ 16.

The Defendants' argument is based on a false understanding of the applicable law. If the

dialing system had the capacity, present or future, to predictively dial it is an ATDS. The

"functionality" of the system at the time of the improper phone calls is not relevant. The FCC has

specifically rejected this argument. *In re Collecto, Inc.*, No. 14-MD-02513-RGS, 2016 WL 552459,

at *4 (D. Mass. Feb. 10, 2016)("[T]he FCC's definition of an ATDS is based on the capacity of a

dialer to operate without human intervention, and not on whether some act of human agency

occurs at some point in the process."); *Lathrop v. Uber Techs., Inc.*, No. 14-CV-05678-JST, 2016

WL 97511, at *2 n.3 (N.D. Cal. Jan. 8, 2016)("The 2015 FCC Order justified its 'potential

capacity' interpretation based on the 2003 FCC Order: 'By finding that, even when the equipment presently lacked the necessary software, it nevertheless had the requisite capacity to be an autodialer, the Commission implicitly rejected any 'present use' or 'current capacity' test.' 2015 FCC Order ¶ 16.'').

## ii.    Human Intervention

The concept of "human intervention" is only relevant to determining whether a dialing system qualifies as an ATDS.  Once a dialing system qualifies as an ATDS (capability to store and dial calls without human intervention) then the concept of human intervention is no longer applicable. *See McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 WL 428728, at *3 (N.D. Cal. Jan. 30, 2015)(equipment was not an ATDS because it did not have the capacity to send texts without human intervention).

The TCPA itself does not discuss human intervention. The FCC, however, refers to the term "human intervention" in determining if a dialing system is an ATDS. According to the FCC, to be an ATDS the system must be capable of storing numbers and dialing those numbers without human intervention. If a system is capable of dialing without human intervention it is an ATDS regardless of how it was used by the telemarketer/debt collector. Nowhere does the FCC rule that in order to violate the TCPA an entity must have "used an ATDS without human intervention" as previously asserted by Defendants. As stated previously, once the dialing equipment qualifies as an ATDS it does not matter how it was used.[6]

---

[6]Additionally, Defendants' assertion that there was "human intervention" in the dialing process is not only irrelevant, it is also factually incorrect. Defendants' corporate representative David Hughes testified that the call center agents had no involvement in the **actual dialing of the telephone numbers**. (Doc. 120-22; 56:5 – 57:14 (emphasis added)).

### 5.   Plaintiff Did Not Consent to Calls to the 5307 Number.

Plaintiff's testimony will be that he never provided his cell phone number (the 5307 Number) either in connection with his Mortgage or to Defendant RoundPoint. Plaintiff also contends that his spouse could not provide consent for him. *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014). The issue of consent is a dispositive factual dispute to be resolved regarding the TCPA. If there was no consent, Defendants will be liable under the TCPA.

### a.   Plaintiff Did Not Provide the 5307 Number in the Loan Application.

Defendants will likely assert that Plaintiff gave prior express consent under the TCPA to be called on the 5307 Number regarding his debt to Riverside Bank (and subsequently to Multibank) because the phone number appears in a Construction Agreement that the Harringtons entered into with an independent third party, Oyster Bay.  Oyster Bay was the builder with whom they contracted to build their home.  Defendants have, in the past, argued that the Construction Agreement was "a part of [the] credit transaction" entered into between Plaintiff (and Lori Harrington) and Riverside Bank on November 26, 2003 (Doc. 111-3 at p. 1 and Doc. 111-4 at p. 1). (*See* Doc.  111 at p. 9).

As stated previously, the FCC has issued a Declaratory Ruling "clarify[ing] that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559 (2008)("**2008 FCC Order**"). Specifically, the FCC "conclude[d] that the provision of a cell phone number to a creditor, *e.g.,* as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be

contacted at that number regarding the debt." *Id.* at 564. The FCC "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed." *Id.* at 564–65. The Commission concluded that "the burden will be on the creditor to show it obtained the necessary prior express consent" because "creditors are in the best position to have records kept in the usual course of business showing such consent." *Id.* at 565. [7]

The premise on which Defendants base their argument regarding the Construction Agreement is false. The Harringtons will testify that they did *not* provide the Construction Agreement to their lender at any time, much less, as the Defendants have falsely stated, to their lender to be placed in their loan origination file "in order to obtain funds to . . . construct the Harringtons' home." (*Compare* Doc. 111 at ¶ 5, *with supra* Part I, ¶¶ 4-5, Doc. 120-2 at ¶ 4, Doc. 120-6 at ¶ 3). The Construction Agreement is between the Harringtons and their builder, not the Harringtons and their lender. Doc. No. 111-5 at p. 1. The Defendants have produced *no* evidence in the record as to how the Construction Agreement was added to the Harringtons' loan application file. (*See supra* Part I, ¶ 4)(and cited authority in Doc. 111-2, ¶¶ 5-8). Again, both Harringtons will testify that they did not provide the lender with a copy of the Construction Agreement. Exh. A, ¶ 4; Exh. B ¶ 3. Thus, Defendants' argument on this point will fail as a matter of law as there is no evidence to support their assertion that the Harringtons' provided their cell phone number contained in the Construction Agreement to the lender.[8]

---

[7] Consent is an affirmative defense on which the Defendants have the burden of proof. *See*, *Williamceau v. Dyck-Oneal, Inc.*, No. 2:16-CV-855-FTM-29CM, 2017 WL 2544872, at *3 (M.D. Fla. June 13, 2017) ("[e]xpress consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof.")

