# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

LARRY HARRINGTON,

      Plaintiff,

v.                              Case No:  2:15-cv-322-FtM-28MRM

ROUNDPOINT MORTGAGE
SERVICING CORPORATION and
MULTIBANK 2010-1 SFR VENTURE,
LLC,

      Defendants.

---

## ORDER

In this action, Plaintiff Larry Harrington sues Defendants Multibank 2010-1 SFR

Venture, LLC (Multibank) and RoundPoint Mortgage Servicing Corporation (RoundPoint),

alleging (1) that the Defendants violated the federal Telephone Consumer Protection Act[1]

(TCPA) by calling Harrington's cell phone without his prior express consent using

equipment that qualifies as an automatic telephone dialing system, and (2) that RoundPoint

violated the Florida Consumer Collection Practices Act[2] (FCCPA) by harassing Harrington

in the process of collecting a consumer debt.  Harrington claims that under the TCPA he is

entitled to between $500 and $1500 for each call, and under the FCCPA he seeks statutory

damages of $1000 as well as actual and punitive damages.

After Defendants' motion for summary judgment was denied, the case proceeded

to a one-day bench trial.  At the close of Harrington's case-in-chief, Defendants moved for

---

[1] 47 U.S.C. § 227.
[2] §§ 559.55–.785, Fla. Stat.

judgment on partial findings under Rule 52(c),[3] Federal Rules of Civil Procedure, on both of Harrington's claims. The Court granted the motion and announced that the findings of fact and conclusions of law required by Rule 52 would be issued in writing. Those findings and conclusions are set forth in this Order. As explained below, Defendants are entitled to judgment on the federal claim because Harrington gave prior express consent to receive calls on his cell phone about the loan at issue, and RoundPoint prevails on the state law claim because Harrington did not establish by a preponderance of the evidence that RoundPoint's calls were harassing or abusive.

## I.    Background

Harrington and his wife, Lori, wanted to build a house on a lot they owned at 3161 Rustic Lane in North Ft. Myers, Florida, and to that end, they entered into a Construction Agreement (the Oyster Bay Agreement) with Oyster Bay Homes, Inc. on September 10, 2003, to construct the house for $297,052.36. (Defs.' Ex. 3). Harrington's cell phone number ending in 5307 appears in bold print in the first sentence of the Oyster Bay Agreement. (Id. at 1). The Oyster Bay Agreement was contingent upon the Harringtons' obtaining a mortgage commitment from a "reputable lending institution," (id. ¶¶ 3 & 7), and on November 6, 2003, the Harringtons applied to Riverside Bank of the Gulf Coast (Riverside) for a loan in the amount of $297,100.00, (Defs.' Ex. 5).

---

[3] Rule 52(c) provides:

If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Riverside approved the application for the loan, and on November 26, 2003, the Harringtons executed five documents:  a promissory note (Defs.' Ex. 1) in favor of Riverside in the amount of $297,100.00; a thirty-year mortgage (Defs.' Ex. 2) securing to Riverside repayment of the loan; a Construction–Perm Loan Rider (Defs.' Ex. 2 at 18); a Construction Loan Agreement (Defs.' Ex. 4 at 1–5); and a Construction Loan Disbursement Agreement (Defs.' Ex. 4 at 6–8).  Under the terms of these documents, the Harringtons obligated themselves to make monthly interest-only payments on disbursed construction funds from January 1, 2004, to November 1, 2004, while the house was being constructed and then to make monthly payments of principal and interest under the note and mortgage beginning on December 1, 2004. (See Construction–Perm Loan Rider, Defs.' Ex. 2 at 18; Note, Defs.' Ex. 1, at 1; Mortgage, Defs.' Ex. 2, at 2).  Harrington's 5307 cell phone number does not appear on any of these documents, but the Oyster Bay Agreement containing that number was included in Riverside's loan file.

Oyster Bay completed construction of the Rustic Lane house, and the Harringtons began making monthly mortgage payments to Riverside.  In 2009, Riverside was taken over by the Federal Deposit Insurance Company (FDIC), and as a consequence, the FDIC acquired the Harrington note and mortgage.  As of at least May 5, 2010, Defendant Multibank had acquired the loan from the FDIC, and Defendant RoundPoint had begun servicing the loan for Multibank; and by that date, the Harringtons had defaulted on their obligations under the note and mortgage by missing at least six monthly payments. (See May 5, 2010 Letter, Defs.' Ex. 11).  Multibank filed a foreclosure action in state court on March 2, 2012. (Joint Pretrial Statement, Doc. 167, at 15–16).

It is undisputed that between May 28, 2011, and May 5, 2014, RoundPoint called

the 5307 number hundreds of times,[4] (see, e.g., Pl.'s Ex. 30; Defs.' Ex. 51), and that Harrington only answered one of the calls, immediately hanging up without speaking, (Joint Pretrial Statement at 15).  It is also undisputed that Harrington never specifically requested that RoundPoint stop calling the 5307 number, (id.), and that RoundPoint immediately stopped calling after receiving, on May 5, 2014, a faxed letter from an attorney representing the Harringtons directing that all future communications be made to his office.  (See id. at 16; May 5, 2014[5] facsimile, Defs.' Ex. 44).  Harrington filed this lawsuit on May 28, 2015, (Compl., Doc. 1), and the case was tried to the Court on October 4, 2017, (Mins., Doc. 189).