[8] Additionally, there is no evidence that the Plaintiff authorized his builder, Oyster Bay, to provide the Construction Agreement to Riverside Bank. Plaintiff specifically testifies that he did *not* authorize Oyster Bay to do so. (*See supra*

In their Motion for Summary Judgment ("**Summary Judgment Motion**"), Defendants relied on certain cases for the proposition that, to show consent, "[t]he number at issue does not have to be provided directly to the calling party but instead, may be provided to an intermediary." (Doc. 111 at pp. 10-12).   The Court has ruled previously that such cases were not applicable to the case at hand.  (Doc. 140 at pp. 9-12).  Instead the Court ruled that the case of *Moise v. Credit Control Servs., Inc.* 950 F.Supp.2d 1251 (S.D. Fla. 2011) is relevant to this case.  (Doc. 140 at p. 12).   In *Moise*, a plaintiff visited his doctor for treatment and provided the doctor with his cell phone number. *Id.* at 1252. As part of the treatment, the plaintiff was referred to an independent medical laboratory for testing. *Id.* When the plaintiff did not pay his laboratory bills, the debt was turned over to a collection company that attempted to contact the plaintiff on his cellular phone. *Id.* As a result of those calls, the plaintiff filed suit against the defendant alleging violations of the TCPA. *Id.* at 1253. The court held that "if [p]laintiff gave his cell phone number directly to [the laboratory], that would constitute consent. However, if the number was given only to [p]laintiff's treating physician, then [p]laintiff did not give prior express consent to [the laboratory] or its third party collector." *Id.* With that, the court held that "[t]o whom Plaintiff gave his number remains an issue for trial." *Id.* (*See* Doc. 140 at p. 12).

In *McCaskill v. Navient Solutions, Inc.,* 178 F.Supp.3d 1281, 1293 (M.D.Fla. 2016), a Middle District of Florida court further elaborated on the requirements that a consumer must specifically authorize an intermediary to transfer a number to a creditor in order to constitute consent under the TCPA. The court stated that "'the intermediary may only convey consent that has *actually*

---

Part I, ¶¶ 5, 6; Doc. 120-2 at ¶ 5; Doc. 120-6 at ¶ 4).  Further, there is no agency relationship between Mr. Harrington and his builder. *Id.  See also* discussion, *infra* Part II.A.5.c where the requirements to establish an agency relationship under Florida law are discussed.  No agency relationship between Plaintiff and his builder existed for these purposes.

*been provided* by the consumer; the intermediary cannot provide consent on behalf of the consumer.'" *Id.* (quoting *In re GroupMe, Inc./Skype Commc'ns S.A.R.L. Pet.,* 29 FCC Rcd. 3442, 3447 (2014)(emphasis added).

In the case at hand, Plaintiff's entrance into the Construction Agreement with Oyster Bay was not part of the "transaction creating the debt" to Riverside Bank. The Construction Agreement (executed in September 2003) (Doc. 111-5 at p. 1), sets forth the funds the Harringtons were to pay their builder (Doc. 120-2 at ¶ 7). The Note and the Mortgage, entered into between Plaintiff (and Lori Harrington) and Riverside Bank on November 26, 2003 set forth the funds the Harringtons were to receive from Riverside Bank. (Doc. 111-3 at p. 1; Doc. 111-4 at p. 1). The Note and the Mortgage in no way reference, rely, incorporate, or in any manner include the Construction Agreement as part of the loan transaction between the Harringtons and Riverside Bank. (*See* Doc. 111-3 and Doc. 111-4).

Even if the Court concludes that the Construction Agreement was part of the "transaction creating the debt" to Riverside Bank, although Plaintiff will provide sufficient evidence that it is not, Defendants' argument that Plaintiff gave consent under the TCPA via the Construction Agreement fails under *McCaskill*. The Construction Agreement does not contain any language that could be construed as permission by the Harringtons to Oyster Bay to send the personal information contained in the Construction Agreement to *any* lender of the Harringtons. (Doc. 111-5). Thus, there will be no evidence that Plaintiff Mr. Harrington did *actually provide* Oyster Bay, the intermediary, consent to provide his cell phone to Riverside Bank. *McCaskill,* 178 F.Supp.3d at 1293 (citation omitted). Therefore, under *McCaskill,* prior express consent by Plaintiff is not

proven by the inclusion of the cell phone number in the Construction Agreement and Defendants' argument on this point fails as a matter of law.[9]

>    **b. Plaintiff Did Not Give His 5307 Number to RoundPoint on November 29, 2010, and, Thus, He Did Not Give RoundPoint Consent to Call Him on that Number on November 29, 2010.**

Defendants will likely next assert they are entitled to judgment on Count I because they allege Plaintiff provided prior express consent to be contacted when he called RoundPoint on November 29, 2010 and provided the 5307 Number. In support, Defendants will likely introduce a portion of RoundPoint's purported loan history software that shows the addition of the 5307 Number to their electronic database the day after the call. (*See* Doc. 111-6 at p. 3). Defendants will attempt to bolster this evidence by stating that RoundPoint's regular business procedure is to require call center representatives to request at least two (2) phone numbers during incoming calls. (Doc. 111-2 at ¶ 19). The Court has already called into question this evidence by pointing out the fact that the RoundPoint representative on the June 28, 2011 call did not request even a single form of contact information from the Plaintiff. (Doc. 140 at p. 13 n. 6; Doc. 111-11).

Regardless, Plaintiff will testify that he did not provide his cell phone number (the 5307 Number) to RoundPoint in a November 29, 2010 telephone call. (Doc. 120-2 at ¶ 8).  There will

---

[9] Indeed, the Court has already recognized certain evidence that calls into serious question whether prior express consent was granted through possession of the Construction Agreement. (*See* Doc. 140 at pp. 12-13).  In its Order denying the Defendants' Motion for Summary Judgment ("**Summary Judgment Order**"), the Court noted the following evidence:

>    First, Harrington denies that he provided the Construction Agreement to Riverside Bank or to the Defendants, or that Oyster Bay had permission to provide it on his behalf. (120-2 at ¶¶ 4, 5). Second, neither the Note nor the Mortgage reference the Construction Agreement, and . . . the Construction Agreement does not contain a waiver relating to its transmittal to other parties. (Doc. 111-5). And, while Defendants have stated that Riverside Bank provided the Construction Agreement to the FDIC in the Loan File, they do not detail how the Construction Agreement ended up in the Loan File in the first place. Defendants, therefore, have not carried their burden of demonstrating Harrington's prior express consent.