## II.    Analysis, Findings, and Conclusions

### A.    Rule 52(c) Standards

"When ruling on a Rule 52(c) motion, 'the court must weigh the evidence and may consider the witnesses' credibility,' treating the motion 'as if it were a final adjudication at the end of trial . . . .'"  JDI Holdings, LLC v. Jet Mgmt., Inc., 732 F. Supp. 2d 1205, 1209 (N.D. Fla. 2010) (quoting Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1504 (11th Cir. 1993)).  "Thus, the court resolves the disputed issues on the basis of the preponderance of the evidence, without drawing any special inferences in favor of the plaintiff."  Id.

### B.    Application

#### 1.    TCPA Claim (Count I) (against both RoundPoint and Multibank)

In his first claim, Harrington asserts that each of RoundPoint's calls to his cell phone

---

[4] Evidence of earlier calls was also presented, but those calls are outside the four-year TCPA statute of limitations and the two-year FCCPA statute of limitations.

[5] The letter is dated April 5, 2014, but it was faxed on May 5, 2014.  (See Defs.' Ex. 44).

violated the TCPA, which provides in relevant part that "[i]t shall be unlawful for any person . . . to make any call (other than a call made for emergency purposes or **with the prior express consent of the called party**) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).  By its terms, the TCPA does not bar calls made "with the prior express consent of the called party."

In a 1992 Report and Order, the Federal Communications Commission (FCC)[6] explained that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."  In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 FCC Rcd. 8752, 8769 (Oct. 16, 1992).  And in 2008, the FCC concluded in a declaratory ruling "that the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt."  In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 23 FCC Rcd. 559, 564 (Jan. 4, 2008).[7]  In that 2008 ruling, the FCC also referred to provision of consent in terms of "ma[king] the number available to the creditor regarding the debt." Id. at 567.

In order for there to be consent, the called party need not have given the cell phone

---

[6] "Congress has conferred upon the FCC general authority to make rules and regulations necessary to carry out the provisions of the TCPA," and "the TCPA permits the FCC to create exemptions 'by rule or order' for certain automatically dialed or prerecorded calls."  Mais v. Gulf Coast Collection Bureau, Inc., 768 F.3d 1110, 1117 (11th Cir. 2014).

[7] In Mais, the Eleventh Circuit held that this "2008 FCC Ruling . . . has the force of law."  768 F.3d at 1121.

number directly to the creditor.  Instead, "the appropriate analysis turns on whether the called party granted permission or authorization, not on whether the creditor received the number directly." Mais v. Gulf Coast Collection Bureau, Inc., 768 F.3d 1110, 1123 (11th Cir. 2014).  "'[T]he burden [is] on the creditor to show it obtained the necessary prior consent' because 'creditors are in the best position to have records kept in the usual course of business showing such consent.'" Id. at 1118 (quoting 23 FCC Rcd. at 565).

The statute of limitations for a TCPA claim is four years. See 28 U.S.C. § 1658(a); Solis v. CitiMortgage, Inc., 700 F. App'x 965 (11th Cir. 2017).  Thus, the relevant time period for this claim is May 28, 2011, through May 28, 2015—the date on which Harrington filed this lawsuit.  Because the trial evidence established that Harrington made the 5307 number available in connection with the loan three times[8] before any calls to that number were made within the limitations period, Defendants are entitled to judgment in their favor on the TCPA claim based on "prior express consent."[9]

Consent Provided During the 2003 Loan Transaction

Defendants first argue that Harrington made the 5307 number available to Riverside

---

[8] In addition to the three occasions discussed in the text infra, Defendants also argued at trial that Harrington's "prior express consent" was provided a fourth time—on May 7, 2013, in the foreclosure action, when the Harringtons' counsel withdrew and the 5307 number was provided as the contact number for the Harringtons.  (See Defs.' Ex. 32).  Although this argument is also well-taken, if this last occasion were the only time consent was given it would not bar Harrington's TCPA completely but instead would only limit the actionable period to that running from May 28, 2011, to May 6, 2013.  Thus, the Court does not ground its Rule 52(c) ruling on the fact that consent was given by at least May 7, 2013.

[9] To the extent Harrington based his TCPA claim on calls to a cell phone number other than the 5307 number, he did not establish by a preponderance of evidence at trial that any such calls were made during the four-year TCPA statute of limitations.  The evidence presented as to calls to other numbers was not time-specific and was otherwise vague.

in 2003 when applying for the loan,[10] thereby providing "prior express consent" to be called on that number about the debt.  The Court agrees, and Defendants' Rule 52(c) motion is granted on this basis.

As earlier noted, in September 2003 the Harringtons entered into the Oyster Bay Agreement with their builder, Oyster Bay Homes, and in November 2003 they applied for and obtained a loan from Riverside.  The Harringtons' home phone number ending in 1089 and the 5307 number—identified as "Larry's Cell"—appear in bold type in the first sentence of the Oyster Bay Agreement, (Defs.' Ex. 3 at 1), but the 5307 number does not appear on the loan application, the Construction Loan Agreement, or any other loan-related documents.  Nevertheless, the Court concludes that Harrington made the 5307 number available to Riverside in November 2003 by either providing the Oyster Bay Agreement to Riverside himself during the loan application process or authorizing Oyster Bay to provide Riverside with the Oyster Bay Agreement.  He also signed loan documents evidencing provision of the Oyster Bay Agreement to Riverside.  By these actions, Harrington knowingly assented to the Oyster Bay Agreement being provided to Riverside and thereby consented to be called on the 5307 number regarding the debt.