(Doc. 140 at pp. 12-13).

be no evidence in the record establishing that he did so. (*See supra*, Part I, ¶¶ 12-13 (and evidence discussed therein)).  The business records do not establish that either (1) Plaintiff called in; or (2) he provided his cell phone number. *See id.*  Defendants' record states merely that "BRRW CALLED RQST STATS OF ACCT" and fail to indicate the identity of the caller or the substantive contents of the call. (Doc. 111-6 at p. 3).

Even if it is believed that Plaintiff called RoundPoint on November 29, 2010, there is no evidence in the record that Plaintiff provided RoundPoint with his cell phone number. The business records themselves do not state that he did so.  Mr. Harrington denies that he did so. (Doc. 120-2 at ¶ 8).  As the Court noted in its Summary Judgment Order, no audio or transcribed record exists of the call. (Doc. 140 at p. 14).  Consequently, the Court has stated, "there is no hard evidence to show that Harrington provided the 5307 Number during the conversation." (*Id.*). Therefore, Defendants will not be able to meet their burden of proof to establish that Plaintiff gave his express consent to be called on the 5307 Number on November 29, 2010 and Defendants' argument on this point will fail as a matter of law.

### c. Plaintiff Did Not Give RoundPoint Consent to Call the 5307 Number (Through Any Agent) on June 2, 2011.

Defendants will likely next assert they are entitled to judgment on Count I because they will allege express consent was provided when an individual purporting to be Lori Harrington, called RoundPoint on June 2, 2011 and provided the 5307 Number. (*See* Doc. 140 at p. 14).  Plaintiff will prove two lines of reasoning that preclude such a finding of fact on consent.  First, Plaintiff will prove that Jamie Harrington, not Lori Harrington was the actual party on the phone on June 2, 2011.  Second, Plaintiff will prove that he did not authorize Lori Harrington or Jamie Harrington to provide RoundPoint with the 5307 Number.

Assuming, then, that this Court will find as fact that Jamie Harrington, and not Lori Harrington, made the call on June 2, 2011, the question then becomes whether Jamie Harrington had the authority on behalf of Plaintiff to consent to calls to the 5307 Number on June 2, 2011.[10]

### i. Jamie Harrington, as the caller on June 2, 2011, Had No Authority from Plaintiff to Provide the 5307 Number to RoundPoint or to Give Permission to RoundPoint to Call Such Number.

Plaintiff did not request Jamie Harrington to contact RoundPoint and did not authorize her to do so. (Doc. 120-2 at ¶ 12). Furthermore, Plaintiff did not authorize Jamie Harrington to provide his cell phone number to RoundPoint. (*Id*). There will be no evidence establishing that Jamie Harrington was an agent of Plaintiff for purposes of providing his cell phone number to RoundPoint. Pursuant to TCPA and Florida law, RoundPoint is required to make such a showing.

In *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014) the defendants argued that a live-in girlfriend and mother of the plaintiff's child had authority to consent to calls made to the plaintiff's cell phone number by a creditor, and, thus, there were no violations of the TCPA. The court analyzed the facts under Florida agency law and found that an implied or apparent agency arises only when, among other requirements, there has been "a representation by the principal that the actor is his or her agent." *Id.* at 1253 (citations omitted). "The acts of the agent, standing alone, are insufficient to establish that the agent is authorized to act for the principal." *Id.* "Moreover, the scope of the agent's authority is limited to what the principal has authorized the agent to do." *Id.* The *Osorio* defendant argued that such authority should be inferred from the fact that the girlfriend and the plaintiff had an adult son together, and shared a home and a cell phone

---

[10] As discussed previously, Plaintiff is the called party under the definition of the TCPA. (*See* discussion, *supra,* Part II.A.2). Thus, as this Court stated in its Summary Judgment Order, Plaintiff alone possessed the authority to consent to calls on the 5307 Number or give authority to another to do so. (Doc. 140 at p. 17).

plan.  The *Osorio* court rejected such an argument, and found that the facts must be analyzed under agency law to determine whether the plaintiff (the principal) made a representation to the creditor that the girlfriend (the actor) was his agent and could consent to calls to his cell phone.  *See id.* at 1253-54.  In rejecting defendant's argument that authority should be inferred from the relationship of the girlfriend and the plaintiff, the court made it clear that if it did not, "[p]arents and cohabitants everywhere would be shocked to learn that every adult in their household is legally entitled to consent to having autodialing debt collectors call any of their cell phones."  *Id.* at 1254. The court refused to so hold. *See id.* [11]

In the case at hand, there will be no evidence in the record that Plaintiff made any representation to RoundPoint at any time that Jamie Harrington had authority to act on his behalf and consent to calls to his cell phone. *See Osorio,* 746 F.3d at 1253.  The fact that Jamie Harrington called into RoundPoint and gave the phone number to RoundPoint cannot, alone, infer that she was the agent of Plaintiff.  *See id.*  Thus, any argument to the contrary by Defendants will fail.

ii.     **Lori Harrington Did Not Have Actual or Apparent Authority from Plaintiff to Provide the 5307 Number to RoundPoint or to Give Permission to Call Such Number; therefore, Lori Harrington could not (and indeed did not) give authority to Jamie Harrington, the caller, to Give Permission to Call Such Number.**

Defendants will likely next assert they are entitled to judgment on Count I because they will allege that Jamie Harrington was given actual authority to call RoundPoint by Lori Harrington,

---

[11] In *McCaskill,* 178 F.Supp.3d at 1291-92, the defendants argued that a daughter had authority to consent to calls made to her mother's cell phone number by a creditor, and, thus, there were no violations of the TCPA.  The court analyzed the facts under Florida agency law, quoted *Osorio,* and found that an implied or apparent agency arises among these parties only when, among other requirements, there has been "a representation by the principal that the actor is his or her agent." *Id.* at 1291 (quoting *Osorio,* 746 F.3d at 1253).  The *McCaskill* court found that there was no evidence in the record that such a representation had been made under the circumstances and, thus, the court found that defendants' argument on this matter failed as a matter of law.  *Id.* at 1292-93.