On direct examination at trial, Harrington testified that he never gave his cell phone number to Riverside.  He also testified, somewhat contradictorily, that he never discussed the cell phone with Riverside at all and that he was asked to give a cell phone number to

---

[10]Harrington does not argue that any consent that was provided to Riverside did not transfer to the FDIC and then to Multibank and RoundPoint.  Indeed, such a position would not be well-taken.  See, e.g., Moriarity v. Nationstar Mortg., LLC, No. 1:13-cv-0855 AWI AMS, 2014 WL 801021, at *4 (E.D. Cal. Feb. 27, 2014) (noting, in TCPA case involving consent issue, that "[i]t is the general rule that, where a valid assignment of a mortgage has been consummated with proper consideration, the assignee is vested with all the powers and rights of the assignor" (internal quotation and citation omitted)).

Riverside but "gave them a home phone number and a business land line, and . . . didn't give out [his] cell phone."[11]

Harrington also testified that he was not aware that Oyster Bay might give the Oyster Bay Agreement to Riverside and that he did not authorize Oyster Bay to do so. He claimed that he did not know how the Oyster Bay Agreement ended up in Riverside's loan file, and he maintained that he did not even realize that Riverside had the Oyster Bay Agreement in its file until some point during this litigation.

On cross-examination, Harrington acknowledged that the Oyster Bay Agreement had his home phone number and the 5307 number in the first sentence. He also acknowledged that the purpose of the Oyster Bay Agreement was to build a house and that he knew he was going to have to get a loan to finance the construction project. And, he recognized that the loan was a construction loan, which would require "a joint effort with the bank and the builder and [him] to get the house built."

Nonetheless, Harrington insisted that he used the 5307 number for his drywall business and gave it out only to people he worked with or for, close friends, and family. He testified that he did not want the bank calling him on his cell phone. Harrington denied that Riverside ever asked him for the Oyster Bay Agreement, but he also acknowledged at trial that he wanted the loan and "can't think of a reason why [he] wouldn't give it to them." Indeed, he admitted that if Riverside had required the Oyster Bay Agreement to be provided in order to make the loan, he "more than likely" would have given it to them.

---

[11] The loan application form had spaces for home and business phone numbers, and in those spaces the Harringtons provided numbers ending in 1089 and 6188, respectively. (See Defs.' Ex. 5 at 1). The loan application did not ask for a cell phone number.

Although Harrington denies that he gave the Oyster Bay Agreement to Riverside, his credibility on this point and others suffers.[12]   Riverside required the Oyster Bay Agreement as well as the plans and specifications contained within it as a condition of approving the loan, and it is extraordinarily unlikely that anyone other than the Harringtons would submit documents necessary to complete an application for a residential loan.  And obviously, no lender would be willing to make a residential mortgage loan without reviewing the sales contract or, in the case of new construction, the construction contract.  Harrington suggests that Oyster Bay delivered the Oyster Bay Agreement to Riverside, but even if that is what happened, it occurred pursuant to Harrington's instructions or with his specific knowledge and consent.  The Court finds from a preponderance of the evidence presented at trial that Harrington either provided the Oyster Bay Agreement to Riverside, authorized Oyster Bay to do so, or at minimum, signed documents reflecting that the Oyster Bay Agreement had been provided to Riverside.  Harrington thus made the 5307 number available to Riverside and provided prior express consent to be called on that number

---

[12] In assessing Harrington's credibility, the Court followed the credibility-assessment instruction it gives to juries, which includes consideration of these questions: 1. Did the witness impress me as one who was telling the truth? 2. Did the witness have any particular reason not to tell the truth? 3. Did the witness have a personal interest in the outcome of the case? 4. Did the witness seem to have a good memory? 5. Did the witness have the opportunity and ability to accurately observe the things he or she testified about?  6. Did the witness appear to understand the questions clearly and answer them directly?  7. Did the witness's testimony differ from other testimony or other evidence?  Eleventh Circuit Civil Pattern Jury Instruction 3.4 (2013).

Obviously, as a plaintiff seeking economic damages, Harrington has an interest in the outcome of the case, and he is an experienced TCPA plaintiff; he has filed four TCPA cases and was awarded $123,500 and $15,000 in the two that have already reached their conclusion.  Harrington did not seem to have a good memory, and although he appeared to understand the questions posed at trial, he often did not answer them directly.  And his testimony regarding whether he knew the Oyster Bay Agreement was provided to Riverside conflicted with the documentary evidence regarding the loan and the reality of lending practices and requirements.

regarding the debt.