who they will contend had either actual or apparent authority (or both) from Plaintiff to provide

the 5307 Number in connection with the Loan.

   a)   Jamie Harrington had no Actual Authority from Lori Harrington to provide the 5307
        Number to Roundpoint

   As discussed below, Plaintiff will provide evidence that will show that Lori Harrington had

neither actual or apparent authority under the facts and Florida law to consent to calls to Plaintiff's

5307 Number. Therefore, she could not have passed that authority on to Jamie Harrington, who

made the June 2, 2011 call.  As a preliminary matter, however, Plaintiff will show that whether or

not Lori had authority to do so, she did not give Jamie Harrington actual authority under Florida

law to consent to calls to the 5307 Number.[12]   Although, the Court has indicated that Lori

Harrington may have given  Jamie Harrington actual authority "to call RoundPoint to request

insurance information" and that "Jamie Harrington could reasonably expect to be required to

answer security questions that were incidental to the call" (Doc. 140 at pp. 15-16), Plaintiff will

provide testimony that will show a request for a cell phone number is not a security question

incidental to a call requesting insurance information. (*Id.*)

   b) No Actual Authority for Lori Harrington

   Even if this Court finds that Jamie Harrington had actual authority from Lori Harrington,

which Plaintiff will argue that she did not, Lori Harrington did not have actual authority from

---

[12] The Court, in its Summary Judgment Order, stated that "'[t]he essential elements of an actual agency relationship are: (1) acknowledgement by the principal that the agent will act for him or her, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent.'" (Doc. 140 at p. 15 quoting *Robbins v. Hess*, 659 So.2d 424, 427 (Fla. 1st DCA 1995) (internal citations omitted)). The Court further noted that "actual agency in Florida does not require the principal to specify the singular acts for which his or her authority exists as long as the acts are incidental to or reasonably necessary to accomplish what is authorized." (Doc. 140 at p. 16 citing *Bd. of Trs. of the City of Delray Beach Police and Firefighters Ret. Sys. v. Citigroup Global Mkts., Inc.*, 622 F.3d 1335, 1342-43 (11th Cir. 2010) (internal citations omitted)).

Plaintiff to convey the 5307 Number, and, thus, could not pass such authority onto Jamie Harrington, the maker of the June 2 call. Defendants will likely again argue to this Court that Lori Harrington had such actual authority by either the fact that she is Plaintiff's wife or a signatory and obligor on the loan. (*See* Doc. 140 at p. 17). However, Defendants have failed to cite specific law that states that a wife is an actual agent of her husband under all circumstances simply by virtue of her status as his spouse, nor have they cited to specific authority that because Lori Harrington was a co-signatory and borrower on the loan, she had actual authority to consent to calls to Plaintiff's cell phone. Indeed, Florida law is replete with examples where questions of agency between spouses or co-signatories/obligors must be analyzed under apparent agency principals, and not actual authority principals. *See, e.g., Fi-Evergreen Woods, LLC v. Estate of Robinson*, 172 So. 3d 493, 495-96 (Fla. Dist. Ct. App. 2015)(Whether wife was bound by husband's signature on arbitration agreement was a question of apparent or implied agency); *Stalley v. Transitional Hosps. Corp. of Tampa, Inc.*, 44 So.3d 627, 630-31 (Fla. Dist. Ct. App. 2010) (Whether husband was bound by wife's signature on arbitration agreement was a question of apparent or implied agency); *Blunt v. Tripp Scott, P.A.*, 962 So.2d 987, 989 (Fla. Dist. Ct. App. 2007) (Court ruled against law firm who argued that signature of husband bound wife and son on settlement agreement in suit for legal fees, utilizing an apparent agency analysis).

Defendants may also argue to this Court that Lori Harrington had such actual authority through her alleged access to his personal information. (*See* Mot. 140 at pp. 17-18). However, Plaintiff will provide testimony that he in no way gave Lori Harrington authority to use his personal cell phone number in dealing with any creditors at any time. (*See* Doc. 120-2 at ¶ 12).

c)  No Apparent Authority for Lori Harrington

Defendants will likely next argue to this Court that Lori Harrington had apparent authority to give Plaintiff's cell phone number to RoundPoint, again, by either the fact that she is Plaintiff's wife or a signatory and obligor on the loan.[13]  (*See* Doc. 111 at pp. 13-14; Doc. 140 at p. 20).

The Court, in its Summary Judgment Order, stated the relevant law regarding apparent authority as follows:

> **Unlike actual authority, the doctrine of apparent authority "rests on appearances created by the principal and not by agents** who often ingeniously create an appearance of authority by their own acts." *Taco Bell of Cal. v. Zappone,* 324 So. 2d 121, 124 (Fla. 2d DCA 1975).
>
> Apparent authority exists "only if each of three elements are present: (a) **a representation by the purported principal;** (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation." *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995). . . [A]pparent authority can arise from express or implied consent. *Thomkin Corp. v. Miller*, 156 Fla. 388, 24 So.2d 48, 49 (1945). That said, an agent's actions, on their own, are insufficient to establish authority to act on the principal's behalf. *See Owen Indus., Inc. v. Taylor*, 354 So.2d 1259, 1262 (Fla. 2d DCA 1978); *Taco Bell of Cal.,* 324 So.2d at 124. . . . Moreover, **even where authority is granted, the scope of the agency is limited to that which the principal has authorized the agent to do.** *See Poe & Assocs., Inc. v. Estate of Vogler*, 559 So.2d 1235, 1236 (Fla. 3d DCA 1990); *see also Taco Bell of Cal.*, 324 So. 2d at 124.

(Doc. 140 at pp. 19-20 (emphasis added; complete citations added)).