The Oyster Bay Agreement was part of a larger transaction that entailed the Harringtons obtaining a loan to cover the cost of construction, and the Oyster Bay Agreement is interconnected with the loan documents. The Oyster Bay Agreement was contingent on the lender accepting Oyster Bay's draw schedule, which was set forth in the Oyster Bay Agreement and provided for incremental payments of $297,052.36 tied to completion of certain phases of construction. .(Defs.' Ex. 3). And just as the Oyster Bay Agreement contemplated and referred to obtaining a loan, the loan documents depended upon and referred to the Oyster Bay Agreement.   The loan origination and closing documents repeatedly refer to the Oyster Bay Agreement in generic terms, including as one of the "contingencies for loan approval." (See Defs.' Ex. 5 at Bates RDPT-001633; id. at Bates RDPT-003116 (requiring construction plans and "copy of fully executed contract"); id. at Bates RDPT-002945 (listing "purchase/construction contract" on "document order for booking and imaging quality control check"); id. at Bates RDPT-002997 ("closing procedures" document requiring that the appraisal and the contract have the same address)). The Construction Loan Agreement itself states on its first page that "Borrower has applied to the Lender for a mortgage loan to encumber [the property] for the purpose of constructing improvements thereon in accordance with plans and specifications submitted to and approved by the Lender." (Defs.' Ex. 4 at 1). And the Oyster Bay Agreement included specifications for the house, (Defs.' Ex. 3 at 1 & 3); thus, in signing the Construction Loan Agreement with Riverside, Harrington acknowledged submission of the Oyster Bay Agreement to Riverside.

Further, the Construction Loan Disbursement Agreement—signed by the

Harringtons, Riverside, and Oyster Bay—states in its first paragraph that "it is important that there be a clear understanding concerning responsibilities of the Lender, Borrower, and Builder and the relationship between all parties during and following the construction period." (Defs.' Ex. 4 at 6 (Bates DOC 001918)).  In that document, Harrington agreed that he would not "change the construction from the final plans and specifications unless same is agreed to in writing by Lender." (Id. at 7 (Bates DOC 001919)).  Again, specifications were contained within the Oyster Bay Agreement, which included the 5307 number in bold print.  An Oyster Bay representative expressly assented to the Construction Loan Agreement, (Defs.' Ex. 4 at 5), and signed the Construction Loan Disbursement Agreement as well, (id. at 8).  And Oyster Bay is listed at the seller on the settlement statement for the loan closing, which was signed by an Oyster Bay representative and by the Harringtons. (Defs.' Ex. 5 at 29).  These documents underscore the tripartite relationship among the Harringtons, Oyster Bay, and Riverside.

Further, although Harrington testified that he did not know how much contact the bank would have with the builder, he acknowledged that the Construction Loan Disbursement Agreement—to which Riverside, Oyster Bay, and the Harringtons were signatories—specifically provided that the Harringtons appointed Oyster Bay as their "agent to request and receive advances under [the] Method and Conditions of Disbursement of Loan Proceeds [section] of the Construction Loan Agreement between Borrower and Lender, for all requests with advances to be made by check payable to the Builder only, requiring only the Builder's signature." (Defs.' Ex. 4 at 6 (Bates DOC 001918) (emphasis removed)).  Thus, even if Oyster Bay provided the Oyster Bay Agreement to Riverside, Harrington had authorized Oyster Bay to act as his agent; providing the Oyster

Bay Agreement containing a draw schedule and building specifications is certainly within the scope of the grant of agency here.

In sum, the Court finds that Harrington knowingly assented to provision of the Oyster Bay Agreement to Riverside in 2003. In doing so, he provided prior express consent to be called on the 5307 number within that agreement in connection with the loan. Thus, Harrington's claim under the TCPA fails.

### Consent Provided During a November 29, 2010 Phone Call

Defendants alternatively argue that even if Harrington did not provide prior express consent in 2003 when he obtained the loan from Riverside, he provided RoundPoint with the 5307 number during a telephone call on November 29, 2010—six months outside the four-year statute-of-limitations period—thus barring the TCPA claim. The Court agrees with this alternative argument, which also supports granting Defendants' Rule 52(c) motion.

An entry in RoundPoint's records for November 29, 2010,[13] indicates "BRRW CALLED RQST STATS OF ACCT," meaning that the "borrower" called and requested the status of the account. (Defs.' Ex. 12 at 3 (entry for Nov. 29, 2010)). A RoundPoint representative, David Hughes, explained at trial that Harrington was the "borrower" on the loan and that Lori was "co-borrower." Thus, "BRRW CALLED" denoted that it was Harrington who called on November 29, 2010.

RoundPoint's records further reflect that as of November 24 and 29, 2010, RoundPoint did not have any phone numbers in its system for the Harringtons' loan. (See

---

[13] Although recordings of phone calls made to RoundPoint by Harrington on June 28, 2011, and by his daughter on June 2, 2011, were presented at trial, no recording of the November 29, 2010 call was presented. RoundPoint's senior Vice-President, David Hughes, testified at trial that there is no recording of the November 29, 2010 phone call.

Defs'. Ex. 16 at Bates RDPT-004499 & RDPT-004510).   But by November 30, 2010—the day after the call noted in the records—two phone numbers had been inputted into the system:  a home telephone number ending in 6864[14] as the primary number, and the 5307 number as a secondary number.  (Id. at Bates RDPT-004521).

Consistent with RoundPoint's naming system, records from a June 2, 2011 call purportedly made by Lori[15] reflect that "COBRRW CALLED."  (Defs.' Ex. 12 at 6 (entries for June 2, 2011)).  And after the 5307 number was undisputedly provided during the June 2, 2011 call as the only contact number,[16] RoundPoint's records were immediately updated to reflect no secondary number and the 5307 number as the primary number.  (Defs.' Ex. 16 at Bates RDPT-004532, 004544, & 004555).   Thus, RoundPoint's explanation of its naming of the borrower and co-borrower, and of its practice of updating contact numbers, is credible, coherent, and supported by the record.