Applying these principals, the Court dismissed the presumptions by Defendants that the Harringtons' marital relationship and their status as co-signers on the Loan *necessarily* constituted a representation upon which RoundPoint could "rely that Lori Harrington (or those posing as her with her consent) had authority to convey the 5307 Number." (*See* Doc. at pp. 20-21).  The Court analyzed these arguments under the *Osorio* precedent and was not convinced that such

---

[13] With specific regard to the TCPA, *Osorio and McCaskill* make it clear that the only party that can give consent to calls to a cell phone is the "subscriber" to the cell phone, *(i.e.,* the person who pays the bills for the number or who is the customary user of the number), either directly or through an agent with apparent authority to specifically do so. *See McCaskill,* 178 F.Supp.3d at 1290; *Osorio,* 746 F.3d at 1251-54.

relationships, without more, rose to the level of bestowing apparent agency on Lori Harrington by Plaintiff.[14] (*Id.*).

As the *Osorio* court makes clear, the fact that Lori Harrington shared a home and children with Plaintiff does not, *per se*, show apparent authority to provide consent to RoundPoint to call Plaintiff's cell.[15]  Additionally, Defendants have no evidence that Plaintiff made any representation

---

[14] The Court's analysis of this issue in its Summary Judgment Order was as follows:

> This issue has previously been confronted in *Osorio*, where a roommate of credit card debtor sued a creditor, alleging that it had violated the TCPA by using autodialed debt collection calls made by creditor's agent to roommate's wireless number. *Osorio*, 746 F.3d at 1247-48. The Court there found that although the roommate and the debtor shared an adult child, lived in the same residence, and shared a cell-phone plan, because they had never given each other authority to consent to calls from third parties, a genuine issue of material fact existed if she had implied apparent authority to convey the roommate's cell phone number. *Id.* at 1253-54.

> Like Osorio, this case involves an individual that was not the called party, but who still provided contact information to a creditor. *See id.* at 1247. Moreover, as in Osorio, the called party has testified that he never gave anyone authority to consent to phone calls from third parties. *See id.* at 1253-54. Even so, Defendants attempt to distinguish this case by arguing that the Harringtons are married whereas *Osorio* involved individuals who were not. Defendants also argue that, unlike in *Osorio*, both Harrington and Lori Harrington were co-signers on the Note and Mortgage, and thus joint obligors. **These are distinctions without a difference.** First, *Osorio* specifically contemplated the existence of an intra-family relationship and equated it with that of cohabitation, stating "[p]arents and cohabitants everywhere would be shocked to learn that every adult in their household is legally entitled to consent to having autodialing debt collectors call any of their cell phones." *Id.* at 1254. The court continued by noting that "[t]his is not to say that in some cases one adult might authorize another adult to do so, but we cannot say that all cohabitants possess such authority as a matter of law." *Id.* at 1254. In so holding, the Eleventh Circuit clearly indicated that an individual cannot simply gain the ability to grant prior express consent on behalf of another adult by virtue of a relationship, but rather that such a finding was fact-specific.

> Second, to the extent that Defendants argue this case is different than Osorio because both Harrington and Lori Harrington are co-signers on the Note and Mortgage, they miss the entire basis upon which *Osorio* was decided. *Osorio* did not turn on the creditor's relationship to the parties, but rather on a party's ability to consent to calls to a number for which she was not the called party. Here, like in *Osorio*, there is a question issue of material fact as to whether Lori Harrington had the apparent authority to consent to a creditor's calls to a number for which she was not the called party. That is the relevant focus. Though Lori Harrington's status as a co-signor is relevant to discerning the existence of actual or apparent authority, it is not dispositive.

(Doc. 140 at pp. 20-21)(emphasis added)).

[15] Defendants have relied also on the *Mais* case as proof that a court should assume that a wife has apparent authority by virtue of her status as a spouse.  (*See* Doc. 111 at pp. 16-18).  However, a close reading of *Mais* shows that the court assumed authority of the wife to sign the documents that consented to the calls only because there was no argument

to RoundPoint at any time that Lori Harrington had authority to act on his behalf and consent to calls to his cell phone. *See* Doc. 120-2 at ¶ 12. *See also Osorio,* 746 F.3d at 1253.   The fact that a female that called herself Lori Harrington called into RoundPoint and gave the 5307 number to RoundPoint cannot, alone, infer that Lori Harrington was the agent of Mr. Harrington.  *See Osorio,* 746 F.3d at 1253.   Thus, Defendants will not be able to prove that Lori Harrington had apparent authority to give Plaintiff's cell phone number to RoundPoint for the calls made regarding his debt.

### 6.   There was no ratification of any action by Plaintiff on June 28, 2011.

Defendants also will likely again argue that the Plaintiff somehow ratified consent to call the 5307 Number when he called in on June 28, 2011, either by failing to tell RoundPoint to stop calling, or by failing to tell RoundPoint Jamie Harrington and/or Lori Harrington were not authorized to act for him when the June 2, 2011 call was made.  In its Summary Judgment Order, the Court stated the applicable law on ratification as follows: "Florida courts have defined ratification as 'the express or implied adoption by a person of an act or contract entered into in his behalf by another without authority.'" (Doc. 140 at p. 22 (quoting *Port Largo Club, Inc. v. Warren*, 476 So. 2d 1330, 1333 (Fla. 3d DCA 1985))).  "It 'requires an affirmative showing of an intention on the part of the principal to ratify the act in question.'" (Doc. 140 at p. 22 (quoting *Carolina-Georgia Carpet & Textiles, Inc. v. Pelloni*, 370 So. 2d 450, 452 (Fla. 4th DCA 1979))).  "'Moreover, the required intention must be manifested in some way.'" (Doc. 140 at p. 22 (quoting *G & M Rests. Corp. v. Tropical Music Serv., Inc.*, 161 So. 2d 556, 558 (Fla. 2d DCA 1964))).  The Court stated that, in this case, although Plaintiff testified in deposition that he talked with Lori Harrington about

---

to the contrary, not because she had *per se* apparent authority due to her status as a wife. *See Mais* 768 F.3d at 1113-14, 1122-26 (undisputed material facts, plaintiff's arguments and court's analysis thereof).