Harrington claims that he does not recall making the November 29, 2010 call to RoundPoint.[17]  But he testified at trial that he did not keep records of phone calls with RoundPoint, and he did not deny the possibility that he called—he just cannot remember. And when he was asked whether he disputed that he called RoundPoint on November 29,

---

[14] This home number differs from the home number that appears along with the 5307 number on the Oyster Bay Agreement.  (See Defs.' Ex. 3 at 1 (reflecting home number ending in 1089)).

[15] A recording (Defs.' Ex. 27) and transcript (Defs.' Ex. 29) of the June 2, 2011 call were received in evidence.  The caller identified herself as Lori Harrington, but all agree that Lori was not the caller and instead the Harringtons' daughter, Jamie, called at Lori's request and pretended to be her mother.  For purposes of the instant discussion, the salient point is that when the caller identified herself as Lori on June 2, 2011, the RoundPoint representative described her in the records as "COBRRW," for co-borrower.

[16] (See Defs.' Ex. 27 (recording of June 2, 2011 call) & Defs.' Ex. 29 (transcript of recorded June 2, 2011 call)).

[17] Harrington maintained at trial that he only called RoundPoint once—on June 28, 2011.

2010, if RoundPoint, according to its records, indicated that the borrower was Harrington and that the borrower called, Harrington answered, "No, sir."

Harrington suggests that even if he called on November 29, 2010, it is possible that the 5307 number appeared on RoundPoint's caller ID and that that is how RoundPoint acquired the 5307 number. But that theory does not explain how RoundPoint also obtained Harrington's correct home number on that date, and Harrington's speculation on this point is rejected.

The Court finds from a preponderance of the evidence that Harrington called RoundPoint on November 29, 2010, and provided the 5307 number to RoundPoint, thereby consenting to be called on that number. Harrington's TCPA claim thus fails based on his provision of express consent by at least November 29, 2010.

### Consent Provided During a June 2, 2011 Phone Call

Next, Defendants argue that even if Harrington did not give prior express consent either when he obtained the loan in 2003 or during the November 29, 2010 phone call, such consent was provided on June 2, 2011, when his daughter called RoundPoint and provided the 5307 number as the only contact number. The Court agrees, and the giving of consent on June 2, 2011, provides yet another basis for granting Defendants' Rule 52(c) motion.

It is undisputed that on June 2, 2011, the Harringtons' adult daughter, Jamie, who lived with them at that time, called RoundPoint at the direction of Lori, who was ill with cancer. A recording of the June 2 phone call was played during the trial, and a transcript of the call was admitted into evidence. (See Defs.' Exs. 27 (recording) & 29 (transcript)). Jamie identified herself as Lori during that call, and when asked for information by the

RoundPoint representative, Jamie provided, without hesitation:  the loan number; the last four digits of Harrington's and Lori's social security numbers; and the property address. (Defs.' Ex. 29 at 2–3; Defs.' Ex. 27).   When asked for "the phone number [she] can be reached at," Jamie provided the 5307 number.  (Defs.' Ex. 29 at 3).   When asked whether the 5307 number was the primary number, Jamie replied, "Yes."  (Id.).  And when asked whether there were any alternate numbers, Jamie responded, "No.  That's the main number."  (Id. at 3–4).  Jamie then asked for information about insurance on the house. (Id. at 4).  As earlier noted, after Jamie made that phone call, RoundPoint's records were updated to denote the 5307 number as the primary rather than the secondary contact number for the loan, and thereafter no secondary number appeared in RoundPoint's records.  (See Defs.' Ex. 16 at Bates RDPT-004532, RDPT-004544, & RDPT-004555).

Lori died a few months before trial,[18] but her deposition was admitted into evidence and portions of it were read during the trial.  (Pl.'s Ex. 45; Defs.' Ex. 40).  Lori testified that Harrington handled their personal financial matters and their joint obligations "[m]ost of the time," but she dealt with their joint obligations "[w]hen [she] ha[d] to."  (Lori Dep. at 8).  On June 2, 2011, she had a question about insurance on the property, and without discussing it with Harrington first, she asked Jamie to call RoundPoint.  (Id. at 9).

---

[18] Trial was set to begin on July 10, 2017, in Orlando, but at a June 29, 2017 pretrial conference Harrington advised that Lori was extremely ill and that it would be a hardship for him to travel from Ft. Myers to Orlando for trial.  (Mins., Doc. 169).  And during a July 3 telephone conference, Harrington advised that Lori could not travel to Orlando for trial and would be unable to testify at trial whether it was held in Orlando or Ft. Myers.  (Mins., Doc. 172).  Harrington asked that the trial be held in Ft. Myers on July 10, but Defendants moved for a continuance based on the unavailability of Lori.  (Id.; Order, Doc. 171).  The Court granted the motion and asked that the parties file a status report by July 17.  (Doc. 171). On July 14, Harrington filed a status report advising that Lori died on July 11.  (Status Report, Doc. 173).  The trial was ultimately held on October 4, 2017.  (Mins., Doc. 189).