Jamie Harrington's phone call after it was made (Doc. 129-2 at 42:20-21), there was no evidence that he had knowledge of the substantive content of the call, and, therefore, he could not know of the provision of the 5307 Number (Doc. 140 at p. 22).  Absent such knowledge (of the provision of the 5307 Number), Plaintiff could not possibly exhibit an intent to ratify the act on June 28, 2011 or any other relevant time.  (Doc. 140 at pp. 22-23).

> **7.   The 2015 amendments to the TCPA are not applicable because the FDIC, as a receiver, is not the United States Government and even if it were, the amendments have not yet taken effect.**

Defendants will argue that the Budget Act amendment to the TCPA excepts out calls made to a debtor that are "made solely to collect a debt owed to or guaranteed by the United States." (citing the Budget Act, § 301(a)(1)(A)).  Defendants assert that Defendant Multibank "is owned in part by the FDIC, **a government agency.**" In so doing, Defendants claim that the debt is owed to the United States, and, thus, is barred by the TCPA statutory exception. Defendants are wrong.

The amendment to the TCPA allowing certain calls to cell phones to be made without consent in the Budget Bill of 2015 is inapplicable because the Federal Deposit Insurance Corporation ("**FDIC**"), acting as a receiver, is not the "United States Government." *See O'Melveny & Myers v. Fed. Deposit Ins. Corp.,* 512 U.S. 79, 81-82, 85 (1994) ("the FDIC is not the United States").

In their transactional documents with Multibank, the FDIC discloses that it is a receiver in its transactions involving the mortgage loan owned by Multibank and the subject of the calls.  *See* Amended and Restated Limited Liability Company Operating Agreement (Multibank 2010-1 SFR Venture, LLC), dated as of April 1, 2010 (the "**Operating Agreement**"), pp. 1, 89 (*note* opening paragraph, recitals and signature page); Mortgage Loan Contribution and Sale Agreement By and

Between the Federal Deposit Insurance Corporation as Receiver for the Failed Banks and Multibank 2010-1 SFR Venture, LLC, dated as of April 1, 2010 (the "**Mortgage Loan Agreement**"), pp. 1, 38 (*note* title page, opening paragraph, recitals and signature page) which will be introduced into evidence by Plaintiff.

Even if the Budget Bill of 2015 applies, it is not yet effective because the FCC rules implementing the changes have not been finalized.[16] In section 301(b) to the Budget Amendment, Congress expressly required that the FCC must issue regulations to *implement* the amendment:

> Not later than 9 months after the date of enactment of this Act, the Federal Communications Commission, in consultation with the Department of Treasury, *shall prescribe regulations to implement the amendments made by this section*.[17]

The word "implement" means: "to put into effect according to or by means of a definite plan or procedure."[18] If Congress had intended for the amendment to be immediately effective, this mandate to issue "implementing regulations" would not have been necessary. The instructions to the FCC would not have been to "implement," but rather would have only to been to provide restrictions or protections on the effect of the change to fulfill the consumer protection purposes of the TCPA. Because the FCC has not yet implemented the regulations, the amendments are not yet effective.

---

[16] *See*, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order, FCC 16-99* (Rel. Aug. 11, 2016) Para. 60 ("The rules that give effect to this interpretation of Congress' intent are delayed by PRA requirements and OMB approval. We determine that the regulatory scheme we implement today must include both the ability for callers to make calls and the right of debtors to ask that calls stop—and that both portions of the regulatory scheme become effective simultaneously. To do otherwise would be to allow callers to make calls but to leave debtors with no consumer protections until OMB approval is complete. We determine that both portions of the rules must become effective for the regulatory scheme to be effective.").

[17] Pub. L. No. 114-74, 129 Stat. 584, § 301(b) (Nov. 2, 2015) (emphasis added).

[18] *See e.g.* Dictionary.com, available at http://www.dictionary.com/browse/implement.

### 8.  As RoundPoint is liable, so is Multibank.

To the extent Defendants continue to argue that Multibank is not liable to Plaintiff under the TCPA, Plaintiff points out that as RoundPoint is liable, so is Multibank.  In its Order on Defendants' Motion to Dismiss, this Court ruled accordingly.  (Doc. 63 at pp. 7-8).  In that ruling, the Court deferred to the holdings of the 2008 FCC Order and found that "'[c]alls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call.'" (Doc. 63 at p. 8 quoting 2008 FCC Order at 565). The Court stated that the "FCC has ruled, in essence, that a creditor is placed 'in the shoes' of the caller for purposes of liability under the TCPA." (Doc. 63 at p. 8 citing *Hartley-Culp v. Green Tree Servicing, LLC,* 52 F. Supp. 3d 700, 703 (M.D. Pa. 2014)). Thus, the Court concluded, the "TCPA can impose liability directly on any person or entity on whose behalf a third party places a call in violation of § 227(b)(1)(A)."

### B.   Count II: Plaintiff's FCCPA Claim:  RoundPoint is liable for the harassing nature of the calls they placed to Plaintiff and his family under the FCCPA.

With regard to the FCCPA claim of harassment, Section 559.72(7) of the Florida Statute prohibits "willfully communicat[ing] with the debtor or any member of her or his family with such frequency as can reasonably be expected to harass the debtor or her or his family, or willfully engag[ing] in other conduct which can reasonably be expect to abuse or harass the debtor or any member of her or his family." Fla. Stat. § 559.72(7). There is no factual dispute that *at least* 264 calls were made to Plaintiff and 74 voicemails were left during the two years immediately preceding the suit. (Doc. 140 at p. 24; Doc. 111-2 at ¶ 16; Doc. 120-17).  While RoundPoint will likely continue to argue that, "without more," the volume of calls will not justify a violation of Section 559.72 (7) of the FCCPA, this case presents the "more." The Court recognized in its Summary Judgment