Lori explained that she asked Jamie to make the call because she was not feeling well. (Id. at 10). She told Jamie to ask RoundPoint why the check for the insurance had been sent back. (Id.). It was usual for Jamie to help Lori with personal obligations if requested. (Id. at 10–11). Lori claimed that Jamie had her and Harrington's social security numbers from working in bookkeeping at the family business, Aced Interiors. (Id. at 12 & 15). Lori denied that Jamie had authority to give her social security number to RoundPoint when she called about the insurance. (Id. at 14). Lori did not know why Jamie pretended to be her when she made the call, (id. at 23–24), or why Jamie gave out the 5307 number to RoundPoint, (id. at 24 & 38).

Jamie testified at trial that Harrington did not ever give her express permission to give out his cell phone number to RoundPoint and that Lori did not tell her to give his cell phone number to RoundPoint. Jamie explained that when she worked in payroll at Aced Interiors, she had access to her parents' social security numbers and that allowed her to memorize them. Jamie stopped doing payroll work for Aced Interiors in 2007—four years before this phone call.

Jamie explained that Lori did not ask her to imitate Lori; Lori just asked her to call about the insurance policy. When asked at trial whether she believed it was a misrepresentation for her to tell the representative that she was Lori, Jamie responded, "I guess so, yes." According to Jamie, when Lori asked Jamie to call, Lori showed her a piece of paper with only a phone number and probably the account number on it.

For his part, Harrington equivocated at trial regarding what authority Lori had with regard to dealing with the loan account and giving out his cell phone number. On direct examination, he testified that he never gave Lori permission to give his cell phone number

to RoundPoint and did not recall giving her permission to give his cell phone number to anyone.  But on cross-examination, Harrington admitted that for their joint debts—such as the mortgage loan—Lori was authorized to speak on his behalf with creditors and that "she was authorized to do whatever needed to be done."  Further, Harrington acknowledged that he had given Lori his personal information so that she could speak with their creditors.

Harrington also testified that Lori used the 5307 number from time to time and that she did not need his permission to use that phone, nor did she need his permission to tell people to call her on the 5307 number.  And when Harrington learned that Jamie had called about the insurance, he was not upset that she had done so, though he claimed that he did not learn until this litigation that Jamie had pretended to be her mother and given RoundPoint his cell phone number during that phone call.

Prior express consent under the TCPA refers to consent of the "called party," which means the current subscriber of the cell phone number.  Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1251 (11th Cir. 2014).  But the subscriber—here, Harrington—may authorize another adult to provide the requisite consent, id. at 1252–54, and that is what occurred here.  Based on the trial testimony, the Court finds that Lori had actual authority to call RoundPoint on behalf of herself and Harrington and to provide express consent to RoundPoint to call the 5307 number regarding the debt.  And based on Harrington's broad grant of authority to Lori, Lori also had the authority to enlist Jamie's assistance and to have Jamie call RoundPoint on her and Harrington's behalf and provide whatever information RoundPoint requested.  Thus, when Jamie called RoundPoint at Lori's behest, Jamie had actual authority to act on behalf of both Lori and Harrington, including authority to provide consent for the 5307 number to be called by RoundPoint.

Again, Harrington testified that Lori "was authorized to do whatever needed to be done." This grant of authority implied "the authority to do acts that are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." 2 Fla. Jur. 2d Agency & Employment § 47 (2005), cited in Bd. of Trs. of the City of Delray Beach Police & Firefighters Retirement Sys. v. Citigroup Global Markets Inc., 622 F.3d 1335, 1342–43 (11th Cir. 2010). Here, acts "reasonably necessary to accomplish" dealing with the loan included enlisting Jamie's assistance to call RoundPoint, and—despite denials from Lori and Jamie regarding what Jamie was authorized to do—the Court finds that Jamie was authorized to do what was necessary regarding Lori and Harrington's joint debt.[19] See, e.g., McCabe v. Howard, 281 So. 2d 362, 363 (Fla. 2d DCA 1973) (noting that the factfinder "is entitled to infer the existence of an agency on the part of an alleged principal and agent even where both deny the existence of such an agency"); accord Cleveland Compania Maritima, S.A. Panama v. Logothetis, 378 So. 2d 1336, 1338 (Fla. 2d DCA 1980) ("The factfinder may find agency on circumstantial evidence, and may do so even when both principal and agent deny the relationship."). When Jamie called RoundPoint and provided Harrington's cell phone number as a contact number, she provided—as an authorized agent—Harrington's consent for Riverside to call the 5307 number regarding the debt.