Order that liability under Section 559.72(7) depends on a fact-intensive inquiry that includes the frequency of the calls but also other egregious conduct, such as calling immediately after hanging up, calling multiple times in a single day, calling places of employment, calling family or friends, calling at odd hours, or calling after being asked to stop.  (Doc. 140 at pp. 24, 25 citing *Waite v. Fin. Recovery Servs., Inc.,* No. 8:09-CV-02336, 2010 WL 5209350, at *3 (M.D. Fla. Dec. 16, 2010)). Further, the Court recognized that "where reasonable efforts at persuasion or negotiation have failed, the trier of fact may consider that such communications are harassing in frequency." (Doc. 140 at p. 24 citing *Story v. J. M. Fields, Inc.,* 343 So. 2d 675, 677 (Fla. 1st DCA 1977)).  The Court stated that, "[i]n this regard, calls 'should be viewed from the perspective of a consumer whose circumstances makes him relatively more susceptible to harassment, oppression, or abuse.'" (Doc. 140 at p. 24 quoting *Jeter v. Credit Bureau, Inc.,* 760 F.2d 1168, 1179 (11th Cir. 1985).

To begin with, the volume of calls is astonishing and makes this case outside the ordinary:

- Between June of 2010 and May of 2014, RoundPoint called Plaintiff and his family at least 652 times. (Doc. 120-9).

- Between June of 2010 and May of 2014, RoundPoint left at least 317 messages for Plaintiff or his family.  (Doc. 120-14).

- On the one occasion when Plaintiff spoke to a representative of RoundPoint on June 28, 2011, RoundPoint told him they would not accept payments, would not provide any information to Plaintiff, said his property was in foreclosure, and told him to contact RoundPoint's attorney. (*See* Doc. 111-11; *see supra* ¶ 17).  After doing so RoundPoint called Plaintiff at least another 527 times. (Doc. 120-11) and left at least another 237 messages (Doc. 120-16).

- Within the statute of limitations period for the FCCPA, RoundPoint called Plaintiff at least 263 times, **after foreclosure** had begun. (Doc. 120-12).

- Within the statute of limitations period for the FCCPA, RoundPoint left at least 74 messages for Plaintiff, **after foreclosure** had begun. (Doc. 120-17).

RoundPoint also contacted Plaintiff while it knew Plaintiff was represented by an attorney. (Doc. 120 at ¶ 47). This is a violation of the FCCPA. Fla. Stat. Sec. 559.72(18). While that particular set of calls took place outside the statute of limitations, such violations are relevant to the harassing nature of RoundPoint's conduct.

Aside from the sheer volume of calls, the manner in which the calls were placed shows a violation of the FCCPA. During the statute of limitations period alone, on five occasions RoundPoint called Plaintiff four times in a single day, on 24 occasions RoundPoint called Plaintiff three times in a single day, and on 40 occasions RoundPoint called Plaintiff twice in a single day. (Doc. 120-19). On two days RoundPoint left multiple messages. (*Id.*) On 14 days RoundPoint called back after leaving a message on that same day. (Doc. 120-20). On at least 29 occasions RoundPoint called back within 2 hours after a first call. Once RoundPoint called back 3 minutes later, once 5 minutes later, once 8 minutes later, once 13 minutes later, once 20 minutes later and once 30 minutes later, all within the statute of limitations. (Doc. 120-19).

The Court has accurately summarized the issue regarding whether the Defendants' conduct violates the FCCPA in its Summary Judgment Order. (Doc. 140 at pp. 23-26). First, Harrington has provided evidence that RoundPoint often called the 5307 Number multiple times on a single day. (Doc. 140 at p. 25 citing Doc. 120-19). Second, both Lori Harrington and Jamie Harrington will testify that they received calls from RoundPoint on their personal cell phones regarding the debt. (Doc. 140 at p. 25 citing Doc. 120-6 at ¶¶10-11 and 120-7 at ¶ 5). Third, the evidence has shown that RoundPoint placed telephone calls to the 5307 Number even though the debt at issue was in active litigation and Plaintiff was represented by counsel. (Doc. 140 at p. 25 citing Doc. 120-5). Finally, when Plaintiff called on June 28, 2011, the RoundPoint representative

emphatically stated that the property was in foreclosure and it would **no longer be taking payments,** would not answer questions and but instead directed Harrington to RoundPoint's attorney for further information (Doc. 140 at p. 25 citing Doc. 111-11 at 5:18-23 (emphasis added)).

Plaintiff disputes that RoundPoint's records accurately reflect the actual number of calls RoundPoint made to Plaintiff.[19] (Doc. 120-2 at ¶¶ 16-21). Plaintiff will testify that the total number of calls RoundPoint made to him is at least twice the 652 number of calls shown in RoundPoint's records. (Doc. 120-2 at ¶ 16). Plaintiff will testify that instead of the 263 calls shown by RoundPoint's records to have been made to him during the statute of limitation period and after foreclosure had begun, RoundPoint actually made at least 500 to 600 calls to him or his family during the statute of limitations time period. (Doc. 120-2 at ¶ 20). Plaintiff will testify that RoundPoint called each of the cell phones owned by him, multiple times a day with numerous back-to-back calls. (Doc. 120-2 at ¶ 21).

Even when analyzed on just the calls RoundPoint admits, the evidence will show that RoundPoint's actions constitute a violation of Section 559.72(7). Again, while RoundPoint argues that "without more" the volume of calls will not justify a violation of Section 559.72 (7) of the FCCPA, this case presents the "more." For alleged FDCPA/FCCPA violations, a court must evaluate the circumstances under the "least sophisticated debtor" standard, thereby determining whether a debt collector's actions would harass the least sophisticated debtor. *Holland v. Bureau of Collection Recovery*, 801 F. Supp. 2d 1340, 1342 (M.D. Fla. 2011) (citation omitted). Defendants will likely continue to argue that Plaintiff is relying on the sheer volume of calls alone to show such

---

[19] Plaintiff questions the accuracy of the records. For example, on the entry dated June 28, 2011 the MSP Notes state that there was a "CURTAILMNT (sic) OF INCOME." (*See* Doc. 111-6, entry dated 6/28/11. *See also* Doc. 120-5, entry dated 6/28/11). The transcript of the telephone call establishes that Mr. Harrington did not mention or address the subject of curtailment of income. (*See* Doc. 111-11, 2:1-7:25).