Thus, the Court finds that by June 2, 2011, RoundPoint had obtained Harrington's

---

[19] Both the facts and the posture of the case at bar distinguish it from Osorio, on which Harrington heavily relies. There, both the debtor who gave out her housemate's cell phone number and the housemate testified in their depositions that they had never given each other authority to consent to phone calls from third parties. 746 F.3d at 1253–54. And there, in reversing a grant of summary judgment, the court found that there was a genuine dispute of material fact as to whether the debtor acted as the housemate's agent when she provided his cell phone number. Id. In the case at bar, the Court, as the finder of fact in a bench trial, finds that Jamie acted as Lori and Harrington's authorized agent with regard to the loan and the 5307 number.

consent to call the 5307 number regarding the debt.  Because Harrington did not establish by a preponderance of the evidence that Defendants made any calls to the 5307 number between May 28, 2011 (the beginning of the statute of limitations period) and June 2, 2011, his TCPA claim fails based on prior express consent.[20]

### Conclusion as to TCPA Claim

In sum, the Court finds from a preponderance of the evidence presented at trial that on three occasions, Harrington made the 5307 number available regarding the debt, thus providing his prior express consent to be called on that number regarding the mortgage loan.  Consent was provided during the 2003 loan transaction and during phone calls to RoundPoint on November 29, 2010, and June 2, 2011.  Defendants are entitled to judgment under Rule 52(c) based on each of these provisions of consent.[21]

###### 2.   FCCPA Claim (Count II) (against RoundPoint only)

In his second claim, Harrington contends that RoundPoint's repeated phone calls violated the FCCPA, which provides that "[i]n collecting consumer debts, no person shall . . . [w]illfully communicate with the debtor or any member of her or his family with such frequency as can reasonably be expected to harass the debtor or her or his family, or willfully engage in other conduct which can reasonably be expected to abuse or harass the

---

[20] There is evidence of one phone call on May 28, 2011, and the next call was not until June 7, 2011. (See Pl.'s Ex. 30 at 3; Defs.' Ex. 51 at 1). Harrington's exhibit listing the calls made by RoundPoint does not indicate what number was called on May 28, 2011. (See Pl.'s Ex. 30 at 3). Defendants' exhibit, however, lists the numbers for each call and indicates that the call on May 28, 2011, was to the 6864 home phone number, not the 5307 number. (Defs.' Ex. 51 at 1). The Court credits Defendants' evidence on this point and finds that no call was made to the 5307 number between the start of the TCPA limitations period and June 2, 2011.

[21] Because Defendants prevail on their Rule 52(c) motion on Count I based on the Court's findings of prior express consent, the Court need not reach the issues (1) whether there is a basis for Multibank to be held liable for RoundPoint's phone calls and (2) whether the calls were made using an automatic telephone dialing system.

debtor or any member of her or his family." § 559.72(7), Fla. Stat.  At trial, Harrington did

not establish by a preponderance of the evidence that RoundPoint's conduct violated this

provision.  Accordingly, the Rule 52(c) motion is granted as to Count II.

An action under the FCCPA "must be commenced within 2 years after the date the

alleged violation occurred." § 559.77(4), Fla. Stat.  Harrington filed this suit on May 28,

2015, (Compl., Doc. 1), and thus only calls made on or after May 28, 2013, are actionable

here.  And because it is undisputed that RoundPoint did not make any calls after May 5,

2014, the relevant period during which calls were made is May 28, 2013, through May 5,

2014—less than one year.

In arguing that RoundPoint violated section 559.72(7), Harrington relies largely on

the number of calls made during the period at issue—262 or 263,[22] an average of about

23 calls per month.  Florida courts have declined to quantify a standard for "[h]ow frequent

. . . communication [must] be to constitute harassment." Story v. J.M. Fields, Inc., 343 So.

2d 675, 676 (Fla. 1st DCA 1977).  The Story court held that "the effect of repeated

telephone calls is colored by their tone and purpose," and in gauging a claim a factfinder

must consider "not only the frequency of the calls but also the legitimacy of the creditor's

claim, the plausibility of the debtor's excuse, the sensitivity or abrasiveness of the

personalities and all other circumstances that color the transaction." Id. at 676–77.  Other

courts have noted that "[w]hether there is actionable harassment or annoyance turns not

only on the volume of calls made, but also on the pattern of calls." Joseph v. J.J. Mac

---

[22] The parties' assessments of how many calls were made differ by only one.  (See Pl.'s Ex. 30; Defs.' Ex. 51).

Intyre Cos., 238 F. Supp. 2d 1158, 1168 (N.D. Cal. 2002)[23]; accord Brandt v. I.C. Sys., Inc., No. 8:09-cv-126-T-26MAP, 2010 WL 582051, at *2 (M.D. Fla. Feb. 19, 2010). Another factor that courts have considered is whether the calls "were accompanied by oppressive conduct." Pugliese v. Prof'l Recovery Serv., Inc., No. 09-12262, 2010 WL 2632562, at *9 (E.D. Mich. June 29, 2010).

Here, there is no dispute as to the legitimacy of the debt, and there is no evidence of any abrasiveness by RoundPoint's calling representatives. Of course, in this case there were no telephone conversations resulting from any calls RoundPoint made because Harrington only answered one call and on that occasion he hung up without speaking. The only recording of a conversation between Harrington and RoundPoint presented at trial was of a June 28, 2011 call initiated by Harrington. The RoundPoint representative who answered was polite and responsive, and the representative who answered the June 2, 2011 call from Harrington's daughter, Jamie, was equally professional. Indeed, Harrington acknowledged in his trial testimony that the RoundPoint representatives were polite and "quite pleasant." Similarly, on the occasions when RoundPoint left messages, the messages were requests for return calls; Harrington presented no evidence that any message included rude, threatening, or offensive language.