harassment.  (*See* Doc. 111 at p.18).   Defendants arguments are misplaced.  In *Borneisen v. Capital*

*One Financial Corp.,* the court described the relevant question regarding harassment under FCCPA

§ 559.72(7) as follows:

> The purpose as well as frequency of calls are relevant in determining whether a
> creditor or collection agency has harassed a debtor, within the means [sic]
> [meaning] of consumer collection practices legislation; proof of numerous calls
> alone does not create a jury issue where the creditor calls only to inform or remind
> the debtor of the debt, to determine reasons for nonpayment, to negotiate
> difference or to persuade the debtor to pay without litigation. However, such
> communications may be considered harassing when they continue after all such
> information has been elicited and reasonable efforts at persuasion and negations
> [sic] [negotiations] have failed. *Story v. J.M. Fields, Inc.,* Fla.App., 343 So.2d 675,
> 677 (1977), certiorari denied 348 So.2d 254.

*Borneisen v. Capital One Fin. Corp.*, No. 8:09-CV-02539-T-17, 2011 WL 2730972, at *13 (M.D. Fla.

July 13, 2011), *aff'd,* 490 F. App'x 206, 2012 WL 4092652 (11th Cir. 2012). *See also Grave v. Wells*

*Fargo Bank, N.A.,* No. 14-60975-CV, 2014 WL 11776961, at *7 (S.D. Fla. July 11, 2014) ("A claim

under § 559.72(7) of the FCCPA 'does not require a specific frequency of calls – it only requires

that the frequency, tone, and purpose of the calls be enough to constitute harassment.'")(quoting

*Sprogis v. Suntrust Bank,* 6:13-CV-365-ORL-37, 2013 WL 2456090, at *1 (M.D. Fla. June 6,

2013)(citation omitted)).

    In the case at hand, the evidence set forth by Defendants alone shows that *all* calls to

Plaintiff's 5307 Number were for collection, and not to "inform or remind . . . [Plaintiff] of the

debt, to determine reasons for nonpayment, to negotiate difference or to persuade Plaintiff to pay

without litigation." *Id.* (*See* Doc. 120-5 at entries 6/22/10 to 5/5/14).   More importantly, it is

clear from Defendants' evidence that the calls continued after "reasonable efforts at persuasion

and [negotiations] had failed." *Borneisen,* 2011 WL 2730972 at *13. (*See* information *supra*, Part

I, ¶17(and evidence cited therein)).   Specifically, the evidence will show that Plaintiff called RoundPoint on June 28, 2011 and disputed the payment amounts he was to pay, but was told that his property was in foreclosure, that RoundPoint would not be taking any more payments and that if Plaintiff had any more questions, he should contact RoundPoint's attorney.  (*See supra,* Part I, ¶ 17 (and evidence contained therein)).   RoundPoint's records reflect that RoundPoint called Plaintiff at least 527 times after they told him they would not be taking any payments, that his property was in foreclosure, and that he could only get any information from their attorney (*see* Doc. 120-11); at least 263 of these calls were within the statute of limitations of the FCCPA (*see* Doc. 120-12).

In the case at hand, RoundPoint had obviously sufficiently elicited reasons for nonpayment as they had begun foreclosure proceedings and had hired an attorney to answer any further questions about the Debt. *Borneisen,* 2011 WL 2730972 at *13.  Foreclosing on Plaintiff's property, not accepting any more payments, and turning the file over to the attorney certainly constitutes a point where "reasonable efforts at persuasion and [negotiations] had failed." *Id.*[20]   Thus, under *Borneisen,* the 263 collection calls made and the 74 messages left within the statute of limitations and after foreclosure proceedings had started are harassment in violation of § 559.72(7).   Thus, Plaintiff will prove that Defendants violated the FCCPA in their actions on the debt in question.

---

[20] Indeed, for example, in *Bank of America, N.A. v. Zaskey,* the court found that where there were a small number of calls, but foreclosure and a short sale had occurred on the property before the calls were made, and the plaintiff had attempted to discuss payment history with the debt collector in a call, there was more than sufficient evidence to defeat defendant's summary judgment on alleged violations of FCCPA § 559.72(7).   *Bank of Am., N.A. v. Zaskey,* No. 9:15-CV-81325, 2016 WL 4991223, at *2, 9 (S.D. Fla. Sept. 19, 2016).

### III.   DAMAGES

#### A.  TCPA Damages

Statutory damages for violation of the TCPA are $500 per call. 47 U.S.C. § 227(b)(3)(B). In addition, the court has the flexibility to increase the damages to $1,500 per call if there is a finding of a willful violation. *Id.* § 227(b)(3)(concluding language). "'The TCPA is essentially a strict liability statute' that 'does not require any intent for liability except when awarding treble damages.'" *Lardner v. Diversified Consultants Inc.,* No. 1:13-CV-22751-UU, 2014 WL 1778960, at *4 (S.D. Fla. 2014). "The statute further specifies that the appropriate remedy is 'an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater.'" *Osorio*, 746 F.3d 1242, 1250 (11th Cir. 2014) "Treble damages are also available for knowing or willful violations." *Id.*   The evidence will show willful violations by RoundPoint.  The TCPA does not allow for the recovery of attorneys' fees.

#### B.  FCCPA Damages

Violations of the FCCPA are each punishable by an award of statutory damages of up to $1,000.00 per adjudication, in addition to actual damages, plus reasonable attorneys' fees and costs. Fla. Stat. § 559.77(2). In addition, the FCCPA provides for the recovery of punitive damages. Fla. Stat. § 559.77(2). "Actual damages under the FCCPA include damages for emotional distress." *See Minnifield v. Johnson & Freedman, LLC*, 448 F.App'x 914 (11th Cir. 2011).

Plaintiff will prove his statutory and actual damages.  Plaintiff will also prove that punitive damages are appropriate in this case.