In opposing RoundPoint's Rule 52(c) motion on this claim, Harrington argued that the frequency of calls was "overwhelming" and that there was "more than just the frequency." Specifically, Harrington argued that RoundPoint: sometimes called back within two or three hours of a prior call; sometimes left a message and then called back

---

[23] Joseph is a federal Fair Debt Collection Practices Act (FDCPA) case rather than an FCCPA case, but it and other FDCPA cases are instructive on FCCPA claims of harassment.

the same day or the next day; and continued to call even after telling Harrington during the June 28, 2011 call initiated by Harrington that RoundPoint would not accept any more payments because the loan was in foreclosure.[24]   However, the Court does not find that any of this conduct, even considered along with the number of calls, elevates RoundPoint's conduct to actionable harassment.

RoundPoint did frequently call Harrington more than once in a single day. (See Pl.'s Ex. 30; Defs.' Ex. 51).  For the most part, however, multiple calls were not made in rapid succession but instead were spaced throughout the day. (See Pl.'s Ex. 30; Defs.' Ex. 51). And while RoundPoint sometimes called back within two or three hours of a prior call, the Court does not find such occasional conduct harassing, especially where no calls were ever answered.  On twenty-two occasions, RoundPoint did leave a message and then call back the same day—caller conduct that has been looked upon with disfavor by courts. See, e.g., Tucker v. CBE Grp., Inc., 710 F. Supp. 2d 1301, 1305 (M.D. Fla. 2010) (noting in caller's favor that caller "did not call back the same day after leaving a message").  But RoundPoint's representative, David Hughes, testified that such a calling pattern was part of RoundPoint's strategy to try to reach debtors.  Hughes explained that "every now and then" RoundPoint would try to leave a message in the morning and then run a "predictive pass" with the computer dialer in the afternoon, with instructions to the representatives not to leave a second message if the later call was answered.  This testimony is consistent

---

[24] Harrington also suggested in his Trial Brief (though not during trial in response to the Rule 52(c) motion) that RoundPoint's harassing conduct included calling members of his family. (Doc. 166 at 36).  However, even if this point had been preserved, the testimony regarding calls to family members was vague as to both time and frequency, and Harrington did not establish that any such calls were made within the two-year FCCPA statute of limitations.

with the call records; on all but two[25] of the twenty-two days on which a call was made after a message had been left, a predictive pass by the dialer was made following the message, and a second message was not left. The Court does not find that RoundPoint's calling strategy as explained by Hughes is *per se* impermissible or harassing, and again, considering that no calls were ever answered, the repeated calling and leaving of messages does not rise to the level of a section 559.72(7) violation under the circumstances of this case.

Finally, the Court rejects Harrington's contention that RoundPoint's continued calls after the loan had been referred to a foreclosure attorney evidence harassment. Communications may be considered "harassing in their frequency . . . when they continue after all . . . information [regarding resolving the debt] has been communicated and reasonable efforts at persuasion and negotiation have failed"; at that point, the creditor must cease calling, because continued communications serve only to "exhaust the resisting debtor's will." Story, 343 So. 2d at 677. However, the circumstances of this case do not fit within this vein of harassment.

Harrington called RoundPoint on June 28, 2011, to ask why some loan payments had been sent back. (See Transcript of June 28, 2011 call, Defs.' Ex. 30). During that call, RoundPoint told Harrington that the account was "active in foreclosure"; informed him that RoundPoint would not be accepting any more payments; and gave Harrington contact information for the attorney handling the foreclosure. (Id. at 4–7). But the RoundPoint

---

[25] According to the call records submitted by both sides, on June 13, 2013, and September 27, 2013, a representative—rather than the dialer—made another call after a message had been left earlier that day. (See Pl.'s Ex. 30 at 9 & 10; Defs.' Ex. 51 at 15 & 20).

representative also told Harrington during that call that although no further payments would be accepted, RoundPoint "can work with" him and could "send . . . out [a] workup package to try to work a modification with" him. (<u>Id.</u> at 5).

RoundPoint's representative, David Hughes, credibly testified at trial that even after a loan has gone into foreclosure, it is RoundPoint's practice to continue to make outreach attempts with the mortgagor to try to get the loan into a current state. Hughes explained that the purpose of RoundPoint's calls during the period at issue here was to try to work out the loan and enter into a loan modification. The trial evidence does not support a finding that continued calls to Harrington were made only to exhaust his will. There was no will to exhaust regarding payments because further payments were not being accepted. Harrington never answered a call or responded to a message to signal to RoundPoint that he was not interested in modifying the mortgage or that he wanted RoundPoint to stop calling. Until Harrington's second attorney told RoundPoint in May 2014 to contact him rather than Harrington, RoundPoint could not have determined that additional calls would be futile. And once RoundPoint was asked to stop calling Harrington, the calls immediately ceased.

In sum, Harrington failed to establish by a preponderance of evidence at trial that RoundPoint's calls from May 28, 2013, to May 5, 2014, were abusive or harassing under section 559.72(7), Florida Statutes. Accordingly, RoundPoint is entitled to judgment under Rule 52(c) on Count II.

## III.   Conclusion

For the foregoing reasons, Defendants' ore tenus Rule 52(c) motion for judgment on partial findings was granted at trial. It is **ORDERED** that the Clerk shall enter a judgment providing that Plaintiff, Larry Harrington, takes nothing on any of his claims against

Defendants Multibank 2010-1 SFR Venture, LLC and RoundPoint Mortgage Servicing Corporation.  Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida, on November 30, 2017.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record